# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION, CANTON

| | |
|---|---|
| In re: ) | |
| ) | Case Nos. 10-61078 and 10-61081 |
| BUCYRUS COMMUNITY HOSPITAL, INC., ) | (Jointly Administered under |
| et. al.,[1] ) | Case No. 10-61078) |
| ) | |
| Debtors. ) | Chapter 11 |
| ) | |
| ) | Judge Russ Kendig |

**AFFIDAVIT AND STATEMENT OF GLEN A. McMURRAY, DDS IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

STATE OF OHIO )
 ) SS:
COUNTY OF CRAWFORD )

I, Glen A. McMurray, under penalty of perjury, hereby declares as follows:

I am the Chairperson of the Board of Directors of Bucyrus Community Hospital, Inc. ("BCH") and Bucyrus Community Physicians, Inc. ("BCP" and, together with BCH, the "Debtors" or "Bucyrus") and have held such position since January 24, 2008  I am familiar with the business, operating history and affairs of Bucyrus.  BCH and BCP are chapter 11 debtors and debtors-in-possession in the above-captioned chapter 11 cases.

I submit this affidavit (the "Affidavit") in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code §§ 101-1532 (the "Bankruptcy Code"), filed concurrently herewith, and other relief, in the form of motions and applications, that the Debtors have requested of this Court (the "First Day Motions and Applications").  I believe that the relief sought in each of the First Day Motions and Applications:  (a) is necessary to enable

---

[1] The Debtors include:  Bucyrus Community Hospital, Inc. (Employer Tax I.D. No. 34-4468311) and Bucyrus Community Physicians, Inc. (Employer Tax I.D. No. 20-0232621).

{2082556:}
2103718

the Debtors to operate in chapter 11 with minimum disruption to their operations; (b) is necessary to protect the Debtors' estates from loss of value; (c) constitutes a critical element in achieving a successful reorganization of the Debtors; and (d) best serves the Debtors' estates and their creditors' interests.

All of the facts set forth in this Affidavit and Statement are based on my personal knowledge, upon information supplied to me by others at the Debtors' businesses, upon my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

This Affidavit describes the businesses of the Debtors and the circumstances surrounding the commencement of the Debtors' chapter 11 cases.

## I. Background

### A. The Chapter 11 Filing

1. On March 19, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### B. Corporate Information

2. Founded in 1931, Debtor BCH is an independent, not-for-profit entity with the tax exempt status in accordance with Section 501(c)(3) of the Internal Revenue Code. BCH has no sponsor or parent organization, and is governed by a self-nominating, twelve-member board of directors (the "Board"). Debtor Bucyrus Community Physicians, Inc. ("BCP") was formed in 2006 as a wholly owned, for-profit subsidiary of BCH, and is similarly governed by the Board.

C.  **General Operations and History**

3. BCH is a 25-bed Critical Access Hospital ("CAH") located in Bucyrus, Ohio, a community approximately 65 miles north of Columbus, Ohio. BCH provides a broad spectrum of acute care services including, but not limited to: (a) surgery and recovery; (b) oncology; (c) cardiac and pulmonary rehabilitation; (d) occupational health and therapy; (e) imaging; and (f) an intensive care unit. BCH has been the primary acute care center for Bucyrus since its founding in 1931. Although it has previously been affiliated with or managed by regional health systems such as Ohio State and/or OhioHealth, BCH has operated independently since 1999. In 2003, BCH received its designation as a CAH from the Ohio Department of Health, in accordance with the Ohio medical Rural Hospital Flexibility Program.

4. In addition to the CAH located at 629 N. Sandusky Avenue, Bucyrus, Ohio, BCH owns the property located at 120 W. Main Street, New Washington, Ohio 44854. The majority of this space is currently occupied by a physician employed with BCP for the operation of an ancillary medical practice. BCH also leases property at the following locations, for the following purposes:

   a. <u>416 E Mansfield Street, Bucyrus, Ohio 44820</u>: Operates as a storage warehouse for BCH.

   b. <u>959 Hopley Avenue, Bucyrus, Ohio 44820</u>: BCH operates an occupational and physical therapy practice at this location.

   c. <u>140 Hill Street, Suite A, Bucyrus, Ohio 44820</u>: This location operates as an additional physician office, but is currently empty.

   d. <u>140 Hill Street, Suite B, Bucyrus, Ohio 44820</u>: This location operates as an additional physician office, and is currently occupied by a physician employed with BCP.

   e. <u>140 Hill Street, Suite C, Bucyrus, Ohio 44820</u>: This location operates as an additional physician office, and is currently occupied by a physician employed with BCP.

   f. <u>725 N. Sandusky Avenue, Bucyrus, Ohio 44820</u>: This location is occupied by both a cardiologist and an obstetrician/gynecologist, neither of whom are employed by BCP.

      g.      <u>130 Hill Street, Bucyrus, Ohio 44820</u>: This location operates as an additional physician office, and is currently occupied by a physician employed with BCP.

      h.      <u>124 Hill Street, Bucyrus, Ohio 44820</u>: This location operates as an additional physician office, and is currently vacant.

      i.      <u>512 Hill Street, Bucyrus, Ohio 44820</u>: This location operates as an additional physician office, and is currently occupied by a physician employed with BCP.

      j.      <u>139 Gaius Street, Bucyrus, Ohio 44820</u>: This location operates as an additional physician office, and is currently occupied by a physician, a nurse practitioner, and an assistant employed by BCP.

      k.      <u>61 S. Marion Street, Bloomville, Ohio 44818</u>: This location operates as an additional physician office, and is currently vacant.

5. BCP, as a subsidiary of BCH, operates primarily to facilitate physician recruitment and in order to operate the associated clinics and medical practices in and around the Bucyrus community, as described above.

6. BCH's primary service area consists of the City of Bucyrus, zip code 44820, (the "Primary Service Area") accounting for more than 84% of BCH's Medicare admissions in 2008. BCH's secondary service area consists of the community of New Washington, a village of more than 1,000 individuals located approximately 12 miles north of the city of Bucyrus (the "Secondary Service Area"). For the year ended December 31, 2009, the payor mix at BCH, based on revenue, was as follows: 51.2% Medicare, 30.5% managed care plans, 12.2% Medicaid and 6.1% self-pay patients.

**D.    Prepetition Debt Structure**

*(1)    The HUD Facility*

7. On or about July 21, 2005, BCH executed that certain Building Loan Agreement (the "Building Loan") between BCH and Lancaster Pollard Mortgage Company ("Lancaster Pollard") in the original principal amount of $25,945,000 to aid BCH in the construction of HUD Project No. 042-13003. The Building Loan was and is insured by the U.S. Department of

Housing and Urban Development ("HUD"), pursuant to the Section 242 Mortgage Insurance Program for hospitals (the "HUD Insurance").

8. In accordance with the terms of the financing documents, the Building Loan bears interest at a rate of 5.9% per annum, and is evidence by a note (the "Mortgage Note") and secured by a non-recourse Mortgage Deed dated as of July 20, 2005, but made effective as of July 21, 2005 (the "Mortgage"[2]). As a condition to the consummation of the Building Loan, BCH also executed that certain Security Agreement dated as of July 21, 2005, naming Lancaster Pollard as a secured party, and naming HUD as an additional secured party (the "Security Agreement"). Upon information and belief, and in accordance with the Security Agreement and Mortgage, BCH granted Lancaster Pollard and HUD a security interest in substantially all of the assets of BCH, including but not limited to real estate, equipment, inventory, general intangibles, revenue, accounts receivable, and unrestricted cash.

9. In September of 2007, Lancaster Pollard made a supplemental loan of approximately $1,000,000 (the "Supplemental Loan") to BCH. The Supplemental Loan was evidenced by a Supplemental Mortgage Note (the "Supplemental Note") in favor of Lancaster Pollard, naming HUD as an additional secured party, and secured by a Supplemental Mortgage (the "Supplemental Mortgage"[3]). As a condition to the consummation of the Supplemental Loan, BCH executed the First Amendment to Security Agreement, dated as of September 27, 2007 (the "First Amendment") reaffirming the security interests granted in the Security Agreement, the Mortgage and the Supplemental Mortgage.

10. In accordance with the terms of the HUD Facility, the Debtors are required to make monthly principal and interest payments on the Mortgage Note in the amount of $171,964

---

[2] The Building Loan, Mortgage Note and Mortgage, collectively, the "Building Loan".
[3] The Supplemental Loan, Supplemental Note and Supplemental Mortgage, collectively, the "Supplemental Loan". The Supplemental Loan, together with the Building Loan, collectively, the "HUD Facility".

through the Mortgage Note's maturity on August 1, 2032. BCH is additionally required to make monthly escrow payments for insurance, taxes and a .50% annual mortgage insurance fee payable to HUD. These escrow payments are approximately $37,297 per month. Due to BCH's and BCP's current financial difficulties, a $31,125 monthly mortgage reserve deposit otherwise required by the HUD Facility has been temporarily suspended. The current principal balance with respect to the HUD Facility is approximately $25,897,393, plus accrued interest in the amount of $381,327.

*(2) The United Facilities[4]*

11. In addition to the HUD Facility, BCH also has two separate financing arrangements with United Bank, Division of the Park National Bank ("United"). On February 26, 2008, BCH executed a Promissory Note (the "Term Note") to secure a term note facility in the original principal amount of $250,000 (the "Term Loan"). The Term Loan had an original interest rate of approximately 7.5%, and a maturity date of August 26, 2008. In conjunction with the execution of the Term Note, BCH executed a Commercial Security Agreement (the "Term CSA") purporting to grant United a security interest in chattel paper and accounts of BCH.

12. BCH and United subsequently executed that certain Change in Terms Agreement (the "Term Modification"[5]) on or about December 31, 2008 extending the maturity date of the Term Note to December 31, 2009, reflecting a new principal amount of $248,706.26, and an interest rate of 6.5%. The current balance of the Term Facility is approximately $24,000, plus interest.

13. In addition to the Term Facility, on or about June 30, 2008, BCH executed a separate Promissory Note (the "Line Note") to secure a line of credit in the original principal

---

[4] The Term Facility and the Line Facility, as defined herein, collectively, the "United Facilities".
[5] The Term Note, the Term Loan, the Term CSA and the Term Modification, collectively the "Term Facility".

amount of $500,000 (the "Line of Credit"). The Line of Credit had an original interest rate of approximately 6.5%, and a maturity date of June 30, 2009. In conjunction with the execution of the Line Note, BCH executed a Commercial Security Agreement (the "Line CSA") purporting to grant United a security interest in all inventory, chattel paper, accounts, equipment and general intangibles of BCH.

14. BCH and United subsequently executed that certain Loan No. 40111979 Amendment (the "Line Amendment") on or about July 6, 2009, extending the maturity date of the Line Note to August 31, 2009 and reflecting a new floor interest rate of approximately 6.0%, effective as of July 1, 2009. On or about August 31, 2009, BCH and United superseded and replaced the Line Note, as amended by the Line Amendment, by executing a supplemental Promissory Note (the "Supplemental Line Note")[6], renewing the Line of Credit through a maturity date of December 20, 2009. The current balance of the Line Facility is approximately $500,000 plus interest.

*(3) The First Federal Facilities*

15. On or about July 27, 2006, BCP (formerly known as the d/b/a Maple Creek Medical, Inc.) executed a loan agreement with First Federal Community Bank ("FFCB") in the original principal amount of $57,475 (the "Equipment Loan"), with a maturity date of July 25, 2011 and a fixed interest rate of approximately 8.0% per annum. The balance on the Equipment Loan is approximately $17,072. In accordance with the terms of this agreement, FFCB purports to take a security interest described as a "UCC on all assets of the medical practice." While the Debtors do not believe that this description is sufficient to grant a security interest in accordance

---

[6] The Line Note, the Line CSA, the Line Amendment and the Supplemental Line Note, collectively, the "Line Facility".

with the Uniform Commercial Code, out of an abundance of caution, the Debtors describe the Equipment Loan as a financing arrangement in this Affidavit.

16. On or about September 29, 2006, BCP executed a loan agreement with FFCB in the original principal amount of $75,000 (the "Acquisition Loan"), with a maturity date of September 29, 2011 and a fixed interest rate of 8.0% per annum. The balance of the Acquisition Loan is approximately $27,117. In accordance with the terms of this agreement, FFCB purports to take a security interest described as "assets of medical practice." While the Debtors do not believe that this description is sufficient to grant a security interest in accordance with the Uniform Commercial Code, out of an abundance of caution, the Debtors describe the Acquisition Loan as a financing arrangement in this Affidavit.

17. On or about October 13, 2006, BCP executed a loan agreement with FFCB in the original principal amount of $100,500 (the "Second Acquisition Loan"), with a maturity date of October 11, 2011 and a fixed interest rate of approximately 8.0% per annum. The balance of the Second Acquisition Loan is approximately $38,024. In accordance with the terms of this agreement, FFCB purports to take a security interest described as "assets of medical practice formerly known as Internal and Family Medicine of Bucyrus." While the Debtors do not believe that this description is sufficient to grant a security interest in accordance with the Uniform Commercial Code, out of an abundance of caution, the Debtors describe the Second Acquisition Loan as a financing arrangement in this Affidavit.

E. **Events Leading to Chapter 11**

18. In 2004, BCH proposed a master plan to modernize and expand its facilities (the "Modernization Plan"). The Modernization Plan proposed additions to existing facilities totaling nearly 60,000 square feet, enabling BCH to move, expand and renovate nearly all major departments.

19. The Modernization Plan was funded with the Building Loan, as enhanced by the HUD Insurance. Unforeseen challenges associated with the large scope of the renovations, however, resulted in significant construction delays and cost overruns. As a result, the Modernization Plan required an increase in the insured amount of the Building Loan and HUD Insurance in the amount of $1 million to complete the project. While various of the BCH departments resumed operations at various points throughout 2007, the final "ribbon-cutting" did not occur until October of 2007 — nearly six months behind schedule.

20. In accordance with the terms of the HUD Facility, BCH was required to pay immediately, out-of-pocket, for any overages and unexpected costs in the building project. These overages totaled, by the completion of construction, well over $1 million.

21. While BCH reported an 18% increase in operating revenue for the period of 2006 through 2008, the transfer of physician contracts from BCH to BCP resulted in a significant growth in expenses of BCP, which BCP was unable to cover solely from the revenues of BCP. Ultimately, the BCP's expense growth has resulted in more than $6 million in financial support provided by BCH to BCP since 2006, significantly depleting BCH's cash resources. Despite efforts to streamline operations between BCH and BCP, BCH reported a decline in operating revenue in 2009, ending the year at approximately 6.12% below 2008 levels. BCP experienced a similar level of revenue growth during the periods between 2006 and 2008, and a similar decline in yearly revenues for 2009.

22. As of December 2009, Crawford County posted a nearly 14% unemployment rate, nearly four percent higher than the 10% unemployment rate of the State of Ohio[7]. This has resulted in a decline in managed care revenues for the first two months of 2010, coupled with an increase in self-pay revenue. Self-pay revenue has already increased to 8.0% for 2010 to date,

---

[7] According to the Ohio Department of Jobs and Family Services.

up from the 5.2% experienced during the first two months of 2009. The Debtors expect the increasing self-pay and decreasing managed care revenue trend to continue, as unemployed members of the Bucyrus community and BCH's Primary and Secondary Markets continue to experience expiration of any extended medical benefits. The expiration of extended benefits is expected to produce significant demands by self-pay patients on BCH's emergency room services, as more and more unemployed community members lacking medical benefits postpone or ignore preventive care, seeking treatment only when such community member's medical condition necessitates emergency-level intervention.

23. In response to its large operating loss in 2008 and the results of a "going concern" opinion from BCH's independent auditors, BCH implemented a number of cost cutting measures during early 2009. These initiatives led BCH to report an early $2 million loss for fiscal year 2009[8]. While 2009 represented an approximately $2 million improvement over 2008 results, management was unable to further reduce expenses in a manner sufficient to generate positive cash flow from operations. Without sufficient operating cash flow to meet its long-term debt and capital lease obligations, BCH drew down cash reserves and began defaulting on payments to various suppliers and vendors.

24. In addition to supplier and vendor defaults, Bucyrus has not been able to meet its long-term debt and capital lease obligations. BCH has defaulted on the HUD Facility, making only a partial payment in December of 2009 and no payment for January, February or March of 2010. The total amount due and owing on the HUD Facility is now more than $1 million. BCH has also been unable to fulfill its commitment to United on the Line of Credit, which currently posts a balance equal to more than the original principal amount.

---

[8] In accordance with the Unaudited Financial Statements for the year 2009.

25.	In a further effort to reinvigorate the operations of BCH and BCP, BCH engaged QHR Consulting Services ("QHR") to perform a "Financial Assessment Review" (the "FAR") in November of 2009. The FAR was delivered to the Board in December of 2009. Acting on information contained in the FAR, the Board replaced the then - chief executive officer and the then - chief financial officer with interim leadership provided by QHR. The QHR consulting team took over BCH's operations on January 6, 2010. The report identified a number of items contributing to BCH and BCP's financial difficulties, including inadequate insurance contracts, billing services and physician practice oversight. In addition, the report identified a number of underutilized services, as well as market share opportunities.

26.	Since QHR began assisting with operations in early January, 2010, Bucyrus has begun implementation of several initiatives in an effort to reconfigure the businesses and return to profitability. These initiatives include: (i) restructuring physician and nursing services; (ii) improving various relationships to maximize efficiency; and (iii) restructuring and reassigning costs to more accurately assess the efficiencies within the system. Additionally, several changes in the surrounding community medical structure should help alleviate the burden upon BCH to provide certain non-emergency services to community members who have, to-date, been without many other critical care options. Such changes include the return of a diagnostic cardiologist, alleviating unnecessary transfers to the BCH emergency room for chest pain complaints, and the opening of a new wound care center in February.

27.	Implementation of cost-savings initiatives are still in their infancy, and, accordingly, have not had an opportunity to significantly impact the cash position of Bucyrus to the positive. Bucyrus is still in recovery from the cash drain caused by the massive construction overages experienced in 2007 and 2008 as BCH pushed to complete the Modernization Plan, as well as the more than $6 million in financial support provided from BCH to BCP since 2006.

Coupled with the experienced and expected increases in fixed-payor revenues, such as Medicare and Medicaid, and the experienced and expected increases in self-payor patient revenues, the cash reserves of Bucyrus are ultimately not sufficient to continue operations for any significant period of time outside the protections of a chapter 11 bankruptcy.

**F.     Support of First Day Motions**

12.     Concurrently with the filing of these chapter 11 cases, the Debtors have filed a number of First Day Motions and Applications. I have reviewed each of these First Day Motions and Applications (including the Exhibits attached thereto) and I believe that the relief sought in each of these First Day Motions and Applications is necessary to enable the Debtors to operate in chapter 11 with a minimum of disruption or loss of revenue.

## II.     Notice

13.     No trustee, examiner or official committee has been appointed in these chapter 11 cases. Notice of this Affidavit has been served on the following parties or, in lieu thereof, to their counsel, if known: (i) the United States Trustee for the Northern District of Ohio; (ii) those creditors listed on each Debtor's List of Creditors Holding 20 Largest Unsecured Claims; (iii) United Bank, Division of the Park National Bank; (iv) Lancaster Pollard Mortgage Company; (v) the Secretary of Housing and Urban Development; (vi) First Federal Community Bank; and (vii) the District Director of Internal Revenue. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice need be given.

## III.     Conclusion

For the forgoing reasons, I respectfully submit that the relief sought in the First Day Motions and Applications is necessary and appropriate, and request that the Court grant the requested relief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

March 19, 2010

_____
Glen A. McMurray
**Chairman of the Board of Directors,
Bucyrus Community Hospital, Inc. and
Bucyrus Community Physicians, Inc.**

Sworn to me and subscribed in my presence this 19th day of March, 2010.

Cinda M Kropka
Notary Public
Commission expires 4-17-2012

