# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Case Nos. 10-61078 and 10-61081 |
| BUCYRUS COMMUNITY HOSPITAL, INC. | ) (Jointly Administered under |
| et. al.,[1] | ) Case No. 10-61078) |
| | ) |
| Debtors. | ) Chapter 11 |
| | ) |
| | ) Judge Russ Kendig |

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(A) AND 363 OF THE
BANKRUPTCY CODE FOR ORDERS: (I) APPROVING SALE AND BIDDING
PROCEDURES AND AUCTION DATE; (II) SCHEDULING DATE AND TIME
FOR A HEARING ON THE APPROVAL OF PROPOSED SALE; (III) APPROVING
FORM AND MANNER OF NOTICE OF HEARING AND AUCTION; (IV)
AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
AND INTERESTS; AND (V) APPROVING A BREAK-UP FEE**

---

[1] The Debtors include: Bucyrus Community Hospital, Inc. (Employer Tax I.D. No. 34-4468311) and Bucyrus Community Physicians, Inc. (Employer Tax I.D. No. 20-0232621).

{2406013:2}

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

I.      INTRODUCTION ...........................................................................................1

II.     BACKGROUND ............................................................................................1

        A.      The Debtors and the Chapter 11 Filings .............................................1

        B.      The Debtors' Decision to Sell............................................................2

        C.      The Proposed Sale .............................................................................3

III.    RELIEF REQUESTED....................................................................................4

        A.      Approval of the Sale Procedures........................................................4

        B.      Setting the Auction Date....................................................................5

        C.      Scheduling the Sale Hearing ..............................................................5

        D.      Approval of the Sale Notice...............................................................6

        E.      The Break-Up Fee ............................................................................7

        F.      Authorizing the Sale of the Debtors' Assets .......................................9

                1.      The Sale is Authorized Under Section 363(b)............................9

                2.      The Sale Should Be Free and Clear of Liens .........................12

                3.      The Sale Should Be Free and Clear of Claims, Including Successor
                        Liability Claims ...............................................................16

        G.      The Sale Complies With Section 363(d)(1).......................................17

        H.      A Successful Bidder Should be Entitled to the Protection of Section
                363(m) .........................................................................................18

IV.     WAIVER OF BANKRUPTCY RULE 6004(H).............................................19

V.      WAIVER OF REQUIREMENT TO FILE MEMORANDUM OF LAW.......................19

VI.     NO PRIOR REQUEST ................................................................................19

VII.    NOTICE ....................................................................................................19

10-61078-rk    Doc 375    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 2 of 22

# I.    INTRODUCTION

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby move the Court, pursuant to sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for the entry of orders (the "Proposed Order or Orders") (i) approving certain procedures for bidding on, and the sale of, substantially all of the Debtors' assets (the "Sale Procedures"); (ii) setting a date for an auction of such assets (the "Auction"); (iii) scheduling the date and time for a hearing on approval of the proposed sale resulting from the bidding procedures (the "Sale Hearing"); (iv) approving the form and manner of notice of the Auction and the Sale Hearing; (v) authorizing a sale of substantially all of the Sale Assets (as defined below) free and clear of all liens, claims, encumbrances and interests; and (vi) authorizing the Debtors to pay a break-up fee (the "Break-Up Fee").

In support of this Motion, the Debtors respectfully represent as follows:

# II.    BACKGROUND

## A.    The Debtors and the Chapter 11 Filings

1.      On March 19, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes pursuant to an order entered March 23, 2010, Docket No. 37.

3.      The factual background relating to the Debtors' commencement of their chapter 11

cases is set forth in detail in the Affidavit and Statement of Glen A. McMurray, DDS in Support of

Chapter 11 Petitions and First Day Motions, Docket No. 17.

**B.      The Debtors' Decision to Sell**

4.      Soon after filing their chapter 11 cases and reaching agreement with their Prepetition

Secured Lenders[1] regarding use of cash collateral, the Debtors began exploring their options for

exiting bankruptcy.  The Debtors recognized that they could emerge, intact, from chapter 11 only if

they completed an operational turnaround, reduced their operating costs, and improved their balance

sheet.  The Debtors had, in fact, begun taking such steps prior to the Petition Date with the

engagement of Quorum Health Resources LLC, a professional consulting organization with

significant experience and expertise with hospital clients.

5.      Not long after the Petition Date, the Debtors (after consultation with their Prepetition

Secured Lenders and the Official Committee of General Unsecured Creditors[2] (the "Committee"))

began exploring a sale of the Debtors' hospital operations in earnest.  To lead these efforts, the

Debtors selected and retained[3] Melcap Partners, LLC ("Melcap") as their investment bankers.

Charged with assisting the Debtors in pursuing a sale, Melcap has spent the past six months, among

other things, identifying and contacting potential bidders, soliciting bids and helping the Debtors

select a lead bidder.  From a list of 95 strategic buyers and well in excess of 100 financial buyers,

---

[1]  As used herein, the term Prepetition Secured Lenders shall mean:  (a) United Bank, Division of the Park National Bank ("United"), (B) Lancaster Pollard Mortgage Company, (c) the United States Department of Housing and Urban Development, and (d) First Federal Community Bank ("FFCB").  The term Prepetition Secured Lenders is used in this Motion for convenience purposes only; use of this term shall not be considered as determinative of the secured status of such party to whom such term refers.

[2]  Pursuant to that certain Appointment of Committee of Unsecured Creditors, Docket No. 68, dated as of March 26, 2010.

[3]  Pursuant to that certain Order Authorizing Debtors to Retain and Employ Melcap Partners, LLC as Investment Banker to the Debtors, Docket No. 250, dated as of July 2, 2010.

Melcap arranged confidentiality agreements with 14 interested parties, and then guided those parties through the early due diligence process. Ultimately three parties made bids. By October, 2010, the Debtors had determined that one party – GCH Acquisition Sub ("GCH"), a subsidiary of Galion Community Hospital (defined below) – was the bidder with the best bid, based on price, terms, and likelihood of closing, and devoted the necessary resources to reach and execute a stalking horse purchase agreement.

6.     Since GCH's selection as the lead bidder, it and the Debtors have devoted substantial resources to completing necessary due diligence, procuring appropriate financing, negotiating an appropriate purchase agreement, and corresponding with key constituencies to pave the way for a smooth sale process.

**C.     The Proposed Sale**

7.     Attached to this Motion as Exhibit A is a copy of the Asset Purchase Agreement (without Schedules and Exhibits, as defined in the APA) between the Debtors and GCH (the "APA"). A summary of the critical elements of the APA is as follows:

    a.     Assets to be Sold (the "Sale Assets"). The APA provides that GCH will acquire substantially all of the Debtors' operating assets at their primary hospital campus, as well as most of the Debtors' non-operating assets, including inventories, accounts receivable, licenses, intellectual property and active patient records.

    b.     Excluded Assets. The APA excludes from the Sale Assets cash in the Debtors' various accounts. It also excludes Bankruptcy Code-related causes of action, any records that cannot be legally transferred and insurance recoveries.

    c.     Assumed Liabilities. The APA provides that GCH will assume certain of the Debtors' liabilities, including "Cure Costs" for executory contracts and unexpired leases to be assumed by GCH, certain employee obligations and certain obligations with respect to postpetition accounts payable.

    d.     Purchase Price. The APA provides that GCH will, in addition to assuming the Debtors' obligations identified above, pay to the Debtors $8,000,000. GCH has made a deposit of $100,000. The purchase price is subject to adjustment for changes in "Net Working Capital." In addition, 10% of the purchase price (after adjustment for changes in

Net Working Capital) will be placed in escrow as a reserve for certain post-closing indemnification obligations of the Debtors.

     e.    <u>Key Conditions</u>. GCH's obligation to purchase the Sale Assets is not subject to financing. Certain conditions to a closing exist in the APA, including, but not limited to, entry of an order approving the sale by the Court, entry of any other orders required under the APA, the Debtors complying with their obligations under the APA and non-occurrence of a "Material Adverse Change."

     f.    <u>Deposit</u>. The APA, as indicated above, provides for a deposit of $100,000.

     g.    <u>Termination</u>. The APA allows for termination by GCH under certain, limited circumstances, although GCH is able to withdraw from the proposed transaction without penalty until 12:00 noon on November 3, 2010 if GCH is not satisfied that it can obtain financing. BCH may terminate if GCH fails to remedy a breach of any representation or warranty within three business days of notice.

To the extent that any description of the agreement contained in this Motion is inconsistent with the APA, the APA shall control.

## III.    <u>RELIEF REQUESTED</u>

     8.    By this Motion, the Debtors seek an order (a) approving the Sale Procedures; (b) setting a date for the Auction; (c) scheduling the Sale Hearing; (d) approving the form of notice for the Auction and Sale Hearing; (e) authorizing the sale of the Sale Assets, free and clear of all liens, claims, encumbrances and interests; and (f) authorizing the payment of the Break Up Fee.

### A.    <u>Approval of the Sale Procedures</u>

     9.    Consistent with the goal of maximizing the recovery from the sale of their assets, the Debtors propose, and seek the Court's approval of, the Sale Procedures attached to this Motion as <u>Schedule 1</u> to <u>Exhibit B</u>. The Sale Procedures are designed to allow for the Debtors' consideration of alternative bids, while providing some structure to that consideration. The following is a summary of the Sale Procedures:

     (a)    <u>Determination of Qualified Bidders and Bids</u>. The proposed Sale Procedures impose certain threshold requirements for any party wishing to make a bid. Those

requirements include a deadline for delivery of a competing bid; the execution of a confidentiality agreement (if one has not already been executed); the delivery of evidence of the bidder's ability to finance the purchase; execution of an acceptable purchase agreement; confirmation of the completion of due diligence; inclusion of a deposit; and a purchase price at least $400,000 greater than the purchase price under GCH's APA.[4]

       (b)    <u>Procedures Regarding Bids</u>.  The proposed Sale Procedures also set out certain procedures regarding the treatment of Qualifying Bids (as that term is defined in the Sale Procedures), including procedures for the receipt and return of deposits.

       (c)    <u>Auction</u>.  The proposed Sale Procedures provide for an auction of the Debtors' assets in the event that the Debtors receive competing bids.  The proposed Sale Procedures also set out certain rules governing the Auction, including minimum incremental amounts for bids at the Auction.  The Debtors anticipate that the Auction would be held 1 to 5 days prior to the Sale Hearing.

10.    The Debtors believe that the Sale Procedures are fair and reasonable.  They are also necessary to enable the Debtors to maximize the value to be received from the sale of their assets.

**B.**    <u>**Setting the Auction Date**</u>

11.    The Debtors propose that they conduct the Auction, if necessary, on December 7, 2010 in the event competing bids are received.

**C.**    <u>**Scheduling the Sale Hearing**</u>

12.    The Debtors request that a hearing on the sale of their assets be set on or about December 9, 2010.  A Sale Hearing on that date would provide the Debtors sufficient time to solicit additional bids for their assets, but not create uncertainty regarding the closing of a sale.

---

[4] This amount is compromised of the Break-Up Fee of $240,000 plus $160,000.

**D.**     **Approval of the Sale Notice**

13.     The Debtors also seek approval of the proposed notice of the Sale and the Auction (the "Sale Notice") attached to this Motion as Exhibit C.  The Sale Notice identifies the assets to be sold and also sets forth the Sale Procedures.  The Sale Notice will contain the date and time of the Auction as well as the date and time of the Sale Hearing.  The Sale Notice complies with the requirements of sections 102 and 363(b) and (f) of the Bankruptcy Code, Rules 2002 and 6004 of the Bankruptcy Rules, and all Local Rules.

14.     The Debtors propose that the Sale Notice be served on:  (a) the United States Trustee; (b) counsel for the Prepetition Secured Lenders; (c) counsel for the Committee; (d) GCH; (e) any party that has expressed an interest in the purchase of the Sale Assets; (f) any party that has filed a notice of appearance in the Debtors' chapter 11 cases; (g) the District Director of Internal Revenue; (h) the Ohio State Department of Health; (i) the office of the Attorney General for the State of Ohio[5]; (j) U.S. Department of Health and Human Services; (k) Ohio Department of Job and Family Services; (l) all known creditors of the Debtors (including without limitation all known personal injury and/or tort claimants); (m) the U.S. Attorney; (n) Centers for Medicare and Medicaid Services; (o) Ohio State Board of Pharmacy; (p) Federal Trade Commission; (q) U.S. Department of Justice; and (r) The Joint Commission.   Further, the Debtors propose to conspicuously post the Sale Notice at their facilities.  Thus, once the Sale Notice is served and posted, the Debtors will have provided adequate notice to all interested parties, and have complied with the requirements of sections 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, and all Local Rules.

---

[5] A separate notice will be sent to the Charitable Law Section of the Ohio Attorney General's Office by certified mail.

15.     The Debtors further propose to, and by this Motion request authority to, publish the Sale Notice in The Plain Dealer and The Bucyrus Telegraph Forum.

**E.      The Break-Up Fee**

16.     The Debtors also seek approval of a fee of $240,000 (3% of the proposed cash purchase price, subject to certain adjustments based on Net Working Capital, as described in the APA) to be paid to GCH under certain conditions.  This proposed Break-Up Fee is designed to compensate GCH in the event that the Debtors do not consummate the sale to GCH.  GCH, in turn, has deposited $100,000 as a performance deposit (the "Performance Deposit") to secure its performance under the APA.  The Performance Deposit is to be applied to the purchase price, refunded to GCH or forfeited by GCH depending upon the outcome of the Auction and pursuant to the terms of the APA.

17.     If the APA is terminated for any reason other than GCH's breach of a representation or warranty, the Performance Deposit is to be refunded to GCH.  In addition, if the APA is terminated because the Debtors consummate an "Alternative Transaction" (defined as a sale to a party other than GCH), then the Debtors would pay to GCH the Break-Up Fee from the proceeds of an Alternative Transaction.  Finally, if the APA is terminated because of a breach by GCH, then GCH would forfeit the Performance Deposit and the Debtors would be free to pursue damages against GCH.

18.     The Debtors believe that the Break-Up Fee is a necessary and appropriate expense for the administration of their estates, pursuant to sections 503 and 507 of the Bankruptcy Code. The Break-Up Fee would be an allowed administrative expense against their estates, junior only to the claims of the Debtors' prepetition and postpetition secured lenders and any professional retained

by the Debtors or the Committee. Any payments of the Break-Up Fee under the APA would be made by the Debtors from the proceeds of an Alternative Transaction.

19. Courts have recognized that break-up fees are permissible in bankruptcy. See *e.g.* In re Hupp Industries, Inc., 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992); Calpine Corp. v. O' Brien Env. Energy, Inc. (In re O'Brien Env. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999). Bankruptcy Courts in the Sixth Circuit have required that such fees be necessary to preserve the value of, or provide some benefit to, the debtor's estate as required by the plain language of section 503(b)(2)(A) of the Bankruptcy Code governing allowance of certain claims as administrative claims. See In re Nashville Senior Living, 2008 WL 5062366 (Bankr. M.D. Tenn. 2008) (a copy of which is attached hereto as Exhibit E); In re Dorado Marine, Inc., 332 B.R. 637, 641 (M.D. Fla. 2005). The Debtors assert that the Break-Up Fee satisfies the standard set forth in Hupp and O'Brien, and is an appropriate exercise of the Debtors' business judgment and should be allowed.

20. The court in Hupp identified the following factors in determining whether to authorize compensation for the initial bidder:

> (a)  whether the fee requested correlates with a maximization of value to the debtor's estate;
>
> (b)  whether the fee is part of an arms-length transaction between the debtor's estate and the buyer;
>
> (c)  whether the principal secured creditors and the official creditors' committee are supportive of the concession;
>
> (d)  whether the subject-break up fee constitutes a fair and reasonable percentage of the proposed purchase price;
>
> (e)  whether the dollar amount of the break-up fee is so substantial that it provided a "chilling effect" on other potential bidders;
>
> (f)  the existence of available safeguards beneficial to the debtor's estate; and

(g)     whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

21.     The Debtors, by proposing to pay a Break-Up Fee, recognize the expenditures that GCH has incurred in conducting due diligence and negotiations and the resulting value to the Debtors' sale efforts.  The APA is the result of arms' length negotiations between the parties.  The amount of the Break-Up Fee is not so substantial that it would provide a "chilling effect" on other potential bidders.   Moreover, GCH's bid may serve as a catalyst for other parties to submit competing bids.  The Break-Up Fee is designed to maximize value to the Debtors' estates by ensuring that the highest and best price will be obtained for the Sale Assets and that the current price will not fall by establishing a floor for bidding without chilling the bidding process.  Thus, the Break-Up Fee provides a substantial benefit to the Debtors' estates.

22.     In light of the value of the Sale Assets, the proposed Break-Up Fee constitutes a fair and reasonable percentage of the proposed purchase price.  Here, the total deal value is greater than simply the cash purchase price of $8.0 million.  As a percentage of the total value of the deal, the Break-Up Fee is less than 3%.  This is a reasonable percentage.  Accordingly, the Debtors submit that the Break-Up Fee should be approved.

**F.     Authorizing the Sale of the Debtors' Assets**

       **1.     The Sale is Authorized Under Section 363(b)**

23.     Section 363(b) of the Bankruptcy Code specifically authorizes asset sales outside the ordinary course of business.  See 11 U.S.C. § 363(b)(1) ("[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate").  In approving the sale of assets outside the ordinary course of business and outside of a chapter 11 plan pursuant to section 363 of the Bankruptcy Code, courts, including those in the Sixth Circuit, have adopted the "sound business reason" test established by the Second Circuit in In re Lionel Corp.,

722 F.2d 1063 (2d Cir. 1983); see also Stephens Industries, Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Nicole Energy Services, Inc., 385 B.R. 201, 230 (Bankr. S.D. Ohio 2008); In re Jillian's Entertainment Holdings, 327 B.R. 616, 617 (Bankr. W.D. Ky. 2005) (stating that the Lionel standard has been adopted by the vast majority of courts). The issue before the Lionel court was "to what extent chapter 11 permits a bankruptcy judge to authorize the sale of an important asset of the bankrupt's estate, out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization." Lionel, 722 F.2d at 1066; see also In re Country Manor of Kenton, Inc., 172 B.R. 217, 220-221 (Bank. N.D. Ohio 1994); In re Weatherly Frozen Food Group, Inc., 149 B.R. 480 (Bankr. N.D. Ohio 1992) (such test is satisfied if the following elements are demonstrated by the debtor: (1) a sound business reason or emergency justifies a pre-confirmation sale; (2) a sale has been proposed in good faith; (3) adequate and reasonable notice of the sale has been provided to parties-in-interest; and (4) the purchase price is fair and reasonable).

24.     The Lionel test requires a debtor to establish, as a threshold matter, a "sound business reason" justifying the pre-confirmation sale of assets. The Lionel court held that, when addressing a motion pursuant to section 363(b) of the Bankruptcy Code, a bankruptcy judge should consider all salient factors and the business justifications for a debtor to sell assets. Such factors include, but are not limited to:

(a)     The proportionate value of an asset to the estate as a whole;

(b)     The amount of elapsed time since the filing of the chapter 11 petition;

(c)     The likelihood that a chapter 11 plan will be proposed and confirmed in the near future;

(d)     The effect of the proposed disposition of assets on future chapter 11 plans;

(e)     A comparison of the proceeds to be obtained from the disposition of assets to any appraisals of the property;

<blockquote>
(f)    Whether the proposed transaction envisions the use, sale, or lease of the property; and

(g)    Whether the assets are increasing or decreasing in value.
</blockquote>

25.    Application of the <u>Lionel</u> factors to the proposed sale of the Sale Assets leads to the conclusion that the proposed sale should be approved. It is the Debtors' business judgment that a sale to GCH, or a purchaser with the highest and best offer at the Auction, represents the best alternative for realizing the maximum value of the Sale Assets.

26.    The Debtors have proposed the sale of the Sale Assets after thorough consideration of all viable alternatives, and have concluded that the sale is supported by a number of sound business reasons. First, the Debtors believe, at this time, that the results of a sale of their assets will provide a better outcome for their estates and creditors than a stand-alone operational reorganization would under current business conditions and their current debt structure. The Debtors believe that the only means to meet their continuing cash needs is to locate a financial partner that is willing to infuse capital. Unfortunately, despite their efforts, the Debtors have been unable to find such a financial partner. While the receipt of a debtor in possession financing facility[6] (the "DIP Facility") created a suitable bridge to provide the Debtors with sufficient liquidity to continue in and complete the restructuring processes underway, incurring additional debt and lines of credit are not adequate long-term solutions to the Debtors current challenges.

27.    The longer the Debtors' cases remain in bankruptcy, the greater the costs to all parties in interest. It is in the best interests of all parties that these cases be brought to conclusion quickly. A sale accomplishes this goal. Finally, even considering the temporary liquidity provided

---

[6] That certain debtor in possession financing facility authorized between the Debtors and Stearns Bank, National Association pursuant to that certain Order Upon Debtors' Motion for Entry of an Order Pursuant to Sections 361 and 364(d): (I) Authorizing the Debtors to Obtain Postpetition Financing and Enter Into Related Loan Documents; (II) Granting Certain Security Interests; and (III) Granting Adequate Protection, Docket No. 230, dated as of June 18, 2010.

by the DIP Facility, the Debtors are likely to encounter other financial, procedural and timing hurdles in a reorganization process. These anticipated hurdles indicate that a protracted restructuring effort is unlikely to yield more significant benefits to the Debtors estates, or a better recovery to the Debtors' creditors, than the currently proposed sale process. Hence, the Debtors have determined that a sale of the Sale Assets provides the best and most efficient means for maximizing value.

28.     Although section 363 provides a clear path to the sale of the Sale Assets, other statutory authority exists permitting the sale of property outside of the ordinary course of business. Section 105(a) of the Bankruptcy Code permits the Court to effectuate actions not otherwise prohibited under the Bankruptcy Code. See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988). Selling assets free and clear of liabilities involves the power of the bankruptcy courts to affect claims and essentially corresponds to the courts' power to discharge claims. Under section 1141(c) of the Bankruptcy Code, "the property dealt with by the plan is free and clear of all claims and interests of creditors" after confirmation of the debtor's plan. Accordingly, a sale of assets may be made free and clear of claims under section 105(a) of the Bankruptcy Code. See Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996); In re White Motor Credit Corp., 75 B.R. 944, 948-49 (Bankr. N.D. Ohio 1987). Section 105, in other words, provides further support for the Court to approve a sale of the Sale Assets outside of the ordinary course of business.

### 2.     The Sale Should Be Free and Clear of Liens

29.     The Debtors also request that the sale of the Sale Assets be free and clear of any liens, claims, encumbrances or interests held by any third party. Section 363(f) of the Bankruptcy Code authorizes the sale of property to be free and clear of interests in such property held by an entity if:

<blockquote>
(a) Applicable non-bankruptcy law permits a sale of such property free and clear of such interests;

(b) Such entity consents;

(c) Such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d) Such interest is in bona fide dispute; or

(e) Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.
</blockquote>

See, generally, In re Leckie Smokeless Coal Co., 99 F.3d 573 (4th Cir. 1996); In re Gulf States Steel, Inc. of Alabama, 285 B.R. 497, 506 (Bankr. N.D. Ala. 2002). The "interests" in property that assets may be sold "free of" include liens, claims and other encumbrances. See Leckie Smokeless, 99 F.3d at 581-582 (scope of 11 U.S.C. § 363(f) not limited to *in rem* interests); In re Aneco Elect. Const., Inc., 377 B.R. 338 (Bankr. M.D. Fla. 2006).

30. Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any one of the requirements enumerated therein will suffice to warrant the sale of the Sale Assets free and clear of all interests, except with respect to any interests that are liabilities to be assumed under the APA. See Gulf States, 285 B.R. at 506; Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988).

31. Consent of all lienholders is not a prerequisite of a sale under 363(f). To the extent that any creditor asserting a valid interest in or against the Debtors' assets does not consent to the sale, the sale may still be approved. Section 363(f)(4) of the Bankruptcy Code allows a sale to proceed free and clear of any interest if such interest is in bona fide dispute. The purpose of section 363(f)(4) is to permit property of a bankruptcy estate to be sold free and clear of disputed interests "so that liquidation of the estate's assets need not be delayed while such disputes are being litigated." In re Durango Georgia Paper Co., 336 B.R. 594, 597 (Bankr. S.D. Ga. 2005)(citing Gulf

<u>States</u>, 285 B.R. at 507). Currently pending before the Court is Adversary Proceeding 10-06088, commenced by United in an effort to determine the extent, nature, priority and perfection of certain security interests alleged by United in certain prepetition collateral of Bucyrus Community Hospital, Inc.. Further, the Debtors have preserved, through certain filings before this Court, the rights of parties in interest to pursue similar disputes or actions with respect to the nature, extent, priority and perfection of FFCB in certain prepetition collateral of Bucyrus Community Physicians, Inc.. Accordingly, at least with respect to certain of the Sale Assets, the interests of certain of the Prepetition Secured Lenders is in *bona fide* dispute. Section 363(f)(4) is thus satisfied with respect to those assets.

32. Section 363(f)(5) also provides a means to sell the Debtors' assets free and clear of all interests over the objection of a party asserting a lien. Section 363(f)(5) permits such a sale if the party asserting the lien and objecting to the sale "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction." Satisfaction of the standard requires only that a party *could* be compelled, not that it is being, or will be, compelled to accept a money satisfaction. <u>See</u> <u>Gulf States</u>, 285 B.R. at 508 ("the phrase 'could be compelled' only requires 'that the interest in question be subject to final satisfaction on a hypothetical basis, not that there be an actual payment in satisfaction of the interest from the proceeds of the sale in question'") (citations omitted). Some courts have construed the "money satisfaction of such interest" language in 363(f)(5) to mean a payment constituting less than the full payment of the underlying debt. <u>See</u> <u>In re Healthco Int'l, Inc.</u>, 174 B.R. 174, 176 (Bankr. D. Mass. 1994). Hence, section 363(f)(5) does not require that the sale price for the assets to be sold exceed the value of the claims against it. <u>See</u>, <u>e.g.</u>, <u>Gulf States</u>, 285 B.R. at 508 (citing <u>In re Grand Slam U.S.A., Inc.</u>, 178 B.R. 460, 463 (E.D. Mich. 1995)).

Rather, section 363(f)(5) requires only that a mechanism exist to address extinguishing the interest without paying such interest in full.  Id.

33.    The primary mechanism by which the Debtors could compel a lienholder to accept a money satisfaction is a cram down under section 1129(b) of the Bankruptcy Code. Under section 1129(b)(2)(A), a chapter 11 plan proponent can satisfy a secured claim, over the objection of the claimant, by cash payments having a present value equal to the value of the security interest. Grand Slam, 178 B.R. at 462 (citing Healthco, 174 B.R. at 176; In re Terrace Chalet Apartments, Ltd., 159 B.R. 821 (N.D. Ill. 1993)("cram downs" are legal proceedings within the meaning of section 363(f)(5)).  In a cram down procedure, a trustee or debtor in possession may sell assets free and clear, without the consent of a secured creditor, if the present or future payments are made to the secured creditor in an amount equal to the present value of the collateral, even if such value is less than the debt. Grand Slam, 178 B.R. at 462.

34.    In accordance with section 1129(b)(2)(A) of the Bankruptcy Code, the Debtors could construct a plan providing for the cram down of a secured creditor's claim.  The proposal of such a plan, while feasible, might not be in the best interests of the Debtors, their creditors, or the Debtors' estates at this time.   Nevertheless, because the Debtors can demonstrate a mechanism exists whereby a lien interest could be extinguished without payment in full for such interest, the requirements of section 363(f)(5) are satisfied.[7]

---

[7]  In addition, in In re Jolan, Inc., 403 B.R. 866 (Bankr. W.D. Wash. 2009), the court found that 363(f)(5) could be satisfied with respect to a personal property sale because section 9-617 of the UCC authorized a sale free and clear of junior liens.  The same is true here.  O.R.C. 1209.617 provides that a secured party sale is free of the security interest under which it is sold, as well as subordinate security interests.  The same is true with respect to real property liens and a foreclosure sale.  See, e.g., Walker v. Scoll, 7 Ohio App. 335 (1st Dist. 1914) (property sold at a judicial sale is free and clear of interests of all parties to action).

### 3. The Sale Should Be Free and Clear of Claims, Including Successor Liability Claims

35.     In addition, the Sale Assets may be sold free and clear of all successor liability claims. Notwithstanding the apparent limitation of the language "conveyance free and clear of 'any interest'" in section 363(f), that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims, as well. See, e.g., In re Trans World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); see also Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186 `89-90 (Bankr. N.D. Ga. 1986) (sale pursuant to section 363(f) barred successor liability for product defects claims, aff'd 805 F.2d 1515 (11th Cir. 1986); Rubinstein v. Alaska Pac. Consortium (In re New English Fish Co.), 19 B.R. 323, 328 (Bankr. W.D. Wash. 1982) (sale pursuant to section 363(f) was free and clear of successor liability claims for employment discrimination and civil rights violations).

36.     The Sixth Circuit has confirmed the power of bankruptcy courts to broadly cut-off successor liability claims under section 363(f): "The bankruptcy court has the clear power to approve the sale of debtor's assets free and clear of any interest or claims that could be brought against the bankruptcy estate during bankruptcy pursuant to 11 U.S.C. § 363(f)." Al Perry Enterprises, Inc. v. Appalachian Fuels, LLC, 503 F.3d 538, 543 (6th Cir. 2007); see also Douglas v. Stamco, LLC, 2010 WL 337043 (2nd Cir. 2010) (summary opinion) (a copy of which is attached hereto as Exhibit E).

37.     GCH has made clear that it will not proceed with the purchase if the sale were not free and clear of liens and claims, or if GCH were or would be liable for any Excluded Liabilities (as defined in the APA).

38.     As set forth in the APA, the Debtors request that the Court enter the proposed order including language finding that GCH is not a successor for liability purposes, providing that the sale is free and clear of any claims, liens or interests, other than the Assumed Liabilities (as defined in the APA).  Thus, the sale will be free and clear of any claims that could be asserted against the Debtors, under any theory, that arises prior to the Closing (as defined in the APA), regardless of the nature of the claim and regardless of the type of claim or claimant.  In addition, the Debtors request the inclusion in the Sale Order of an injunction against all parties from asserting any such claims against GCH.

## G.     The Sale Complies With Section 363(d)(1)

39.     Section 363(d)(1), added by BAPCPA, requires a nonprofit entity to use, sell or lease property only in accordance with state law.  Ohio Revised Code sections 1703.29 and 1702.40 govern such sales.  Both section 1702.39(B)(1)(a) and 1702.40 allow sales (including substantially all assets) if the transaction has received prior court approval and, in the case of 1702.39, the Charitable Law Section of the Attorney General's Office was given notice.

40.     Although section 1702.39 contemplates that the proceeding will be in the Court of Common Pleas, an uncodified portion of BAPCPA, Pub. L. 109-9, § 1221(e), provides:

> (e) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to require the court in which a case under chapter 11 of title 11, United States Code, is pending to remand or refer any proceeding, issue, or controversy to any other court or to require the approval of any other court for the transfer of property.

41.     Since this Court has exclusive jurisdiction over the sale process, the Debtors submit that this Court's approval of the sale satisfies both sections 1702.39(B)(1)(a) and 1702.40 of the Ohio Revised Code.  The Debtors will serve the Ohio Attorney General's Charitable Law Section by certified mail, and Section 1221(d) of BAPCPA grants the Ohio Attorney General standing to

appear and be heard in response to this Motion. Accordingly, the sale is in compliance with Section 363(d)(1).

### H.    A Successful Bidder Should be Entitled to the Protection of Section 363(m)

42.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. In re Made In Detroit, Inc., 414 F.3d 576, 581 (6th Cir. 2005); In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3rd Cir. 1986).

43.    The APA was negotiated at arm's length, with both parties represented by their own counsel. Although the Debtors engaged in discussions with other parties interested in acquiring certain of their assets, the Debtors submit that GCH's proposal as contained in the APA represents GCH's highest and best offer for the Sale Assets. Additionally, the Debtors will adduce facts at the Sale Hearing on any objection demonstrating that any bidder who is deemed a Successful Bidder for all of the Sale Assets had negotiated at arm's-length, with all parties represented by their own counsel.

44.    Accordingly, the Sale Order will include a provision that the Successful Bidder for the Sale Assets, is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. In addition, the Sale Order will contain a finding that the sale constitutes an arm's length sale between a willing seller and a willing buyer. The sale was voluntary, without compulsion or duress, took place in an open market, and each party acted in its own self-interest. The Debtors believe that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Sale Assets and closing of the same will occur promptly.

## IV. WAIVER OF BANKRUPTCY RULE 6004(H)

45.     The Debtors further request that the 14-day stay that would otherwise be imposed by Rule 6004(h) of the Bankruptcy Rules be lifted to permit the proposed sale to close as soon as possible upon the entry of an order granting this Motion. Closing the proposed sale as soon as possible is an aspect of the proposed sale. Moreover, a quick closing will relieve the Debtors of various financial obligations. The Debtors request, therefore, that the Court order that the 14-day stay that would otherwise be imposed by Rule 6004(h) of the Bankruptcy Rules be lifted.

## V. WAIVER OF REQUIREMENT TO FILE MEMORANDUM OF LAW

46.     The Debtors respectfully request that the Court waive the requirement pursuant to Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Northern District of Ohio that the Debtors file a separate memorandum of law in support of this Motion because the relevant issues of law are fully addressed herein.

## VI. NO PRIOR REQUEST

47.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

## VII. NOTICE

48.     Notice of this Motion and of the hearings relative to this Motion will be served on: (a) the United States Trustee; (b) counsel for the Prepetition Secured Lenders; (c) counsel for the Committee; (d) GCH; (e) any party that has expressed an interest in the purchase of the Sale Assets; (f) any party that has filed a notice of appearance in the Debtors' chapter 11 cases; (g) the District Director of Internal Revenue; (h) the Ohio State Department of Health; (i) the office of the Attorney General for the State of Ohio[8]; (j) U.S. Department of Health and Human Services; (k) Ohio

---

[8] A separate notice will be sent to the Charitable Law Section of the Ohio Attorney General's Office by certified mail.

Department of Job and Family Services; (l) all known creditors of the Debtors (including without limitation all known personal injury and/or tort claimants); (m) the U.S. Attorney; (n) Centers for Medicare and Medicaid Services; (o) Ohio State Board of Pharmacy; (p) Federal Trade Commission; (q) U.S. Department of Justice; and (r) The Joint Commission. The Debtors shall also post the Sale Notice conspicuously at its facilities. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors request that the Court enter an order or orders: (a) in substantially the form presented in Exhibit B (i) approving the Sale Procedures set forth in Schedule 1 to Exhibit B; (ii) scheduling a date and time for the hearing on the approval of the proposed sale; (iii) approving the form and manner of notice of hearing of the Auction and the Sale Hearing; and (iv) approving the Break-Up Fee; and (b) entering an order in substantially the form presented in Exhibit D authorizing the sale of the Debtors' assets free and clear of all liens, claims, encumbrances, and interests pursuant to section 363 of the Bankruptcy Code; and (c) granting such other and further relief as is necessary and proper.

October 22, 2010

Respectfully submitted,

/s/ Paul W. Linehan
Shawn M. Riley (0037235)
Paul W. Linehan (0070116)
Melissa S. Giberson (0082413)
McDONALD HOPKINS LLC
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114-2653
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
E-mail: sriley@mcdonaldhopkins.com
          plinehan@mcdonaldhopkins.com
          mgiberson@mcdonaldhopkins.com

COUNSEL FOR THE DEBTORS
AND DEBTORS IN POSSESSION