# <u>EXHIBIT A</u>
**(Asset Purchase Agreement)**

## ASSET PURCHASE AGREEMENT

by and among

Sellers, as defined herein,

and

GCH Acquisition Sub, as Buyer

Dated:October 21, 2010

{2445155:}

TABLE OF CONTENTS

**ARTICLE 1 PURCHASE AND SALE OF ACQUIRED ASSETS.......................................... 1**
1.1     Acquired Assets. ....................................................................................... 1
1.2     Excluded Assets. ....................................................................................... 4
1.3     Assumed Liabilities. ................................................................................. 5
1.4     Excluded Liabilities. ................................................................................. 6
1.5     Matters Relating to Assumption and Assignment and Cure Costs. ........... 6
1.6     Non-Assignment of Contracts. ................................................................. 7

**ARTICLE 2 CONSIDERATION ........................................................................................ 7**
2.1     Purchase Price. ......................................................................................... 7
2.2     Escrow. .................................................................................................... 7
2.3     Closing Cash Purchase Price Adjustment. ................................................ 8
2.4     Post-Closing Cash Purchase Price Adjustment. ....................................... 8
2.5     Allocation of Purchase Price. ................................................................... 9

**ARTICLE 3 CLOSING ................................................................................................... 10**
3.1     Closing. .................................................................................................. 10
3.2     Deliveries by Sellers. ............................................................................. 10
3.3     Deliveries by Buyer. .............................................................................. 10
3.4     Title Insurance. ...................................................................................... 11

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES ............................................. 11**
4.1     Representations and Warranties of Sellers. ............................................ 11
4.2     Representations, Warranties and Agreements of Buyer. .......................... 15
4.3     Representations Exclusive. ..................................................................... 16

**ARTICLE 5 COVENANTS AND OTHER AGREEMENTS ........................................... 17**
5.1     Mutual Covenants. ................................................................................. 17
5.2     Additional Covenants of Sellers. ........................................................... 25
5.3     Additional Covenants of Buyer. ............................................................ 27

**ARTICLE 6 BUYER'S CONDITIONS TO CLOSING ................................................... 29**
6.1     Performance of Agreement. .................................................................... 29
6.2     Accuracy of Representations and Warranties. ......................................... 29
6.3     Absence of Liability. .............................................................................. 30
6.4     CAH Provider Status; Payor Contracts. ................................................. 30
6.5     Officers' Certificate. .............................................................................. 30
6.6     Ohio Law Requirements. ........................................................................ 30
6.7     No Violation of Orders. .......................................................................... 30
6.8     No Litigation. ......................................................................................... 30
6.9     Sale Order. ............................................................................................. 30
6.10    Closing Deliveries. ................................................................................ 30

**ARTICLE 7 SELLERS' CONDITIONS TO CLOSING .................................................. 31**
7.1     Performance of Agreement. .................................................................... 31
7.2     Accuracy of Representations and Warranties. ......................................... 31
7.3     Officers' Certificate. .............................................................................. 31
7.4     Ohio Law Requirements. ........................................................................ 31

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 3 of 49

| | | |
|---|---|---|
| 7.5 | No Violation of Orders. | 31 |
| 7.6 | Procedures and Sale Orders. | 31 |
| 7.7 | Closing Deliveries. | 31 |

**ARTICLE 8 TERMINATION** ........................................................................................ **31**

| | | |
|---|---|---|
| 8.1 | Termination. | 31 |
| 8.2 | Effect of Termination. | 32 |
| 8.3 | Exclusive Remedy; Waiver. | 33 |

**ARTICLE 9 SURVIVAL AND REMEDIES; INDEMNIFICATION** .............................. **33**

| | | |
|---|---|---|
| 9.1 | Survival. | 33 |
| 9.2 | Exclusive Remedy; Specific Performance. | 33 |
| 9.3 | Post-Closing Escrow; Indemnification. | 33 |

**ARTICLE 10 PROVISIONS OF GENERAL APPLICATION** ...................................... **33**

| | | |
|---|---|---|
| 10.1 | Notices. | 33 |
| 10.2 | Press Releases and Public Announcements. | 35 |
| 10.3 | Expenses. | 35 |
| 10.4 | Successors and Assigns. | 35 |
| 10.5 | Counterparts. | 35 |
| 10.6 | Headings. | 35 |
| 10.7 | Entirety of Agreement; Amendments. | 35 |
| 10.8 | Construction of Agreement. | 36 |
| 10.9 | Waiver. | 36 |
| 10.10 | Governing Law; Jurisdiction. | 36 |
| 10.11 | Severability. | 36 |
| 10.12 | Consents Not Unreasonably Withheld. | 36 |
| 10.13 | Time Is of the Essence. | 37 |
| 10.14 | Disclosure Schedules. | 37 |

**ARTICLE 11 DEFINED TERMS** ................................................................................. **37**

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 4 of 49

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") dated October 21, 2010 (the "Execution Date"), is made by and among BUCYRUS COMMUNITY HOSPITAL, INC., an Ohio nonprofit corporation ("BCH"), BUCYRUS COMMUNITY PHYSICIANS, INC., an Ohio corporation ("BCP"), (BCH and BCP are referred to collectively herein as "Sellers" and each individually a "Seller") and GCH ACQUISITION SUB, an Ohio nonprofit corporation ("Buyer"). Capitalized terms used in this Agreement are defined or cross-referenced in Article 11.

## RECITALS

WHEREAS, on March 19, 2010 (the "Petition Date"), each Seller commenced a voluntary petition for relief (collectively, the "Bankruptcy Cases") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Ohio (the "Bankruptcy Court");

WHEREAS, Sellers own and operate a 25 licensed bed acute care hospital, which is classified as a critical access hospital in the City of Bucyrus, Ohio, and are in the business of providing medical care and services to residents of the city of Bucyrus, Ohio, and surrounding areas (the "Business"); and

WHEREAS, Buyer desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, transfer and deliver to Buyer the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and an order, in the form attached as Exhibit A, or such other form reasonably satisfactory to Buyer and Sellers (the "Sale Order") and in accordance with sections 105, 363, 365, 1146 and all other applicable provisions of the Bankruptcy Code.

## STATEMENT OF AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and their respective representations, warranties, and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF ACQUIRED ASSETS

1.1     Acquired Assets. At the Closing, and upon the terms and conditions set forth herein, each Seller shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase from each Seller, all of such Seller's right, title and interest in, to and under the following properties, assets and rights owned by such Seller, in each case, free and clear of all Liens, liabilities, claims, interests and encumbrances, other than Permitted Encumbrances (collectively the "Acquired Assets"):

(a)     all owned real property (the "Owned Real Property") and leased real property (the "Leased Real Property," together with the Owned Real Property, the "Real Property") of any Seller, together with all fixtures and Improvements thereon, including, without limitation, the Real Property listed on Schedule 1.1(a);

{2394643:10}

(b)     all machinery, equipment, furniture, office and telephone equipment, administrative supplies, maintenance and janitorial equipment, computer hardware, fixtures and fittings, motor vehicles, tools, maintenance parts, spare parts, and including, but not limited to, other similar items of tangible personal property listed on <u>Schedule 1.1(b)</u> (collectively "<u>Equipment</u>");

(c)     all inventories of supplies, drugs, pharmaceuticals and medications, food, janitorial and office supplies, forms, consumables, disposables, linens, medical, maintenance and shop supplies, and other similar items of tangible personal property wherever located on the Closing Date that is used, owned or held primarily in the conduct of the Business (collectively, the "<u>Inventory</u>");

(d)     all contracts ("<u>Contracts</u>") and unexpired leases ("<u>Leases</u>") listed on <u>Schedule 1.1(d)</u>, including Leases of Owned Real Property to the extent such leases are assigned to Buyer pursuant to the terms of the Assigned Contracts Order in the manner provided in Section 1.5 hereof ("<u>Assigned Contracts</u>");

(e)     all notes and accounts receivable in existence as of the Closing Date from patients, Payors, and other third parties (billed and unbilled, recorded and unrecorded, accrued and existing) arising from or in connection with the Business, together with rights to payment for services rendered through the Closing Date (collectively, "<u>Receivables</u>");

(f)     except for certain prepayments made to Retained Professionals and utilities, all advance payments, deposits, prepayments, and prepaid expenses made with respect to the Acquired Assets as of the Closing Date (collectively, "<u>Prepayments</u>"), as listed on <u>Schedule 1.1(f)</u>;

(g)     all Licenses used to operate the Acquired Assets that are legally assignable or transferable to Buyer and are owned by the Seller as of the Closing Date, including without limitation those Licenses listed on <u>Schedule 1.1(g)</u> to the extent such Licenses are legally assignable or transferable;

(h)     all unexpired warranties as of the Closing Date that are legally assignable or transferable to Buyer either received from third parties with respect to the Acquired Assets, including, but not limited to, obligations to repair or replace, or to refund the sales price or any other related expenses relating to alleged defects in goods sold or services, unliquidated rights under manufacturers' or vendors' warranties, and such warranties as are set forth in any construction agreement, lease agreement, equipment purchase agreement, consulting agreement or agreement for architectural and engineering services (collectively, "<u>Warranties</u>");

(i)     all intangible, intellectual and proprietary property used in or related to the Business and owned by any Seller, including without limitation, all patents and patent applications, trademarks, service marks, including without limitation the name "<u>Bucyrus Community Hospital</u>" and all variations, if any, thereof, inventions, trade secrets, know-how, software, computer files and data, assembly instructions, drawings, blueprints, telephone numbers, facsimile telephone numbers, e-mail addresses, confidential business information, including without limitation, those items set forth on <u>Schedule 1.1(i)</u>, and all goodwill, rights to sue and collect with respect to any infringements and the right to receive royalties with respect to the foregoing (collectively, the "<u>Intangible Assets</u>");

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 6 of 49

(j)    to the extent legally transferable, all documents, books, records, operating, employee and policy manuals and files of any Seller used primarily in the conduct of the Business, whether in hard copy, electronic copy or other form, including, without limitation, all vendor and supplier records, financial records, equipment records, and medical and administrative libraries and personnel records related to Hired Employees (collectively, the "Business Records"), but excluding any Sellers' corporate record books, minute books and Tax records, the Retained Hospital Records, the proprietary records, and the Business Records and Patient Records excluded under Section 1.2(c);

(k)    to the extent legally transferable, all Active Patient Records maintained or stored as of the Closing Date pertaining to patients treated at any Seller's facility; *provided, however,* that prior to any Active Patient Records becoming a part of the Acquired Assets, each patient shall be given a reasonable opportunity to object to the transfer of such patient's Active Patient Records to Buyer, and, to the extent of such patient objections, such Active Patient Records shall become a part of the Excluded Assets;

(l)    all liability insurance benefits, including rights and proceeds, arising from or relating to the Acquired Assets or Assumed Liabilities prior to the Closing Date, unless expended in accordance with this Agreement, solely to the extent that such benefits arise from or relate to an event, act or omission that occurs after the date of this Agreement and reduces the value of the Acquired Assets, or increase the amount of the Assumed Liabilities;

(m)    to the extent assignable or transferable under applicable law (or the terms of such instrument, as applicable), all certifications to participate in, and all provider agreements and numbers associated with, the federal reimbursement program under Title XVIII of the Social Security Act of 1935, as amended ("Medicare"), including, without limitation, all agreements and provider numbers necessary to maintain the status of Bucyrus Community Hospital (the "Hospital") as a Critical Access Hospital ("CAH") provider and any other governmental or quasi-governmental third party payor programs as well as any other agreement, arrangement, program or understanding with any federal, state or local governmental agency or organization or pursuant to which Sellers qualify for payment or reimbursement for medical or therapeutic care or other goods or services rendered or supplied to any patient, as set forth on Schedule 1.1(m), (collectively, the "Assumed Provider Agreements");

(n)    the ownership interest in Home Care Matters;

(o)    except as set forth in Section 1.2 below, all causes of action, lawsuits, judgments, claims, and demands of any nature available to or being pursued by any Seller with respect to the Acquired Assets or the Assumed Liabilities, whether known or unknown, contingent or noncontingent, arising by way of counterclaim or otherwise, and all proceeds thereof, and all guarantees, warranties, indemnities, and similar rights, and other intangible property related to the Acquired Assets, the Assumed Liabilities, or the Business, *provided, however,* that no cause of action, lawsuit, judgment, claim, or demand of any kind or nature whatsoever arising between any Seller, on the one hand, and Buyer, on the other hand, relating to the transactions contemplated by this Agreement and the Related Agreements, shall be deemed to be transferred to Buyer hereunder and shall be retained in its entirety by Sellers solely and exclusively;

(p)     the bank accounts of Sellers listed on Schedule 1.1(p) which are depository accounts for the Receivables and all information necessary to access such accounts, to the extent such accounts can be transferred by Sellers, except that any cash or cash equivalents held in such accounts are specifically excluded;

(q)     all regulatory settlements, rebates, adjustments, refunds or group appeals pursuant to Medicare, Medicaid, or Costs Reports, including those arising out of time periods prior to the Closing; and

(r)     except for the Excluded Assets, all other assets, rights, privileges (including attorney-client privileges), or interests (to the extent transferable) of Sellers that are used in the Business and located at any facility owned, leased or used by Sellers.

        1.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the following properties and assets (the "Excluded Assets") are not included in the Acquired Assets, and Sellers shall retain and not transfer to Buyer, and Buyer shall not purchase or acquire, such Excluded Assets:

(a)     the rights of any Seller under any insurance policy or to any insurance proceeds relating to the Acquired Assets (it being understood, however, that Sellers shall not have any obligation to take any action under any such policy to seek any recovery or to continue any such policy in force) provided, however, that as provided in Section 1.1(l), Buyer shall have the right to use such proceeds if necessary to replace or repair or compensate for any Acquired Asset or Assumed Liability

(b)     the rights of any Seller to receive mail and other communications addressed to any of them with respect to Excluded Assets or Excluded Liabilities;

(c)     any and all Business Records and Patient Records, whether or not maintained by Sellers, (i) which are not transferable under applicable Law or any collective bargaining agreement, (ii) which constitute inactive Patient Records, (iii) which constitute Active Patient Records for patients who have objected to the transfer to Buyer of their Active Patient Records; (iv) which are protected by attorney-client privilege; or (v) as listed on Schedule 1.2(c).

(d)     all amounts due to Sellers arising from Intercompany Transactions, which do not arise from Assigned Contracts;

(e)     except as provided in Section 1.1 (n), all equity interests in Sellers and all equity interests in any Seller Affiliate;

(f)     except as provided in Section 1.1(e) and 1.1(o), all claims, counter-claims and causes of action of the Sellers or the Sellers' bankruptcy estates (including parties acting for or on behalf of the Sellers' bankruptcy estates, including, but not limited to, the official committee of unsecured creditors appointed in the Bankruptcy Cases) arising out of events occurring prior to the Closing Date; including, but not limited to, any claims and causes of action under chapter 5 of the Bankruptcy Code and any related claims and causes of action under applicable non-bankruptcy law, and any rights to challenge liens asserted against property of the Sellers' bankruptcy estates, including, but not limited to, liens attaching to the Cash

Purchase Price (as defined below) paid to the Sellers, and the proceeds from any of the foregoing;

(g) except as provided in <u>Section 1.1(e)</u> and <u>Section 1.1(p)</u> all cash, cash equivalents, bank accounts, deposit accounts, trust accounts, escrow accounts, securities accounts, and the assets and free credit balances held therein, security and performance deposits, and other liquid assets of any Seller, wherever located and however held; including, without limitation, those specifically described on <u>Schedule 1.2(g)</u>;

(h) except as provided in <u>Section 1.1(q)</u>,all regulatory settlements, rebates, adjustments, refunds or group appeals, including without limitation pursuant to Ohio Bureau of Workers' Compensation or Hospital Care Assurance Program, arising out of time periods prior to the Closing; and

(i) such other assets, if any, specifically described on <u>Schedule 1.2(i)</u>, and assets which would be Acquired Assets except for the operation of <u>Section 1.6</u> or as expressly provided in other provisions, if any, of this Agreement.

Sellers shall remove at any time prior to or within ninety (90) days following the Closing Date or, with respect to the Retained Hospital Records (as defined in <u>Section 5.1(f)(i)</u>), Sellers may remove from time to time within the relevant Document Retention Period (as defined in <u>Section 5.1(f)(ii)</u>) (in each case, at Sellers' expense, but without charge by Buyer for storage), any and all of the Excluded Assets, provided that Sellers shall do so in a manner that does not unduly or unnecessarily disrupt Buyer's normal business activities.

    1.3    <u>Assumed Liabilities</u>. At the Closing, Buyer shall assume and pay, discharge and perform as and when due, and indemnify, defend and hold harmless Sellers and their Affiliates from and against, all of the following liabilities of Sellers (the "<u>Assumed Liabilities</u>"):

(a) all liabilities and obligations of Sellers under the Assigned Contracts arising on or after the Closing Date, and all cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (such cure costs are, collectively, the "<u>Cure Costs</u>");

(b) all liabilities and obligations arising on or after the Closing Date relating to or arising out of the Acquired Assets;

(c) except as and only to the extent provided in <u>Section 5.1(h)</u>, all liabilities and obligations to any Hired Employee for salary, wages, benefits (including, without limitation, workers' compensation, unemployment and disability) and other accrued compensation through the Closing Date, but only in the amount and to the extent taken into account in determining Net Working Capital (the "<u>Assumed Accrued Benefits</u>"); <i>provided, however,</i> that the foregoing assumption shall not include any liabilities or obligations to any employee with respect to any claims arising out of discrimination, harassment or other alleged actions for periods prior to the Closing Date;

(d) all accounts payable and accrued liabilities arising in the Ordinary Course of Business after the Petition Date, but only in the amount and to the extent taken into account in determining

10-61078-rk   Doc 375-1   FILED 10/22/10   ENTERED 10/22/10 10:16:40   Page 9 of 49

Net Working Capital (the "Assumed Accounts Payable"); *provided, however*, that in no event shall Buyer assume any liability or obligation to any Retained Professional;

(e)     all liabilities and obligations relating to regulatory settlements, rebates, adjustments, refunds or group appeals pursuant to Medicare, Medicaid, or Costs Reports, including those arising out of time periods prior to the Closing; and

(f)     such other liabilities and obligations, if any, specifically described on Schedule 1.3(e).

1.4     Excluded Liabilities.   Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain liabilities and obligations of Sellers (all such liabilities are, collectively, the "Excluded Liabilities").   The Excluded Liabilities include, without limitation, the following liabilities and obligations:

(a)     amounts due pursuant to any Intercompany Transaction which do not arise from Assigned Contracts;

(b)     any liabilities or obligations related to any Excluded Assets;

(c)     any liabilities relating to fraud or the federal statutes relating to health care fraud and abuse and kickbacks (including 42 U.S.C. § 1320a-7b, 42 U.S.C. § 1320a-7a, the Ethics in Patient Referrals Act, as amended, 42 U.S.C. §§ 1395nn *et seq.*, and the federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*) or related or similar statutes or the regulations promulgated pursuant to any of such statutes, and any similar applicable state laws or regulations pertaining to fraud, kickbacks or fee splitting; and

(d)     all liabilities and obligations of Sellers of whatever nature whether presently in existence or hereafter arising, other than the Assumed Liabilities.

1.5     Matters Relating to Assumption and Assignment and Cure Costs.

(a)     Sellers shall file a motion with the Bankruptcy Court (collectively, the "Assigned Contract Motion") identifying those Contracts material to the operation of the Business that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code that Buyer has indicated to Sellers it may wish to assume (the "Noticed Contracts"). The Assigned Contract Motion identifies the proposed cure cost amount for each Noticed Contract (the "Proposed Cure Cost").  Schedule 1.5(a) sets forth the Noticed Contracts with respect to which, as of the execution date of this Agreement, the Sellers had been asked to provide notice pursuant to section 365 of the Bankruptcy Code and the Proposed Cure Costs related thereto.

(b)     Sellers shall use commercially reasonable efforts to obtain an order or orders authorizing, but not requiring or directing, Sellers to assume and assign the Noticed Contracts (the "Assigned Contract Order").   The Assigned Contract Order shall fix the Cure Cost amount required to be paid to assume and assign each Noticed Contract (the "Approved Cure Cost").

(c)     At any time prior to or on the Closing Date, Buyer may, in it is sole discretion, add any Noticed Contracts to Schedule 1.1(d).  Upon the addition of a Noticed Contract by Buyer, the added Noticed Contract shall be deemed an Assigned Contract, the Buyer's Cure Cost

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 10 of 49

associated therewith shall be an Assumed Liability, and Sellers shall take all necessary steps to assume and assign such additional Noticed Contracts to Buyer.

(d)     At any time prior to or on the Closing Date, Buyer may, in its sole discretion, remove any previously added Noticed Contract (whenever added) from Schedule 1.1(d), *provided however*, that in the case of any Noticed Contract relating to medical services provided by physicians, Buyer must remove such Noticed Contract prior to December 3, 2010. Upon such removal, the removed Noticed Contract shall become an Excluded Asset and there shall be no Buyer's Cure Cost for such Noticed Contract.

(e)     At the Closing, Buyer shall pay any Proposed Cure Cost associated with any Assigned Contract or such lower amount as the counterparty to such Assigned Contract and the Buyer may agree ("Buyer's Cure Cost").

(f)     For each Assigned Contract for which the Approved Cure Cost is greater than the Proposed Cure Cost, Sellers shall pay to the counter-party at Closing an amount equal to the excess (which shall in no event be greater than the excess of the Approved Cure Cost over the Proposed Cure Cost) of (i) the actual amount paid to the counter-party of such Assigned Contract in connection with its assumption and assignment over (ii) the Proposed Cure Cost (such excess, the "Sellers' Cure Cost").

(g)     Pursuant to Section 5.3(g), Buyer shall deliver to Sellers, prior to or at the Closing, Schedule 5.3(h) listing Sellers' Cure Cost, if any, and the Assigned Contract related therewith.

       1.6     Non-Assignment of Contracts. Notwithstanding anything contained herein to the contrary, this Agreement shall not constitute an agreement to assign any Assigned Contract, if, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of any other party thereto, would constitute a breach thereof or in any way negatively affect the rights of Sellers or Buyer, as the assignee of such Assigned Contract, as the case may be, thereunder. If, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, such consent or approval is required but not obtained, Sellers shall cooperate with Buyer without further consideration in any reasonable arrangement designed to both (a) provide Buyer with the benefits of or under any such Assigned Contract, and (b) cause Buyer to bear all costs and obligations of or under any such Assigned Contract.

## ARTICLE 2
## CONSIDERATION

       2.1     Purchase Price. The aggregate consideration for the sale, conveyance, assignment, transfer and delivery of the Acquired Assets, Net Working Capital and the assumption by Buyer of the Assumed Liabilities shall be $8,000,000. This price will be adjusted plus or minus on a dollar for dollar basis based upon the actual value of Net Working Capital at the Closing (as so adjusted, the "Cash Purchase Price"). Net Working Capital adjustments shall be calculated in accordance with Sections 2.3 and 2.4.

       2.2     Escrow.

(a)     Within twenty-four (24) hours of the execution of this Agreement, the parties shall execute an escrow agreement (the "Escrow Agreement") in substantially the form of Exhibit B. In

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 11 of 49

the event of any conflict between this Agreement and the Escrow Agreement, this Agreement shall prevail.

(b)     Within twenty-four (24) hours of the execution of this Agreement, Buyer shall deposit with the Escrow Agent (as such term is defined in the Escrow Agreement) an amount equal to $100,000 (the "Deposit"). Upon the Bankruptcy Court's entry of the Procedures Order approving Buyer as the Stalking Horse, Buyer shall deposit with the Escrow Agent an additional $400,000 to be included as a part of the Deposit.

(c)     At the Closing, an amount equal to 10% of the sum of the Cash Purchase Price (the "Escrow Funds") shall be paid to a financial institution as the parties may mutually agree upon, as escrow agent (the "Escrow Agent"), who shall hold such amount in escrow for a period of eighteen (18) months following the Closing Date pursuant to the terms of an escrow agreement (the "Indemnification Escrow Agreement") substantially in the form of Exhibit C attached hereto. The balance of the Cash Purchase Price shall be payable at the Closing by wire transfer of immediately available funds to one or more accounts designated by Sellers to Buyer in advance of the Closing.

2.3     Closing Cash Purchase Price Adjustment.

(a)     Not less than ten (10) Business Days prior to the intended Closing Date, Sellers shall submit to Buyer their good faith estimate of Net Working Capital (as defined in Article 11) as of the end of the most recently ended calendar month prior to the Closing Date for which financial statements are available and consistent with GAAP consistently applied and Exhibit 11 ("Sellers' Estimated Net Working Capital"), together with reasonable supporting documentation. Within three (3) Business Days following receipt of Sellers' calculation, Buyer and Sellers shall work together in good faith to determine a mutually acceptable estimated Net Working Capital as of such date consistent with GAAP consistently applied and Exhibit 11. If agreed by the parties, Sellers' Estimated Net Working Capital shall be the "Estimated Net Working Capital". If the parties are unable to agree, not less than five (5) Business Days prior to the Closing Date, Buyer shall submit to Sellers its good faith estimate of the Net Working Capital consistent with GAAP consistently applied and Exhibit 11, ("Buyer's Estimated Net Working Capital"), together with reasonable supporting documentation. In this case, the Estimated Net Working Capital shall be the average of Sellers' Estimated Net Working Capital and Buyer's Estimated Net Working Capital.

(b)     The Cash Purchase Price payable at the Closing shall be increased or decreased, as the case may be, dollar for dollar by the amount, if any, by which the Estimated Net Working Capital exceeds or is less than the Net Working Capital as of July 31, 2010.

2.4     Post-Closing Cash Purchase Price Adjustment.

(a)     As promptly as practical after the Closing, but in any event within one hundred eighty (180) days following the Closing, Sellers shall provide to Buyer, Sellers' proposed calculation of actual Net Working Capital as of the Closing Date, calculated in accordance with this Agreement ("Sellers' Final Net Working Capital"), together with reasonable supporting documentation. If Buyer does not object to Sellers' Final Net Working Capital within fifteen (15) days following Sellers' delivery of such amount to Buyer, such amount shall be binding on Sellers and Buyer as the "Final Net Working Capital".

(b)     If Buyer objects to Sellers' Final Net Working Capital within the fifteen (15) day objection period, Buyer shall give written notice to Sellers of its disagreement, specifying in reasonable detail the items of disagreement, the bases therefore and provide its proposed calculation of the actual Net Working Capital as of the Closing Date, calculated in accordance with this Agreement ("Buyer's Final Net Working Capital"), together with reasonable supporting documentation.  The parties shall work together in good faith for a period of ten (10) Business Days to resolve their disagreement, and any amount agreed upon by Buyer and Sellers shall become the Final Net Working Capital.  If after the expiration of such ten (10) Business Days, the parties are unable to agree, either party may invoke the provisions of Section 2.4(c) and the resulting Final Net Working Capital shall be final and binding on the parties.

(c)     If either Buyer or Sellers invoke the provisions of this Section 2.4(c), an independent certified public accounting firm (the "Arbitrator") shall be retained, within three (3) Business Days following the prior ten (10) Business Day negotiation period, to arbitrate the disagreement.  Once the Arbitrator is retained, the parties shall each submit to the Arbitrator in writing, within fifteen (15) days after such retention, each parties' respective Final Net Working Capital proposal, together with supporting documentation as such party deems necessary or as required by the Arbitrator (collectively, the "Submissions") (provided that if any documentation requested by the Arbitrator cannot be obtained within such 15-day period (acting in good faith and in a diligent manner), then such 15-day period shall be extended for such a period of time as is reasonably necessary for such information to be obtained).  The Arbitrator shall determine the Final Net Working Capital using the provided Submissions and the calculation method set forth in this Agreement.  The Arbitrator's Final Net Working Capital shall be less than or equal to the higher Final Net Working Capital and more than or equal to the lower Final Net Working Capital, as previously provided by the parties.  The Arbitrator shall provide the Final Net Working Capital, including the calculations supporting any adjustment, to the parties, as soon as practical, but in any event within thirty (30) days after receiving the Submissions.  The Arbitrator's determination of Final Net Working Capital shall be the Final Net Working Capital and shall be binding upon the parties.

(d)     If the Final Net Working Capital is more than the Estimated Net Working Capital, Buyer shall pay the amount that is the difference between the Final Net Working Capital and Estimated Net Working Capital to an account designed by Sellers and provided in writing to Buyer, within three (3) Business Days after the Final Net Working Capital is determined.  If the Final Net Working Capital is less than the Estimated Net Working Capital, Sellers and Buyer shall direct the Escrow Agent to pay the amount that is the difference between the Estimated Net Working Capital and Final Net Working Capital to an account designed by Buyer and provided in writing to Sellers, within three (3) Business Days after the Final Net Working Capital is determined.

(e)     The Arbitrator's fees and expenses incurred in connection with the arbitration of the dispute shall be split equally between the parties with Sellers paying one-half (1/2) and Buyer paying one-half (1/2).

2.5     Allocation of Purchase Price.  The Purchase Price shall be allocated among the various classes of the Acquired Assets and the Assumed Liabilities in accordance with and as provided by Section 1060 of the Code.  Within thirty (30) days following the Closing, Buyer shall provide Sellers with a preliminary allocation of the Purchase Price for Sellers' review and approval,

which approval shall not be unreasonably withheld or delayed. The parties agree that any tax returns or other tax information they may file or cause to be filed with any Governmental Entity shall be prepared and filed consistently with such agreed upon allocation. In this regard, the parties agree that, to the extent required, they will each properly prepare and timely file Form 8594 in accordance with Section 1060 of the Code.

### ARTICLE 3
### CLOSING

3.1     Closing.   The closing of the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities and the consummation of any other transactions contemplated hereunder (the "Closing") shall take place at the offices of McDonald Hopkins LLC, 600 Superior Avenue, Suite 2100, Cleveland, Ohio 44114 (unless the parties agree to another time, date, or place) on the third (3rd) Business Day after satisfaction or waiver of the conditions set forth in Articles 6 and 7, other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions (the "Closing Date"). The transactions to be consummated on the Closing Date shall be deemed to have been consummated as of 11:59 p.m. on the Closing Date. At the Closing, all proceedings to be taken and all documents to be executed and delivered by all parties shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken or not taken nor documents executed or delivered until all have been taken, executed, and delivered.

3.2     Deliveries by Sellers.   On or prior to the Closing Date, Sellers shall deliver to Buyer the following:

(a)     The sale, conveyance, assignment, transfer and delivery by Sellers of the Acquired Assets to Buyer, as herein provided, shall be effected on the Closing Date by quit claim deeds, bills of sale, endorsements, assignments and other instruments of transfer and conveyance, excluding any representations, warranties or covenants and shall otherwise be consistent with the terms of this Agreement reasonably satisfactory in form and substance to counsel for Buyer;

(b)     Sellers shall execute and deliver an officer's certificate delivered in accordance with Section 6.3;

(c)     Copies of resolutions duly adopted by the Board of Directors of each Seller, authorizing and approving its performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and of full force as of the Closing, by the appropriate officers of each Seller;

(d)     All consents, Orders and approvals of the Bankruptcy Court, including certified copies of the Sale Order and the Assigned Contracts Order;

(e)     Certificates of incumbency for the respective officers of each Seller executing this Agreement or making certifications for the Closing dated as of the Closing Date; and

(f)     Such other instruments and documents as Buyer and Sellers deem mutually necessary to effect the transactions contemplated hereby.

10-61078-rk     Doc 375-1     FILED 10/22/10     ENTERED 10/22/10 10:16:40     Page 14 of 49

3.3     Deliveries by Buyer.  On or prior to the Closing Date, Buyer shall deliver to Sellers the following:

(a)     Buyer shall cause the Escrow Agent to pay the Deposit to Sellers in accordance with the terms of the Escrow Agreement by wire transfer of immediately available funds to the bank account designated by Sellers in a writing delivered to Buyer at least two (2) Business Days prior to the Closing Date;

(b)     Buyer shall pay Sellers the Cash Purchase Price, determined in accordance with Article 2, less the Deposit and the Escrow Funds, by wire transfer of immediately available funds to Sellers' bank account, designated by Sellers in a writing delivered to Buyer at least two (2) Business Days prior to the Closing Date;

(c)     Buyer shall execute and deliver to Sellers an instrument of assumption of liabilities with respect to the Assumed Liabilities reasonably satisfactory in form and substance to counsel for Sellers; and

(d)     Buyer shall execute and deliver to Sellers an officer's certificate in accordance with Section 7.3.

3.4     Title Insurance.  In preparation for the Closing, as soon as reasonably possible and in no event later than ten (10) days of the execution of this Agreement, Seller will furnish to Buyer, at Seller's expense, with respect to each parcel of Real Property described on Schedule 3.4 a title commitment, with respect to an ALTA Form 2006 Owner's Policy of Title Insurance to be issued by the Title Company insuring marketable fee title in the Buyer as of the Closing, subject to; (i) taxes and assessments not yet due and payable, (ii) zoning and other ordinances, (iii) encumbrances and restrictions of record which do not materially impair the Buyer's ability to continue to use the Real Property as it is currently utilized in the operation of Sellers' business; and (iv) those matters that would be disclosed by an accurate survey of the Real Property.  Sellers shall pay all title examination charges and commitment fees.  Buyer shall be responsible for payment of the premium for the Owner's Policy of Title Insurance and premiums for any endorsements required by Buyer.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

4.1     Representations and Warranties of Sellers.  Sellers, jointly and severally, represent and warrant to Buyer as follows:

(a)     Corporate Organization of Sellers.  Each Seller is duly incorporated, validly existing, and in good standing under the laws of the State of Ohio.  Each Seller has all requisite corporate power and authority to own its properties and assets and to conduct the Business as now conducted.

(b)     Authorization and Validity.  Subject to Bankruptcy Court approval, each Seller has the full power and authority to execute and deliver this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder. and this Agreement and the Related Agreements will constitute the legal, valid and binding obligation of each Seller, enforceable against each of them in accordance with its terms.

{2394643:10}                                11

(c)     No Conflict or Violation.  Subject to: (i) Bankruptcy Court approval; (ii) receipt of the consents listed on Schedule 4.1(d); and (iii) delivery of notice to the Ohio Attorney General or receipt of approval from the Ohio Attorney General, as applicable, the execution, delivery and performance by Sellers of this Agreement and the Related Agreements, and the performance by Sellers of the transactions contemplated by this Agreement and the Related Agreements, do not (a) violate any provision of Sellers' governance documents, (b) violate any Law or Order, (c) result in a breach of or default (with or without notice or lapse of time or both) under any Contract to which Sellers are a party or by which they or any of their properties may be affected or bound, if the effect of such breach or default shall be a Material Adverse Effect, or (d) cause the acceleration of the maturity of the Assumed Liabilities or the creation of any Lien, charge, or encumbrance upon the Acquired Assets in a manner that shall have a Material Adverse Effect.

(d)     Consents.  Upon entry of the Sale Order and the Assigned Contract Order, and other than (i) any approval from the Ohio Attorney General (as applicable), (ii) the consent of any individual physicians to the assumption and assignment of their respective employment agreements, or (iii) as set forth on Schedule 4.1(d), to Sellers' Knowledge, the execution, delivery and performance by Sellers of this Agreement and the Related Agreements, and the performance by Sellers of the transactions contemplated by this Agreement and the Related Agreements, do not require the authorization, consent or approval of any Governmental Entity or third party of such a nature that the failure to obtain the same would have a Material Adverse Effect.

(e)     Brokers.  Except as set forth on Schedule 4.1(e), no broker, finder, investment banker or other Person is entitled to any brokerage, finder's or other fee or commission in connection with this Agreement or the transactions contemplated hereby based upon any agreements or arrangements or commitments, written or oral, made by or on behalf of Sellers.

(f)     Title to Acquired Assets.  Subject to the entry of the Sale Order, at the Closing, Sellers shall obtain good and marketable title to, or a valid and enforceable right by Contract to use, the Acquired Assets, which shall be transferred to Buyer free and clear of all Liens, other than Permitted Encumbrances.

(g)     Contracts.  Copies of all Material Contracts (including all material modifications and amendments thereto) have been made available to Buyer.  Except as set forth on Schedule 4.1(g), giving pro forma effect to the Sale Order, all of the Assigned Contracts are valid and binding agreements of Sellers and are in full force and effect in all material respects.  Upon entry of the Sale Order and payment of Cure Costs and/or provision of adequate assurances, Sellers shall not be in breach or default in any material respect under any Assigned Contract. To Sellers' Knowledge, as of the Execution Date and except as set forth in Schedule 4.1(g), no other party to any of the Assigned Contracts is in material breach or default thereunder.

(h)     Licenses; CAH Provider Status.  To Sellers' Knowledge, Sellers possess all Licenses necessary for the conduct of the Business as it is currently conducted, other than such Licenses the absence of which would not have a Material Adverse Effect.  Except as set forth on Schedule 4.1(h), Sellers' are in material compliance with all Licenses.  The Hospital is currently enrolled as a CAH provider in the Medicare and Medicaid programs.  The Hospital has at all times in all material respects met and continues to in all material respects meet all conditions of participation as a CAH provider in the Medicare and Medicaid programs and

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 16 of 49

has a current and valid provider contract with such programs designating it as a CAH provider. For each Assumed Provider Agreement, Schedule 4.1(h) sets forth the effective date, the expiration date, and the provider number(s) associated with such Assumed Provider Agreement.

(i) Hazardous Substances. To Sellers' Knowledge, except as disclosed on Schedule 4.1(i):

   (i) There has been no treatment, disposal, or Release of Hazardous Material on the Real Property or any other site to which Sellers have sent knowingly or otherwise arranged the transportation knowingly of Hazardous Materials (other than Releases involving de minimis quantities of Hazardous Materials and other than disposal and transportation by licensed disposers or haulers of Hazardous Materials) that would: (i) constitute a violation of any Environmental Law by Sellers, or by any third party if the effect of such violation by such third party imposes a remediation obligation on the part of Sellers; (ii) trigger any release-reporting obligations of Sellers under any Environmental Law; or (iii) trigger any clean-up or remediation obligations of Sellers under any Environmental Law;

   (ii) Sellers are in compliance with, in all material respects, all Environmental Laws that govern the Real Property;

   (iii) Sellers have obtained all material Licenses required under the Environmental Laws for operation of the Business, and currently are in compliance in all material respects with, all such Licenses; and

   (iv) Sellers have not received in the most recent five (5) year period any written notice of any proceeding, action, or other claim or liability arising under any Environmental Laws (including, without limitation, notice of potentially responsible party status under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§9601 *et seq.* or any state counterpart) from any Person or Governmental Entity regarding the Real Property or the businesses operated from such properties, or any properties to which Sellers have sent knowingly or arranged knowingly for the transportation of Hazardous Materials.

(j) Financial Information. Sellers have previously furnished to Buyer, interim unaudited financial statements dated July 31, 2010 (the "Financial Statements"). Such Financial Statements were prepared in accordance with Sellers' past practices, and fairly present the financial position, results of operations and cash flows of Sellers for the period presented.

(k) Hill-Burton and Other Liens. Except as set forth on Schedule 4.1(k), neither Seller nor any of its predecessors have received any loans, grants or loan guarantees pursuant to the Hill-Burton Act program, the Health professions Educational Assistance Act, the Nurse Training Act, the National Health Planning and Resources Development Act, and the Community Mental Health Centers Act, as amended, or similar laws or acts relating to healthcare facilities. The transactions contemplated hereby will not result in any obligation on Buyer or any of its Affiliates to repay any of such loans, grants or loan guarantees, nor subject Buyer, its Affiliates or the Assets to any lien, restriction or obligation, including any requirement to provide uncompensated care.

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 17 of 49

(l)    <u>Third Party Payor Cost Reports</u>. Seller has duly filed all required cost reports for all the fiscal years through and including the fiscal ended December 31, 2009. All of such cost reports accurately reflect the information required to be included thereon and such cost reports do not claim and Seller has not received reimbursement in any amount in excess of the amounts provided by law or any applicable agreement. <u>Schedule 4.1(l)</u> indicates which of such cost reports have not been audited and finally settled and a brief description of any and all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances, and any and all other unresolved claims or disputes in respect of such cost reports. Seller has established adequate reserves to cover any potential reimbursement obligations that Seller may have in respect of any such third party cost reports, and such reserves are set forth in the Financial Statements.

(m)    <u>Compliance</u>. Except as set forth in a writing delivered by Seller to Buyer which specifically makes reference to this <u>Section 4.1(m)</u> (the "<u>Disclosed Condition</u>") or to the extent set forth on <u>Schedule 4.1(m)</u>, Seller (a) is not a party to a corporate integrity agreement with the Office of Inspector General of the Department of Health and Human Services, (b) has no reporting obligations pursuant to any Settlement Agreement entered into with any governmental entity, (c) to the best of Seller's Knowledge, has not been the subject of any government payer program investigation conducted by any federal or state enforcement agency, (d) to the best of Seller's knowledge, has not been a defendant in any *qui tam*/False Claims Act litigation, (e) has not been served with or received any search warrant, subpoena, civil investigative demand, contact letter, or telephone or personal contact by or from any federal or state enforcement agency (except in connection with medical services provided to third-parties who may be defendants or the subject of investigation into conduct unrelated to the operation of the healthcare businesses conducted by Seller), and (f) has not received any complaints from employees, independent contractors, vendors, physicians, or any other person that would indicate that Seller has violated any law or regulation.

(n)    <u>Compliance with Laws</u>. Except as set forth on <u>Schedule 4.1(n)</u> or as otherwise disclosed to Buyer, (a) Sellers are in compliance with Laws and requirements applicable to the conduct of the Business or to the ownership or use of any of the Acquired Assets; (b) except to the extent that there is no Material Adverse Effect, Sellers are in compliance with Laws, regulations and Orders, as required for participation in the Medicare and Medicaid reimbursement programs and are in compliance with the indigent care conditions, if any, contained in or related to certificates of need obtained by them; (c) except as in the Ordinary Course of Business for denials, takebacks, and Payor audits, Sellers have not received any written notice with current applicability from any Governmental Entity of any violation or failure to comply with any Laws, or any alleged violation or failure to comply with any Laws; (d) neither Seller nor any of its employees have committed a violation of federal or state laws regulating health care fraud, including but not limited to the federal Anti-Kickback Law, 42 U.S.C. §1320a-7b, the Stark I and II Laws, 42 U.S.C. §1395nn, as amended, and the False Claims Act, 31 U.S.C. §3729, et seq. during the preceding six year period; and (e) .there are no pending or, to Sellers knowledge, threatened, investigations, complaints actions or proceedings seeking to limit, alter or terminate the Hospital's status as a CAH provider in the Medicare and Medicaid programs and Sellers have taken no action, or failed to take any action, that could give rise to the right of Medicare or Medicaid to terminate the Hospital's Status as a CAH provider or otherwise limit, alter or terminate the Hospital's enrollment in the Medicare and Medicaid programs.

10-61078-rk   Doc 375-1   FILED 10/22/10   ENTERED 10/22/10 10:16:40   Page 18 of 49

(o)     Employee Relations; Employee Benefits. With respect to the Retained Employees:

    (i)     Sellers are in compliance in all material respects with all applicable laws respecting labor, employment, fair employment practices, terms and conditions of employment, workers' compensation, occupational safety, plant closings, and wages and hours with respect to the employees of the Business.

    (ii)     Except as set forth on Schedule 4.1(o), there are no Plans (as defined below) contributed to, maintained or sponsored by Sellers to which Sellers are obligated to contribute or with respect to which Sellers have any material liability or potential material liability, whether direct or indirect. For purposes of this Agreement, the term "Plans" shall mean any: (i) employee benefit plans whether or not funded and whether or not terminated, (ii) employment agreements, and (iii) personnel policies or fringe benefit plans, policies, programs and arrangements, whether or not funded, and whether or not terminated, including without limitation stock bonus, deferred compensation, profit sharing, pension, severance, bonus, vacation, travel, incentive, and health, disability and welfare plans, agreements or arrangements. Within the six (6) year period ending on the Closing Date, Sellers have not sponsored, contributed to or had an obligation to contribute to a multiemployer plan, multiple employer plan, or single employer plan to which at least two or more of the contributing sponsors are not part of the same controlled group.

(p)     Litigation. Except for the Bankruptcy Cases and proceedings therein, or any garnishment, domestic relation, foreclosure or collection proceedings, or as set forth on Schedule 4.1(p), there is no material action, suit, proceeding in equity or at law, arbitration, or administrative or other proceeding by or before any person (including, without limitation, any Governmental Entity), pending, or to Sellers' Knowledge, threatened in writing against Sellers, and the Acquired Assets are not subject to any Order entered in any material lawsuit or proceeding.

(q)     Physicians. Sellers shall within five (5) days of execution of this Agreement provide Buyer a list of all Physicians and a listing, if any, of adverse actions with respect to any such Physician whether brought by the Hospital's medical staff governing board, state professional review organization or any Governmental Entity. Sellers shall promptly advise Buyer of any adverse action against any Physician whose services or patients generated patient revenues in excess of $750,000 in 2009 affecting such Physician's medical staff membership, license to practice medicine in the State of Ohio or participation in the Medicare and/or Medicaid programs.

4.2     Representations, Warranties and Agreements of Buyer.     Buyer hereby represents, warrants to Sellers and agrees with Sellers as follows:

(a)     Organization and Corporate Power. Buyer is a nonprofit corporation organized and validly existing under the laws of, and is authorized to exercise its corporate powers, rights and privileges and is in good standing in, the State of Ohio, and has full corporate power and authority to carry on its business as presently conducted and to own or lease and operate its properties and assets now owned or leased and operated by it, to own the Acquired Assets,

and to perform the transactions on its part contemplated by this Agreement and all Related Agreements.

(b)     Authorization and Validity.  Buyer has, or on the Closing Date shall have, all requisite corporate power and authority to enter into this Agreement and any Related Agreement, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and each Related Agreement to and the performance of its obligations hereunder and thereunder, have been, or on the Closing Date shall be, duly authorized by all necessary corporate action by the board of directors of Buyer, and no other corporate proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance. This Agreement has been, and each Related Agreement has been, or on the Closing Date shall be, duly executed by Buyer and constitute, or shall constitute, when executed and delivered, Buyer's valid and binding obligation, enforceable against Buyer in accordance with its respective terms except as may be limited by bankruptcy or other laws affecting creditors' rights and by equitable principles.

(c)     Absence of Breach.  Subject to the provisions of Section 4.2(d) below regarding private party and Governmental Entity consents, the execution, delivery and performance by Buyer of this Agreement and the Related Agreements do not (a) violate any of the provisions of the governing documents of Buyer, (b) violate any Law or cause the suspension or revocation of any License presently in effect, except where such violation, suspension, or revocation shall not have a Buyer Material Adverse Effect, or (c) result in a breach of or default (with or without notice or lapse of time or both) under any Contract to which Buyer is a party or by which it or any of its properties may be affected or bound, if the effect of such breach or default shall be a Buyer Material Adverse Effect.

(d)     Consents.  Except as set forth on Schedule 4.2(d), the execution, delivery and performance by Buyer of this Agreement and the Related Agreements, and the performance by Buyer of the transactions contemplated hereby and thereby, do not require the authorization, consent or approval of any Governmental Entity or third party of such a nature that a failure to obtain the same would have a Material Adverse Effect.

(e)     Brokers.  Except as set forth on Schedule 4.2(e), no broker, finder, investment banker or other Person is entitled to any brokerage, finder's or other fee or commission in connection with this Agreement or the transactions contemplated hereby based upon any agreements or arrangements or commitments, written or oral, made by or on behalf of Buyer or any of its Affiliates. Buyer shall be solely responsible for the payment of any such fee or commission to any Person listed on Schedule 4.2(e).

(f)     Acknowledgment by Buyer.  Buyer has concluded whatever inspections, studies, tests and investigations Buyer desired to conduct relating to the Business, affairs, condition (financial and otherwise), prospects, properties, assets, liabilities, and obligations of Sellers, the Acquired Assets, and the Assumed Liabilities, including economic reviews and analyses, soil tests, engineering analyses, environmental analyses and analyses of any applicable records of any Governmental Entity. Buyer is relying solely on (a) the representations, warranties, and covenants of Sellers set forth in this Agreement and the Related Agreements and (b) its own investigation as to the Business, affairs, condition (financial and otherwise), prospects, properties, assets, liabilities, and obligations of Sellers. Buyer acknowledges that all representations regarding the Acquired Assets, the Assumed Liabilities, the Business, and the

past, present, and future condition (financial and otherwise) of Sellers have been made to Buyer in writing only, and limited to representations contained in this Agreement and the Related Agreements.

4.3     Representations Exclusive. THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT AND THE RELATED AGREEMENTS CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF SELLERS TO BUYER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND BY THE RELATED AGREEMENTS. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE RELATED AGREEMENTS, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, UNDER CONTRACT, AT LAW, OR IN EQUITY, IN RESPECT OF ANY OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, OR FRANCHISES OF SELLERS, ANY OF THE LIABILITIES, OBLIGATIONS, OPERATIONS, AFFAIRS, OR PROSPECTS OF SELLERS, OR ANY PRESENT OR FUTURE FINANCIAL CONDITION OF SELLERS OR THEIR RESPECTIVE OPERATIONS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLERS MAKE NO REPRESENTATION OR WARRANTY WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, SUITABILITY, USAGE, WORKMANSHIP, QUALITY, PHYSICAL CONDITION, OR VALUE, AND ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLERS SPECIFICALLY SET FORTH IN THIS AGREEMENT AND IN THE RELATED AGREEMENTS, ALL OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, FRANCHISES, LIABILITIES, AND OBLIGATIONS OF SELLERS INCLUDED IN THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES ARE BEING ACQUIRED OR ASSUMED "AS IS, WHERE IS" ON THE CLOSING DATE AND IN THEIR PRESENT CONDITION, WITH ALL FAULTS, AND BUYER SHALL RELY ON ITS OWN EXAMINATION AND INVESTIGATION THEREOF IN MAKING ITS ACQUISITION INVESTMENT DECISION.

## ARTICLE 5
## COVENANTS AND OTHER AGREEMENTS

5.1     Mutual Covenants. Each Seller covenants to Buyer and Buyer covenants to each Seller the following:

(a)     General. Each of the parties shall use its commercially reasonable efforts to take all actions to do all things necessary in order to consummate and make effective the transactions contemplated by this Agreement, including without limitation, satisfaction of each party's respective obligations pursuant to Articles 6 and 7.

(b)     Notices, Consents and Licenses. Upon execution of this Agreement, each party hereto shall (i) cooperate with the other and take all reasonable steps to obtain, as promptly as practicable, all consents and Licenses required of any party hereto to consummate the transactions contemplated by this Agreement and (ii) provide such other information and communications to any Governmental Entity as may be reasonably requested. Sellers shall be responsible for obtaining all consents and Licenses required for Sellers to transfer the Acquired Assets to Buyer, and Buyer shall be responsible for obtaining all consents and Licenses required for Buyer to acquire the Acquired Assets from Sellers and to operate the Acquired Assets

following the Closing. Upon request, each party hereto shall cooperate with the other parties hereto in all reasonable respects in such party's efforts to obtain the consents and Licenses for which such party is responsible. The parties shall work diligently and in good faith to complete all necessary regulatory filings, applications and notices and secure all necessary consents, and approvals, if any, including, without limitation, filings with the Ohio Attorney General pursuant to Chapter 109 and Chapter 1702 of the Ohio Revised Code (the "ORC"), in order to complete the transactions contemplated under this Agreement. Sellers shall provide Buyer with prompt written notice of any written communication from any Governmental Entity to a Physician that raises the potential that he will be disqualified from receiving payments from, or providing services paid or reimbursed by, Medicaid or Medicare or which threatens liability for penalties, reimbursements or other payments in excess of $150,000. From and after the Execution Date, the parties shall use commercially reasonable efforts to complete, prepare and obtain all materials necessary or desirable to make the filings contemplated by Section 5.1(c) immediately after the entry of the Sale Order.

(c)     ODH, OBP, ODJFS and CMS Filings. After entry of the Sale Order, Sellers shall promptly execute and file any and all forms, notices, consents and applications with the Ohio Department of Health (the "ODH"), the Ohio Department of Job and Family Services (the "ODJFS"), Ohio State Board of Pharmacy (the "OBP"), and the Centers for Medicare and Medicaid Services (the "CMS") as may be necessary for the ODH, the ODJFS, and the CMS to timely issue or transfer any provider agreement to Buyer required for Buyer to operate the Acquired Assets immediately upon the Closing. After entry of the Sale Order, Buyer shall promptly execute and file any and all forms, notices, consents and applications with the ODH, the ODJFS, and the CMS as may be necessary for the ODH, the ODJFS, the OBP, and the CMS to timely apply for the issuance or assumption of any provider agreement to Buyer required for Buyer to operate the Acquired Assets immediately upon the Closing. Buyer shall assume Sellers' provider agreements to participate in the Medicare and Medicaid programs.

(d)     Further Assurances. From time to time, at the reasonable request of either party, whether on or after the Closing, without further consideration, either party, at its expense and within a reasonable amount of time after request hereunder is made, shall (i) execute and deliver such further instruments of assignment, transfer and assumption and take such other action as may be reasonably required to more effectively assign and transfer the Acquired Assets to, and vest the Assumed Liabilities in, Buyer, (ii) deliver or make the payment of the Cash Purchase Price to Sellers or any amounts due from one party to the other pursuant to the terms of this Agreement, or (iii) confirm Sellers' ownership of the Excluded Assets and obligations with respect to the Excluded Liabilities.

(e)     Cooperation Respecting Proceedings. After the Closing, upon prior reasonable written request, each party shall cooperate with the other, at the requesting party's expense (but including only out-of-pocket expenses to third parties and not the costs incurred by any party for the compensation or other benefits paid to its officers, directors or employees), in furnishing information, testimony and other assistance in connection with any inquiries, actions, Tax or Cost Report audits, proceedings, arrangements or disputes involving either of the parties hereto (other than in connection with disputes between the parties hereto) and based upon Contracts, arrangements or acts of Sellers which were in effect or occurred on or prior to the Closing and which relate to the Business or the Acquired Assets, including,

without limitation, arranging discussions with (and the calling as witness of) officers, directors, employees, agents, and representatives of Buyer or Sellers.

(f)     Preservation of and Access to Certain Records.

      (i)     Hospital Records. As set forth in Sections 1.1(j) and 1.1(k), the Business Records and certain Patient Records concerning active patients of Sellers are Acquired Assets under this Agreement (the Business Records and such Patient Records concerning active patients are collectively referred to herein as the "Transferred Hospital Records"). As set forth in Section 1.2(c), the Business Records and Patient Records referred to therein, are Excluded Assets under this Agreement (such records are collectively referred to herein as the "Retained Hospital Records" and, together with the Transferred Hospital Records, the "Hospital Records"). Notwithstanding anything to the contrary in this Agreement, the parties hereto shall cooperate in providing copies and access to the Hospital Records as set forth below.

      (ii)    Treatment of Retained Hospital Records. Notwithstanding that the Retained Hospital Records are Excluded Assets, to the extent required by applicable Law or at Sellers' election, Sellers may choose not to remove the Retained Hospital Records or otherwise acquire possession of such records after the Closing. Unless and until removed by Sellers, Buyer shall, in accordance with applicable Laws, maintain the Retained Hospital Records at the facilities used in the Business (or at such other location reasonably selected by Buyer) at Buyer's cost, and as agent of and bailee for Sellers, until the expiration of seven (7) years from the Closing, or longer pursuant to any applicable statute of limitations period (if, at the expiration of such period, any Tax or Payor audit or judicial proceeding is in progress or the applicable statute of limitations has been extended, for any such longer period as such audit or proceeding is in progress or such statutory period is extended) (the "Document Retention Period"). Sellers shall have the right to remove, and may remove, at Sellers' expense, from time to time on or prior to the Closing Date and during the Document Retention Period any or all of the Retained Hospital Records. Sellers shall give Buyer reasonable prior notice before removing the Retained Hospital Records. After the expiration of the Document Retention Period, Buyer shall not, without at least thirty-one (31) days prior written notification to Seller, destroy any Retained Hospital Records in its possession. Within thirty (30) days after its receipt of such notice of intent to destroy, Sellers shall have the right to require Buyer to deliver any such Retained Hospital Records to Sellers, at Sellers' expense, in accordance with Sellers' reasonable instructions.

      (iii)   Retention of Hospital Records. Each party shall maintain all Hospital Records in each party's possession during the Document Retention Period and provide access to the other party in accordance with this Section 5.1; *provided, however,* that in the event that Buyer transfers all or a portion of the Business to any third party during the Document Retention Period, Buyer may transfer to such third party all or a portion of the books, records, files and documents related thereto. Each party shall adopt a record retention policy which requires that all of the Hospital Records be maintained for the Document Retention Period and destroyed only after compliance with the notice provisions of this Section 5.1 (including the

10-61078-rk   Doc 375-1   FILED 10/22/10   ENTERED 10/22/10 10:16:40   Page 23 of 49

passage of time), and shall inform its employees of such policy;

(iv)   Access to Documents. Sellers and Buyer shall each provide the other party, and such other party's employees, representatives and agents, upon written request and at the expense of the requesting party, access to the Hospital Records in each party's control or possession during the Document Retention Period for any lawful purposes, including, without limitation, the preparation and filing of tax returns, cost reports, audits, compliance with governmental requirements, investigations and regulations, and the prosecution or defense of third party claims. Such access will include the right of the requesting party to make copies or extracts thereof, at the expense of such requesting party. Access to the Hospital Records shall be during normal business hours, with reasonable prior written notice by the requesting party of the time when such access shall be needed. The requesting party and its employees, representatives and agents shall conduct themselves in such a manner so that normal business activities of the other party shall not be unduly or unnecessarily disrupted. Each party shall instruct their appropriate employees to cooperate in providing access to the Hospital Records as contemplated herein. Notwithstanding anything to the contrary in this Agreement, each party's access to, or right to copies of, the Hospital Records shall be subject to any applicable Law, accreditation standard or rule of confidentiality or privilege.

(v)   Electronic Medical Records. Each party may convert to electronic form, at such party's expense, all Hospital Records in its possession pursuant to this Agreement and may provide the other party access electronically in fulfillment of its obligations in this Section 5.1.

(vi)   Compliance with Law. With respect to any Retained Hospital Records or Transferred Hospital Records transferred to or in the possession of Buyer or Sellers pursuant to this Agreement, Buyer and Sellers shall comply with all state and federal laws and regulations applicable to the maintenance, use, and disclosure of medical records and individually identifiable health information, including, but not limited to, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and regulations promulgated pursuant to HIPAA.

(g)   Remittances and Receivables.

(i)   Remittances. All remittances, mail and other communications relating to the Excluded Assets or Excluded Liabilities received by Buyer or its Affiliates at any time after the Closing shall be promptly turned over by Buyer to the addressee thereof, or if the addressee is no longer affiliated with Sellers, to Sellers, and pending such delivery, Buyer shall have no interest in the same and shall hold such remittances, mail and other communications in trust for the benefit of Sellers. All remittances, mail and other communications relating to the Acquired Assets or the Assumed Liabilities received by Sellers, or any of their Affiliates at any time after the Closing shall be promptly turned over by Sellers, or Affiliate to Buyer, and pending such delivery, Sellers shall have no interest in the same and shall hold such remittances, mail and other communications in trust for the benefit of Buyer.

(ii)   Receivables. Notwithstanding anything contained in this Agreement to the contrary,

this Agreement shall not constitute an agreement to assign any Receivable the assignment of which is either prohibited by Law or by the terms of any Contract with a Payor without the consent of such Payor. Any payments received by Sellers after the Closing Date from patients, Payors, clients, customers, or others who are the obligors on Receivables transferred to Buyer as a part of the Acquired Assets on the Closing Date shall be paid over to Buyer within ten (10) days after receipt by Sellers.

(h)     Employee Matters.

   (i)     Retained Employees.  Upon the Closing, Buyer shall offer to hire at least ninety percent (90%) of the employees of Sellers who, as of the Closing, are actively working in the Business (the "Retained Employees"). The majority of offers of employment by Buyer to Retained Employees shall be to perform comparable services in a comparable position. Buyer will offer compensation that is substantially the same as provided to such Retained Employee by Sellers as of the Closing unless a Retained Employee's Seller Compensation is not within the established range of Buyer's existing compensation structure. In such event, the Retained Employee will receive base compensation which is within Buyer's structure based upon position and years of experience. Between the Execution Date and the earlier of the Closing or a termination of this Agreement, Sellers shall consult with Buyer before hiring new employees to replace any employees who are terminated or who voluntarily resign their position of employment.

Buyer will offer the Retained Employees benefits which are substantially comparable to those provided by Seller.

With respect to employees who are on authorized medical leave, military leave, short-term disability (including maternity), workers' compensation, or other leave of absence, these employees (the "Absent Employees") would be eligible to apply at the end of their said leave for any open positions with preferential consideration given. However, current position at the time of Closing would not be guaranteed to such Absent Employees. (All Retained Employees as well as Absent Employees who are granted positions, will be considered "Hired Employees".)

An example for a regular full-time nonexempt employee (80 hours per pay) is shown in the following schedule:

(For Calculation purposes – amounts are based on 80 hours per pay)

   (ii)     Paid Time Off.  Buyer shall give the Hired Employees full credit for the Paid Time Off earned and accrued by them as of the Closing. The Hired Employees shall be allowed to maintain their accrued PTO, not to exceed the Sellers Maximum PTO schedule. All Hired Employees will be provided 50% credit for their earned Years of Service while employed by the Seller and converted to the Buyer's Paid Time Off Accrual Rates:

An example for a regular full-time nonexempt employee (80 hours per pay) is shown in the following schedule:

(For Calculation purposes – amounts are based on 80 hours per pay)

| Level | Service Years | Maximum Hours per Year | Maximum Days per Year | PTO Calculation Factor | Carry-Over Hours |
|---|---|---|---|---|---|
| 1 | 0 – 4 Years | 176 Hours | 22 | 0.08466 | 96 |
| 2 | 5 – 14 Years | 216 Hours | 27 | 0.10388 | 136 |
| 3 | 15 – 24 Years | 256 Hours | 32 | 0.12315 | 176 |
| 4 | 25 – 29 Years | 264 Hours | 33 | 0.12693 | 180 |
| 5 | 30 – 34 Years | 272 Hours | 34 | 0.13077 | 188 |
| 6 | 35 – 39 Years | 280 Hours | 35 | 0.13462 | 196 |
| 7 | 40+ Years | 288 Hours | 36 | 0.13847 | 204 |

An example for a regular part-time nonexempt employee (minimum 48 hours per pay) is shown in the following schedule which is based on an 80 hour pay period:

(For Calculation purposes – amounts are based on 80 hours per pay)

| Level | Service Years | Maximum Hours per Year | Maximum Days per Year | PTO Factor | Carry-Over Hours |
|---|---|---|---|---|---|
| 1 | 0 – 4 Years | 112 Hours | 14 | 0.05388 | 72 |
| 2 | 5 – 14 Years | 152 Hours | 19 | 0.07313 | 112 |
| 3 | 15 – 24 Years | 192 Hours | 24 | 0.09238 | 152 |
| 4 | 25 – 29 Years | 200 Hours | 25 | 0.09616 | 154 |
| 5 | 30 – 34 Years | 208 Hours | 26 | 0.10000 | 158 |
| 6 | 35 – 39 Years | 216 Hours | 27 | 0.10385 | 162 |
| 7 | 40+ Years | 224 Hours | 28 | 0.10770 | 166 |

An example for a full-time exempt employee is shown in the following schedule:

(For Calculation purposes –amounts are based on 80 hours per pay)

| Level | Service Years | Maximum Hours per Year | Maximum Days per Year | PTO Factor | Carry-Over Hours |
|---|---|---|---|---|---|

10-61078-rk   Doc 375-1   FILED 10/22/10   ENTERED 10/22/10 10:16:40   Page 26 of 49

| | | | | | |
|---|---|---|---|---|---|
| 1 | 0 – 4 Years | 216 Hours | 27 | 0.10388 | 136 |
| 2 | 5 – 14 Years | 256 Hours | 32 | 0.12315 | 176 |
| 3 | 15 – 24 Years | 264 Hours | 33 | 0.12693 | 180 |
| 4 | 25 – 29 Years | 272 Hours | 34 | 0.13077 | 188 |
| 5 | 30 – 34 Years | 280 Hours | 35 | 0.13462 | 196 |
| 6 | 35+ Years | 288 Hours | 36 | 0.13847 | 204 |

An example for a part-time exempt employee is shown on the following schedule:

(For Calculation purposes – amounts are based on 80 hours per pay)

| Level | Service Years | Maximum Hours per Year | Maximum Days per Year | PTO Factor | Carry-Over Hours |
|---|---|---|---|---|---|
| 1 | 0 – 4 Years | 152 Hours | 19 | 0.07313 | 112 |
| 2 | 5 – 14 Years | 192 Hours | 24 | 0.09238 | 152 |
| 3 | 15 – 24 Years | 200 Hours | 25 | 0.09616 | 154 |
| 4 | 25 – 29 Years | 208 Hours | 26 | 0.10000 | 158 |
| 5 | 30 – 34 Years | 216 Hours | 27 | 0.10385 | 162 |
| 6 | 35+ Years | 224 Hours | 28 | 0.10770 | 166 |

All Hired Employees will be converted to the Buyer's Paid Time Off program after the Closing.

(iii) <u>Health and Welfare Benefits</u>. Effective as of the Closing Date, Buyer shall assume the Health and Welfare Benefit Plans and programs listed on <u>Schedule 5.1(h)(iii)</u>, together with all associated liabilities. Buyer acknowledges and agrees that Buyer is a successor employer for purposes of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("<u>COBRA</u>"), that the Hired Employees shall not, as a result, be deemed to have incurred a "qualifying event" within the meaning or Code Section 4980B(f)(3) for purposes of COBRA and that any COBRA notices or coverage's required to be given or made available to any Hired Employee shall be given or made by Buyer and not Sellers or their respective Affiliates.

(iv)  Rollover of Defined Contribution Plan. Buyer shall establish or designate a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Code Section 401(k) (the "Buyer Plan") to be effective as of the Closing. Buyer shall cause the Buyer Plan to accept "direct rollovers" (within the meaning of Section 401(a)(31) of the Code) of distributions from a defined contribution plan of Sellers that includes a cash or deferred arrangement with the meaning of Code Section 401(k) (the "Seller Plan") to Hired Employees in cash (but including direct rollovers of outstanding loans and promissory notes or other documents evidencing such loans), if such rollovers are elected in accordance with the terms of the Seller Plan and applicable Law by such Hired Employee.

(v)  Unpaid Wages and Reporting. As of the Closing, Buyer shall assume liability for any unpaid payroll with respect to the Hired Employees (and such amount shall be included in the documentation of Final Net Working Capital). Sellers shall be relieved of their Form W-2, Wage and Tax Statement, reporting obligations and related tax returns, with respect to each Hired Employee. Buyer shall assume Sellers' entire Form W-2 reporting obligations for all Hired Employees, and each W-2 furnished to a Hired Employee by Buyer shall include wages paid and taxes withheld by Sellers and Buyer during the calendar year during which the Closing occurs.

(vi)  Acknowledgement of Responsibility. As of the Closing Date, Buyer shall be considered for purposes of the Worker Adjustment and Retraining Notification Act (the "WARN Act") the employer of the Retained Employees related to the Acquired Assets transferred at the Closing and that Buyer (and not Sellers) shall thereupon be responsible for complying with the WARN Act with respect to such Retained Employees and that prior to such time none of such Retained Employees shall be, nor shall they be deemed to be, terminated. At least five (5) Business Days prior to the Closing Date and again at the Closing Date, Seller shall provide Buyer with a Schedule identifying all employees who have been terminated in the prior ninety (90) days.

(vii)  Service Credit. Under programs required by this Agreement to be adopted by Buyer on and after the Closing Date, Buyer shall, on and after the Closing Date, credit each Hired Employee with his or her years of credited service with Sellers for purposes of vesting and eligibility as though such service was performed for Buyer.

(viii)  No Third Party Beneficiaries. Notwithstanding anything in this Agreement to the contrary, nothing in this Section 5.1 shall, or shall be deemed to, create any rights in favor of any Person not a party hereto or to constitute an employment agreement or condition of employment for any employee of Sellers or any Affiliate of Sellers or any Retained Employee.

(ix)  No Obligation. Notwithstanding anything in this Agreement to the contrary, Buyer shall not be obligated to adopt or provide any benefit, program or privilege not specifically disclosed on Schedule 5.1(i)(xi).

(x)  Cooperation. During the period between the Execution Date and the Closing Date, Buyer and Sellers shall reasonably cooperate on labor matters to effect the transactions contemplated by this Agreement and the orderly transition of the

operations of the Acquired Assets from Sellers to Buyer.

(i) <u>Use of Controlled Substance Permits</u>. To the extent permitted by applicable law, Buyer shall have the right, for a period not to exceed one hundred twenty (120) days following the Closing Date, to operate under the licenses and registrations of Sellers relating to controlled substances and the operations of pharmacies and laboratories, until Buyer is able to obtain such licenses and registrations for itself. In furtherance thereof, Sellers shall execute and deliver to Buyer at or prior to the Closing a limited power of attorney substantially in the form of <u>Exhibit E</u> hereto.

5.2    <u>Additional Covenants of Sellers</u>.

(a) <u>Conduct Pending Closing</u>. Prior to consummation of the transactions contemplated hereby or the termination of this Agreement pursuant to its terms, unless Buyer shall otherwise consent in writing, Sellers shall conduct the Business and otherwise deal with the Acquired Assets only in the usual and Ordinary Course of Business materially consistent with practices followed prior to the execution of this Agreement, except for (a) actions which arise from or are related to the anticipated transfer of the Acquired Assets, (b) the effectuation of ongoing compliance programs, (c) actions contemplated by this Agreement, the transactions contemplated hereby and the Related Agreements, or (d) actions disclosed on any Schedule to this Agreement. Prior to Closing or termination of this Agreement, Sellers shall promptly inform Buyer of any material events or changes relating to the operation of the Business, consult with Buyer regarding the Business as reasonably requested by Buyer and shall promptly respond to Buyer regarding the Business or the Acquired Assets. Without limiting the generality of the foregoing, and except as required pursuant to the terms of this Agreement, from the Execution Date until the Closing or termination of this Agreement, Sellers shall not with respect to the Business, except in the Ordinary Course of Business or pursuant to preexisting Contracts, Orders, agreements, policies, or as disclosed, (whether orally or in writing):

(i)    incur any indebtedness other than in the Ordinary Course of Business;

(ii)    amend their governance documents;

(iii)    pay or increase any bonuses, salaries, or other compensation to any director, officer or employee or enter into any employment, severance or similar contract with any director, officer or employee;

(iv)    adopt or increase the payments to or benefits under, any profit sharing, bonus, deferred compensation, savings, insurance, pension, retirement or other employee benefit plan for or with any employees;

(v)    except as maybe necessary for the continued operation of the Business, acquire any material assets (other than in connection with customary retirement and replacement programs) or sell (other than sales of Inventory in the Ordinary Course of Business), lease or otherwise dispose of any material asset or property (other than retirements of assets in accordance with their respective useful lives or the normal policies and procedures of Sellers) or mortgage, pledge, or impose any material lien or other encumbrance on any material asset or property constituting a part of the Acquired

Assets, other than Permitted Encumbrances;

(vi)     enter into any material contract which would be an Assigned Contract or any material amendment, modification or termination (partial or complete) of any Assigned Contract or grant any material waiver under or give any material consent with respect to any Assigned Contract;

(vii)    knowingly or intentionally cancel or waive any claims or rights with a value in excess of One Hundred Thousand Dollars ($100,000);

(viii)   change its significant accounting principles, except as required by GAAP or applicable Laws;

(ix)     merge or consolidate with, or make any material capital investment in, any material loan to, any material advance to, or material acquisition of the securities or assets of, any other Person;

(x)      settle or agree to settle any litigation relating to the Acquired Assets, except with respect to claims having a value of less than One Hundred Thousand Dollars ($100,000) individually or in the aggregate;

(xi)     incur, create or suffer to exist any Liens on the (other than Permitted Encumbrances) that shall not be removed at or prior to Closing;

(xii)    enter into any agreement which would be an Assumed Provider Agreement or any material amendment, modification or termination (partial or complete) of any Assumed Provider Agreement or grant any material waiver under or give any material consent with respect to any Assumed Provider Agreement;

(xiii)   take any action that would constitute or result in the breach of any term, condition or provision of, or constitute a default under (with or without notice or lapse of time or both), or give rise to any right of acceleration, termination or cancellation with respect to any Assigned Contract, License or Assumed Provider Agreement.

(xiv)    transfer, abandon, cancel or terminate before the natural expiration of its term any Assigned Contract or License included in the Acquired Assets.

Notwithstanding anything in this Agreement to the contrary, nothing in this Section 5.2 shall (i) obligate Sellers to make expenditures other than in the Ordinary Course of Business and consistent with practices of the recent past or to otherwise suffer any economic detriment outside the Ordinary Course of Business, (ii) preclude each Seller from instituting or completing any program designed to promote compliance or comply with Laws or other good business practices respecting the Business, or (iii) preclude Sellers from transferring, selling, or otherwise dealing in any manner with any of the Excluded Assets. In addition to the foregoing, Sellers agree to use commercially reasonable efforts to maintain and preserve business relationships intact, including maintaining their relationships with physicians or medical staff.

(b)     Access and Information. Sellers shall afford Buyer, and the counsel, accountants and other representatives of Buyer, reasonable access, unless such access is otherwise restricted

pursuant to this Agreement, throughout the period from the Execution Date to the Closing Date, to the Acquired Assets and the employees, personnel and medical staff associated therewith and all the properties, books, contracts, commitments, Cost Reports and records respecting the Business and the Acquired Assets (regardless of where such information, may be located) which and Seller possesses or to which it has access, *provided, however,* that Buyer shall have no right to conduct invasive testing. Such access shall be afforded to Buyer during normal business hours and only in such manner so as not to disturb patient care or to interfere in any material respect with the normal operations of the Business; *provided, however,* that without first obtaining the written consent of the Chief Restructuring Officer of Sellers which consent shall not be unreasonably withheld, conditioned, or delayed, neither Buyer nor its counsel, accountants or other representatives shall tour or visit the facilities or contact any of the employees, personnel or medical staff thereof or of any Affiliate of Sellers. Sellers' covenants under this Section 5.2 are made with the understanding that Buyer shall use all such information in compliance with all Laws and for the sole purpose of consummating the transactions. The foregoing notwithstanding, Buyer acknowledges and agrees that Buyer's access to the books and records of the Business and the Acquired Assets shall not include access to, and Sellers shall not have any obligation to deliver to Buyer, any information concerning any alleged dispute or any pending litigation, investigation or proceeding involving Sellers or any of their respective Affiliates that is protected by or subject to the attorney-client privilege, or the disclosure of which is restricted by an agreement entered into in connection with such dispute, litigation, investigation or proceeding or an order entered by any court; moreover, Buyer shall not have access to Patient Records or employee or medical staff records or any other records the disclosure of which would be prohibited by any Law, accreditation standards, or rule or agreement (express or implied) of confidentiality, except that Buyer may be granted access to such records to the extent they are appropriately redacted and in conformity with such other reasonable procedures as may be required to conform to any such requirements of Law, accreditation standards or rule or agreement of confidentiality. Buyer hereby agrees to defend, indemnify, and hold harmless from and against, and to reimburse and compensate, Sellers for all Losses arising out of or relating to Buyer's access provided pursuant to this Section 5.2(b).

(c)     Updating. Prior to consummation of the transactions contemplated hereby or the termination or expiration of this Agreement pursuant to its terms, Sellers shall notify Buyer of any changes or additions to any of Sellers' Schedules to this Agreement by the delivery of updates thereof, if any, promptly upon Sellers becoming aware of such change or addition. The delivery by Sellers of the updated Schedules shall be deemed to amend the disclosure Schedules of Sellers, to have qualified the representations and warranties contained in this Agreement, and to have cured any misrepresentation or breach of warranty that otherwise might have existed under this Agreement.

(d)     Maintenance of CAH Status. Prior to consummation of the transactions contemplated hereby or the termination or expiration of this Agreement pursuant to its terms, Sellers shall at all times maintain the status of Hospital as a CAH provider under all Assumed Provider Agreements pursuant to which it has been designated as a CAH. Sellers shall take no action or omit to take action that would cause the revocation, limitation or any material change to the Hospital's status as a CAH pursuant to such Assumed Provider Agreements.

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 31 of 49

5.3    Additional Covenants of Buyer.

(a)    Conduct Pending Closing. Prior to consummation of the transactions contemplated hereby or the termination of this Agreement pursuant to its terms, unless Sellers shall otherwise consent in writing, Buyer shall not take any action or fail or omit to take any action which would cause any of Buyer's representations and warranties set forth in Section 4.2 to be false as of the Closing.

(b)    Submission to Regulation. Buyer shall submit to regulation by the ODH, the Ohio Attorney General's office, and any other Governmental Entity of the State of Ohio to the same extent as such Governmental Entity currently regulates Sellers in connection with the ownership and operation of the Business, it being agreed that this covenant shall terminate and have no further effect upon Closing or a termination pursuant to Article 8. Buyer shall not make filings with any state Governmental Entity or take any other action in connection with any action, proceeding, or investigation or Law relating to any other businesses conducted by Sellers or any of their respective Affiliates that also are subject to regulation by any of such state Governmental Entities.

(c)    Buyer's Insurance. At least three (3) days prior to the Closing Date, Buyer shall deliver to Sellers a schedule that lists Buyer's policies and Contracts that shall be in effect as of the Closing Date for retroactive claims made coverage for each physician considered to be a Hired Employee, together with a description of the risks insured against, coverage limits, deductible amounts, and carriers, all of which insurance policies and coverage terms shall be reasonably acceptable to Sellers. Buyers' policy limits shall not be less than those policy limits currently carried by Sellers.

(d)    Resale Certificate. Buyer shall furnish to Sellers any resale certificate or certificates or other similar documents reasonably requested by Sellers to comply with or obtain an exemption from pertinent excise, sales and use tax laws.

(e)    Access to Information Following Closing. After Closing, each party shall, and shall cause its employees, representatives and advisors to, afford to the other party, including its advisors, reasonable access to all Hospital Records and any other books, records, files and documents in such party's possession in accordance with Section 5.1 of this Agreement. In addition, on and after the Closing Date, each party shall generally cooperate with the other party and, without limiting the forgoing, make reasonably available to the other party, employees, medical staff, representatives, agents, and advisors requested by the other party in connection with any action, proceeding, or investigation, including to provide testimony, to be deposed, to act as witnesses and to assist counsel.

(f)    Cost Reports and Audit Contests. After the Closing and for the period of time necessary to conclude any pending or potential audit or contest of any Cost Reports with respect to the Business transferred at the Closing that include periods ending on or before the Closing Date, Buyer shall (a) keep and preserve all financial books and records delivered to Buyer by Sellers and utilized in preparing such Cost Reports, including, without limitation, accounts payable invoices, Medicare logs and billing information in accordance with Section 5.1(g)(ii), and (b) within a reasonable time after Buyer's receipt of the same, forward to Sellers all information received from Payors relating to periods prior to and as of the Closing Date including, without limitation, Cost Report settlements, notices of program

reimbursements, demand letters for payment and proposed audit adjustments. Sellers shall provide assistance to Buyer, without cost to Sellers, in preparing all necessary returns and reports relating to the conduct of the Business prior to the Closing Date, including, without limitation, Cost Reports and excise tax and information returns. Upon reasonable written notice by Sellers, Sellers (or its agents) shall be entitled, during regular business hours, to have access to, inspect and make copies of all such books and records. Upon the reasonable request of Sellers, Buyer shall assist Sellers in obtaining information deemed by Sellers to be reasonably necessary or desirable in connection with any audit or contest of such reports, all without cost to Sellers. To the extent required to meet its obligations under this Section 5.3(f), Buyer shall provide the reasonable support of its employees at no cost to Sellers.

(g) <u>Cure Costs</u>. Buyer shall, at or prior to the Closing, pay the Cure Cost for each Assigned Contract, so that such Assigned Contract may be assumed by Sellers and assigned to Buyer in accordance with the provisions of section 365 of the Bankruptcy Code.

(h) <u>Adequate Assurances Regarding Assigned Contracts and Required Orders</u>. With respect to each Assigned Contract, Buyer shall provide adequate assurance of the future performance of such Assigned Contract by Buyer. Buyer shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's Related Persons available to testify before the Bankruptcy Court.

(i) <u>Cooperation with the PBGC</u>. Buyer shall cooperate with the Pension Benefit Guaranty Corporation (the "<u>PBGC</u>") and its agents in connection with their activities with respect to benefit plans which are subject to Title IV of ERISA and persons or groups of persons at any time covered by, or beneficiaries of, benefit plans. Without limiting the generality of the foregoing, Buyer shall, at the PBGC's request, use, or require third parties to use, any of the Acquired Assets, (including, without limitation, records, computers, computer software, and rights under Assigned Contracts) to make any calculation necessary or desirable, or to provide any information necessary or desirable, to the administration of any benefit plan, the making of any benefit determination or the taking by the PBGC of any action it determines to take in respect of any person or group of persons at any time covered by, or a beneficiary of, any benefit plan. It shall be a condition precedent to Buyer's obligations in this Section 5.3(i) that the PBGC shall have agreed to reimburse Buyer for all actual out-of-pocket expenses (including, without limitation, expenses of having third parties run computer programs to generate information), reasonably incurred by Buyer in the performance of this covenant upon presentation of reasonable evidence thereof.

(j) <u>Physician Privileges</u>. Buyer shall continue to accord from and after the Closing all privileges to practice medicine at the facilities operated as part of the Business to each physician who, immediately prior to the Closing, is on the medical staff; *provided*, *that*, such physicians continue to meet the qualifications and guidelines which may be established from time to time by the applicable provider.

(k) <u>Compliance</u>. Prior to the Closing, Buyer will adopt and maintain a compliance program similar to programs described in the compliance guidance published by the Office Of Inspector General ("OIG") of the Department of Health and Human Services. Neither Buyer nor any of its affiliates are a party to a corporate integrity agreement with the OIG and have

no reporting obligations pursuant to any settlement agreement entered into regarding any governmental health care program.

## ARTICLE 6
## BUYER'S CONDITIONS TO CLOSING

The obligations of Buyer to consummate the transactions under this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions, unless, except for Section 6.6, Buyer waives in writing such fulfillment:

6.1     <u>Performance of Agreement</u>. Sellers shall have performed in all material respects their respective agreements and obligations contained in this Agreement required to be performed on or prior to the Closing.

6.2     <u>Accuracy of Representations and Warranties</u>. The representations and warranties of Sellers set forth in <u>Section 4.1</u> shall be accurate in all respects as of the Closing (as updated by the revising of Schedules contemplated by <u>Section 5.2(c)</u>) as if made as of such time (except for those representations and warranties which speak as of a specific time, which shall have been true in all respects as of such time), except where any inaccuracy or inaccuracies would not result in a Material Adverse Effect.

6.3     <u>Absence of Liability</u>. Buyer shall have received evidence reasonably satisfactory to it that it will not have any liability for any Disclosed Condition and no Physician shall have received any written communication from any Governmental Entity that raises the potential that he will be disqualified from receiving payments from, or providing services paid or reimbursed by, Medicaid or Medicare or which threatens such Physician with liability for penalties, reimbursements or other payments in excess of $150,000.

6.4     <u>CAH Provider Status; Payor Contracts</u>.  Buyer shall have obtained written assurances, documentation or other evidence, in form and substance satisfactory to Buyer, that it shall be able to obtain the assignment of Seller's Medicare provider number, Medicare Provider Agreement and to maintain the status of the Hospital as a CAH provider, to obtain the assignment of the Medicaid provider agreement, Medicaid provider number and all material Payor Contracts; *provided*, that if Buyer obtains such assurances, documentation or other evidence, it shall not attempt to reject any such agreements and shall treat such agreements as Assigned Contracts as herein provided; *provided, further*, that none of the Disclosed Conditions shall be a Cure Cost assumed pursuant to <u>Section 1.3(a)</u>.

6.5     <u>Officers' Certificate</u>.  Buyer shall have received from Sellers an officer's certificate, executed on Sellers' behalf by their chief executive officer, president, chief financial officer or treasurer (in his or her capacity as such) dated the Closing Date and stating that to the knowledge of such individual, the conditions in <u>Sections 6.1</u> and <u>6.2</u> have been satisfied.

6.6     <u>Ohio Law Requirements.</u>  All notices required to have been given under Section 109.34 and Chapter 1702 of the ORC shall have been given, any approvals required to have been obtained under Section 109.35 and Chapter 1702 of the ORC shall have been obtained and any application time period under such sections shall have been satisfied.

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 34 of 49

6.7     No Violation of Orders.  No Order by any Governmental Entity shall be in effect that prevents the sale and purchase of the Acquired Assets or any of the other transactions contemplated by this Agreement.

6.8     No Litigation.     There shall not be pending, or threatened in writing by any Governmental Entity, any suit, action, or proceeding, challenging or seeking to restrain, prohibit, alter, or materially delay, the sale and purchase of the Acquired Assets, or any of the other transactions contemplated by this Agreement, or seeking to obtain from Buyer or any of its Affiliates, in connection with the sale and purchase of the Acquired Assets to be acquired by Buyer, any material damages.

6.9     Sale Order.  The Bankruptcy Court shall have entered an order approving bidding procedures, including a break up fee, that are reasonably acceptable to Buyer and in substantially the same form attached as Exhibit C ("Procedures Order"), as well as the Sale Order shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Sale Order shall be in effect on the Closing Date.

6.10    Closing Deliveries.   Sellers shall have made the deliveries contemplated under Section 3.2.

## ARTICLE 7
## SELLERS' CONDITIONS TO CLOSING

The obligation of Sellers to consummate the transactions shall be subject to the fulfillment at or prior to the Closing of the following conditions unless, except for Sections 7.4 and 7.6, Sellers waive in writing such fulfillment.

7.1     Performance of Agreement.  Buyer shall have performed in all material respects all obligations required under this Agreement or any Related Agreement which are to be performed by Buyer on or before the Closing.

7.2     Accuracy of Representations and Warranties.  The representations and warranties of Buyer made in Section 4.2 of this Agreement, in each case, shall be true and correct in all material respects as of the Execution Date and as of the Closing as though made by Buyer again as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date.

7.3     Officers' Certificate.  Sellers shall have received from Buyer an officer's certificate, executed on Buyer's behalf by its chief executive officer, president, chief financial officer or treasurer (in his or her capacity as such) dated the Closing Date and stating that to the knowledge of such individual, the conditions in Sections 7.1 and 7.2 have been satisfied.

7.4     Ohio Law Requirements.  All notices required to have been given under Section 109.34 and Chapter 1702 of the ORC shall have been given, any approvals required to have been obtained under Section 109.35 and Chapter 1702 of the ORC shall have been obtained and any application time period under such sections shall have been satisfied.

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 35 of 49

7.5     No Violation of Orders.  No Order by any Governmental Entity shall be in effect that (a) prevents the sale and purchase of the Acquired Assets or any of the other transactions contemplated by this Agreement.

7.6     Procedures and Sale Orders.  The Bankruptcy Court shall have entered a Procedures Order in a form reasonably acceptable to the Buyer, as well as the Sale Order in a form reasonably acceptable to the Buyer, the Sale Order shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Sale Order shall be in effect on the Closing Date.

7.7     Closing Deliveries.  Buyer shall have made the deliveries contemplated under Section 3.3.


## ARTICLE 8
## TERMINATION

8.1     Termination.  This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time before the Closing as follows:

(a)     By mutual consent of Sellers and Buyer;

(b)     By Sellers, by notice to Buyer, if Sellers have previously provided Buyer with notice of any material inaccuracy of any representation or warranty contained in Section 4.2, or of a material failure to perform any covenant or agreement of Buyer contained in this Agreement or any Related Agreement to which Buyer is party, in any event which would result in the failure to satisfy any of the conditions of Closing in Article 7 and Buyer has failed, within three (3) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Sellers of Buyer's ability to remedy such inaccuracy or perform such covenant such that the relevant condition in Section 7 shall be satisfied at the Closing; *provided, however*, that Sellers shall not have the right to terminate this Agreement under this Section 8.1(b) if any Seller is then in material breach of this Agreement;

(c)     By Buyer, by notice to Sellers, if Buyer has previously provided Sellers with notice of any material inaccuracy of any representation or warranty of Sellers contained in Section 4.1, a material failure to perform any covenant or agreement of Sellers contained in this Agreement or any Related Agreement to which Sellers are party, in any event such would result in the failure to satisfy any of the conditions of Closing in Article 6, and Sellers have failed, within three (3) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Buyer of Sellers' ability to remedy such inaccuracy or perform such covenant such that the relevant condition in Section 6 shall be satisfied at the Closing; *provided, however*, that Buyer shall not have the right to terminate this Agreement under this Section 8.1(c) if Buyer is then in material breach of this Agreement; or

(d)     By Buyer, at any time prior to 12:00 noon on November 3, 2010 by notice to Sellers, if Buyer is not satisfied that it can secure financing for the for the transactions contemplated by this Agreement; or

10-61078-rk     Doc 375-1     FILED 10/22/10     ENTERED 10/22/10 10:16:40     Page 36 of 49

(e)     Automatically, upon the consummation of an Alternative Transaction.

        8.2     Effect of Termination.

(a)     In the event of termination pursuant to Section 8.1, this Agreement shall become null and void and have no effect (other than Article 8, Article 10 and Article 11, which shall survive termination), with no liability on the part of Sellers, Buyer, or their respective Affiliates or respective Related Persons, with respect to this Agreement or any Related Agreement, except for any liability provided for in this Article 8.

(b)     If this Agreement is terminated pursuant to Section 8.1(a) , 8.1(d), or 8.1(e) then, within two (2) Business Days after such termination, the Deposit shall be returned to Buyer, without interest.

(c)     If this Agreement is terminated pursuant to Section 8.1(b) then all right, title and interest to the Deposit shall automatically vest in Sellers.

(d)     If this Agreement is terminated pursuant to Section 8.1(d) then, (i) the Deposit shall be returned to Buyer, without interest; and (ii) Sellers shall pay to Buyer a break-up fee equal to three percent (3%) of the Cash Purchase Price, as adjusted pursuant to Section 2.1 and 2.3 (the "Break-Up Fee"). Any payments of the Break-Up Fee under this Section 8.2 shall be made by Sellers from the proceeds of the Alternative Transaction by wire transfer of immediately available funds to an account designated in writing by Buyer within two (2) Business Days from the close of such Alternative Transaction.

        8.3     Exclusive Remedy; Waiver.     Prior to the Closing, the parties' sole and exclusive remedies for any claim arising out of or in connection with this Agreement shall be termination in accordance with, and obtaining the remedies provided in, this Article 8. The failure by either Sellers or Buyer to pursue or foreclose on any right or remedy against the other party, by itself, shall not constitute a waiver, and any waiver under this Article 8 shall be effective only if made in writing.

**ARTICLE 9**
**SURVIVAL AND REMEDIES; INDEMNIFICATION**

        9.1     Survival. Except for the Surviving Representations, none of the representations and warranties of each Seller and of Buyer made in this Agreement shall survive the Closing Date, and all of such representations and warranties shall be extinguished by the Closing.  All covenants and agreements of the parties contained in this Agreement shall survive the Closing.

        9.2     Exclusive Remedy; Specific Performance. After Closing, and except as provided in Section 9.3, absent actual fraud, the sole and exclusive remedy for damages of a party hereto for any breach of the covenants or agreements of the other party contained in this Agreement and the Related Agreements shall be the remedies contained in this Article 9.  Sellers and Buyer acknowledge that in case of any breach of their respective covenants and agreements after the Closing, the other would suffer immediate and irreparable harm, which money damages would be inadequate to remedy, and accordingly, in case of any such breach, each non-breaching party shall be entitled to seek specific

performance or other injunctive or equitable relief to the extent that specific performance or such other relief would otherwise be available to a party hereunder.

9.3     Post-Closing Escrow; Indemnification.  The representations and warranties made in Sections 4.1(l), Section 4.1(m) or Section 4.1(n) shall survive the Closing for a period of eighteen (18) months.  Sellers shall solely through the Escrow Funds indemnify and hold harmless Buyer and its Affiliates, and its and their respective officers, employees, agents, or independent contractors (collectively, "Buyer Indemnified Parties"), from and against any and all losses, liabilities, damages, costs (including, without limitation, court costs and costs of appeal) and expenses (including, without limitation, reasonable attorneys' fees and fees of expert consultants and witnesses) that such Buyer Indemnified Party incurs as a result of, or with respect to (i) any misrepresentation or breach of warranty by Sellers of Sections 4.1(l), (m) and/or (n) or (ii) any Excluded Liabilities arising from any breach of a Surviving Representation or from Section 1.4(c).  These funds shall be held by Escrow Agent solely for purposes of any claims which Buyer may have for losses or damages incurred arising out of the breach of the Surviving Representations as identified above or otherwise with respect to Buyer's assumption of the Hospital's Medicare and Medicaid Provider Agreements.

## ARTICLE 10
## PROVISIONS OF GENERAL APPLICATION

10.1     Notices.  Any and all notices required or permitted pursuant to the provisions of this Agreement shall be in writing and given to a party by one of the methods provided below, and shall be effective and deemed to provide such party sufficient notice under this Agreement on the earliest of the following:  (a) at the time of personal delivery, if delivery is in person; (b) at the time of transmission by facsimile or electronic mail, addressed to the other party at its facsimile number or electronic mail address specified herein, with confirmation of receipt made by printed confirmation sheet verifying successful transmission of the facsimile or electronic mail; (c) one (1) business day after deposit with an express overnight courier; or (d) three (3) business days after deposit in the United States or foreign mail by certified mail (return receipt requested).  All notices shall be sent with postage and/or other charges prepaid and properly addressed or directed to each party at the address or electronic destination set forth below, or to such other address or electronic destination as any party may designate by one of the indicated means of notice herein.

If to Seller, addressed to:

Bucyrus Community Hospital, Inc.
629 N. Sandusky Avenue
Bucyrus, Ohio  44820
Attention:        Scott Landrum
Facsimile:        (419) 562-5598
Telephone:      (419) 562-4677
Email:             slandrum@bchonline.org

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 38 of 49

with a copy to counsel for Seller, which shall not constitute notice, to:

> McDonald Hopkins LLC
> 600 Superior Avenue, East
> Suite 2100
> Cleveland, Ohio 44114
> Attention: David D. Watson
> Facsimile: (216) 348-5474
> Telephone: (216) 348-5400
> Email: dwatson@mcdonaldhopkins.com

If to Buyer, addressed to:

> GCH Acquisition Sub
> c/o Galion Community Hospital
> 269 Portland Way South
> Galion, Ohio 44833
> Attention: Jerome Morasko
> Facsimile:
> Telephone: 419-468
> Email: jmorasko@galionhospital.org

with a copy to counsel for Buyer, which shall not constitute notice, to:

> Calfee, Halter & Griswold LLP
> 1400 KeyBank Center
> 800 Superior Avenue
> Cleveland, OH 44114-2688
> Attention: Jean R. Robertson
> Telephone: (216) 622-8200
> Fax: (216) 241-0816
> Email: jrobertson@calfee.com

10.2    Press Releases and Public Announcements. No party shall issue any press release or public announcement relating to the subject matter of this Agreement without the prior written approval of the other party; *provided, however*, that the parties shall use their respective best efforts to consult with the other party in advance of any disclosure required by applicable law but the agreement of the other parties hereto shall not be required with respect to any public disclosure a party believes in good faith is required by applicable law.

10.3    Expenses. Except as otherwise provided in this Agreement, Sellers and Buyer shall pay their own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated. Buyer shall pay the cost of all surveys, title insurance policies and title reports ordered or requested by Buyer.

10.4    Successors and Assigns. The rights under this Agreement shall not be assignable or transferable nor the duties delegable by either party without the prior written consent of the other, and nothing contained in this Agreement, express or implied, is intended to confer upon any Person,

other than the parties hereto and their permitted successors-in-interest and permitted assignees, any rights or remedies under or by reason of this Agreement unless so stated to the contrary. This Agreement shall inure to the benefit of and is binding upon each party's permitted successors-in-interest and permitted assigns, which shall include, in the case of any Seller, any trustee, liquidating trustee, or disbursing agent appointed in accordance with the terms of any plan confirmed pursuant to 11 U.S.C. §1129.

10.5    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute the same agreement. The signature of any of the parties may be delivered and made by facsimile, portable document format ("pdf") or other electronic means capable of creating a printable copy, and each such signature shall be treated as original signatures for all purposes.

10.6    Headings. Article and Section headings used herein are for convenience only and are not a part of this Agreement and shall not be used in its interpretation.

10.7    Entirety of Agreement; Amendments. This Agreement (including the Schedules and Exhibits hereto), the Related Agreements, and the other documents and instruments specifically provided for in this Agreement and in the Related Agreements contain the entire understanding between and among the parties concerning the subject matter of this Agreement, the Related Agreements, and such other documents and instruments and, except as expressly provided for herein, supersede all prior and contemporaneous understandings and agreements, whether oral or written, between or among them with respect to the subject matter hereof and thereof. There are no representations, warranties, agreements, arrangements or understandings, oral or written, between or among the parties hereto relating to the subject matter of this Agreement, the Related Agreements, and such other documents and instruments which are not fully expressed herein or therein, and there are no conditions precedent to the effectiveness of this Agreement. This Agreement may be amended, supplemented, or modified only by an agreement in writing signed by each of the parties hereto. All Exhibits and Schedules attached to or delivered in connection with this Agreement are integral parts of this Agreement as if fully set forth herein.

10.8    Construction of Agreement. The parties acknowledge that each party has reviewed this Agreement and has sought and obtained the legal advice of counsel of its choice, and the parties and their respective legal counsel have together negotiated the final terms of this Agreement. Accordingly, all rules of construction that would otherwise require that any ambiguities be resolved against the drafting party are not applicable and shall not be employed in the interpretation of this Agreement. Any reference to any law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. Any reference to the singular in this Agreement shall also include the plural and vice versa. The phrase "to which any Sellers are a party," or similar construction, is intended to limit the applicable listing of any items, properties, assets, or Contracts to only those items that a Sellers actually owns or to which any Sellers are actually a party, as the case may be, and is meant to exclude any listed property or Contract otherwise.

10.9    Waiver. The failure of a party to insist, in any one or more instances, on performance of any of the terms, covenants or conditions of this Agreement shall not be construed as a waiver or relinquishment of any rights granted hereunder or of the future performance of any such term, covenant or condition, but the obligations of the parties with respect thereto shall continue in full force and effect. No waiver of any provision or condition of this Agreement by a party shall be valid

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 40 of 49

unless in writing signed by such party or operational by the terms of this Agreement. A waiver by one party of the performance of any covenant, condition, representation or warranty of the other party shall not invalidate this Agreement, nor shall such waiver be construed as a waiver of any other covenant, condition, representation or warranty. A waiver by any party of the time for performing any act shall not constitute a waiver of the time for performing any other act or the time for performing an identical act required to be performed at a later time.

10.10 <u>Governing Law; Jurisdiction</u>. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Ohio (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law. For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

10.11 <u>Severability</u>. If any term or other provision of this Agreement is deemed by any court or other tribunal of competent jurisdiction to be invalid, illegal or incapable of being enforced under any rule of law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the greatest extent possible.

10.12 <u>Consents Not Unreasonably Withheld</u>. Wherever the consent or approval of any party is required under this Agreement, such consent or approval shall not be unreasonably withheld, conditioned, or delayed, unless such consent or approval is to be given by such party at the sole or absolute discretion of such party or is otherwise similarly qualified.

10.13 <u>Time Is of the Essence</u>. Time is hereby expressly made of the essence with respect to each and every term and provision of this Agreement. The parties acknowledge that each shall be relying upon the timely performance by the other of its obligations hereunder as a material inducement to each party's execution of this Agreement.

10.14 <u>Disclosure Schedules</u>. Any disclosure made under any specific disclosure Schedule to this Agreement is intended to apply to and qualify disclosures contained under any one or more other disclosure Schedules to this Agreement to the extent that such disclosure contains sufficient information to make it reasonably apparent that it would apply to such other disclosure schedule or Schedules.

**ARTICLE 11**
**DEFINED TERMS**

For purposes of this Agreement, the following terms shall have the following meanings:

"<u>Affiliate(s)</u>" of a specified person shall mean any corporation, limited liability company, partnership, sole proprietorship or other Person which directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with the Person specified. The

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 41 of 49

term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person.

"Active Patient Records" shall mean Patient Records of any patient, within two (2) years prior to the date of this Agreement.

"Alternative Transaction" shall mean any transaction (regardless of the form thereof) involving a sale of all of the Acquired Assets by Sellers to a purchaser or purchasers other than Buyer.

"Business Day" shall mean any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions are authorized by Law or other governmental action to close.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Contract(s)" shall mean any contract, agreement, lease or sublease, license or sublicense, instrument, note, indenture, commitment or undertaking, whether in written form or otherwise.

"Cost Report" shall mean any cost report required to be filed, as of the end of a provider cost year or for any other required period, with cost-based Payors with respect to cost reimbursement.

"Environmental Law" shall mean any Law regulating Hazardous Materials, the environment, natural resources, pollution, environmental protection, waste management, industrial hygiene, health, or safety.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Exhibit" shall mean any exhibit to this Agreement.

"GAAP" shall mean United States generally accepted accounting principles as in effect from time to time.

"Governmental Entity" shall mean any agency, division, subdivision, or governmental or regulatory authority or any adjudicatory body thereof, of the United States or any state, county, or political subdivision thereof.

"Hazardous Materials" shall mean any chemicals, materials, substances, or items in any form, whether solid, liquid, gaseous, semisolid, or any combination thereof, whether waste materials, raw materials, chemicals, finished products, by-products, or any other materials or articles, which are regulated by or form the basis of liability under any Environmental Laws, including, without limitation, any hazardous waste, medical waste, biohazardous waste, industrial waste, solid waste, hazardous substance, pollutant, hazardous air pollutant, contaminant, asbestos, polychlorinated biphenyls, petroleum, formaldehyde, industrial solvents, flammables, explosives, and radioactive substances.

"Home Care Matters" shall mean Crawford County Shared Health Services, Inc. d/b/a Home Care Matters, an Ohio nonprofit corporation.

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 42 of 49

"Improvements" shall mean, the buildings, improvements and structures owned by Sellers existing on the Real Property, and all privileges, rights, appurtenances, easements, rights of way, right, title and interest, if any, in adjacent streets and alleys, hereditaments, water, mineral, oil, and gas rights, development rights, air rights, and rights to claims for adverse possession on adjacent properties, and all improvements, structures and fixtures, in each case, as same are located upon or used or connected with the beneficial use of the Real Property.

"Intercompany Transaction(s)" shall mean any Contract between any Seller or between any Seller and an Affiliate of any Seller, whether or not such transaction relates to the provision of goods and services, tax sharing arrangements, payment arrangement, intercompany charges or balances, or the like.

"Law(s)" shall mean all statutes, rules, regulations, ordinances, orders, codes, permits, licenses and agreements with or of federal, state, local and foreign governmental and regulatory authorities and any order, writ, injunction, subpoena, settlement agreement or decree issued or approved by any court, arbitrator or Governmental Entity or in connection with any judicial or administrative proceeding.

"Licenses" shall mean required certificates of need, certificates of exemption, franchises, accreditations, registrations, licenses, permits and other consents or approvals issued by Governmental Entity or accreditation organizations necessary to operate the Business.

"Lien(s)" shall mean any mortgage, pledge, security interest, encumbrance, lien (statutory or other), conditional sale agreement, claim or liability.

"Material Adverse Effect" shall mean any event, occurrence, condition, circumstance, effect or change that would be (or could reasonably be expected to be) materially adverse to the business, assets, condition (financial or otherwise), operating results, or operations of the Business, none of the following shall, in each case, be deemed to constitute a Material Adverse Effect and none shall be considered in determining whether a Material Adverse Effect has occurred:  (i) changes affecting generally the industries or markets in which Sellers conduct the Business, (ii) any adverse effect on the Business, the Acquired Assets or the Assumed Liabilities, taken as a whole, or the operations, properties, assets, and/or condition (financial or otherwise) relating to the Business, the Acquired Assets or the Assumed Liabilities, taken as a whole, resulting from the execution or announcement or pendency of the transactions contemplated by this Agreement or other communication by Buyer of its plans or intentions (including in respect of employees) with respect to any of the Business, the Acquired Assets or the Assumed Liabilities, (iii) the consummation of the transactions contemplated hereby or any actions by Buyer or Sellers taken pursuant to this Agreement or in connection with the transactions contemplated hereby, (iv) changes in general economic or political conditions or the financing or capital markets in general; (v) changes in Laws, rules, regulations or Orders of any Governmental Entity or any Person or changes in accounting requirements or principles; (vi) any natural disaster, force majeure events or any acts of terrorism, sabotage, military action or war (whether or not declared) or any escalation or worsening thereof; (vii) any failure, in and of itself, by the Business to meet any financial projections or forecasts (it being understood that any change in Sellers underlying, or contributing to, such failure may be taken into account in determining whether there exists a Material Adverse Effect on Sellers); or (viii) changes in GAAP.

"Net Working Capital" as of a given date shall mean the amount calculated by subtracting the sum of Assumed Accrued Benefits and Assumed Accounts Payable (including the third party

settlements and "Other Accrued Expenses" from Exhibit 11) from the sum of Inventory, Receivables (net of contractual allowances and estimated bad debts) and Prepayments as of that date, as determined in accordance with GAAP consistently applied. On this basis, Net Working Capital is $1,959,320 as of July 31, 2010. The calculation of this number is attached as Exhibit 11.

"Order" shall mean any applicable statute, rule, regulation, executive order, decree, temporary restraining order, judgment, preliminary or permanent injunction or other order enacted, entered, promulgated, enforced or issued by any Governmental Entity.

"Ordinary Course of Business" shall mean the ordinary course of the Business consistent with past custom and practice (including with respect to quantity and frequency).

"Patient Records" shall mean any and all written or electronically or magnetically stored files, charts, lists, medical histories, and other similar data maintained with respect to any Person treated or medically consulted with in accordance with the Business.

"Payor(s)" shall mean Medicare, Medicaid, or any other third party payor (including an insurance company and self-insured employer), or any health care provider (such as a health maintenance organization, preferred provider organization, peer review organization, or any other managed care program).

"Permitted Encumbrances" shall mean: (a) Liens for Taxes, assessments and Governmental Entity or other similar charges that are not yet due and payable; (b) easements, licenses, restrictions and other matters of record which do not adversely affect the operation of the Business in question as currently operated; (c) any state of facts a survey or other visual inspection would show that do not adversely affect the operation of the Business in question as currently operated; (d) Liens arising from the Assumed Liabilities; (e) Liens included on any policy of title insurance for the Real Property that is issued to Buyer or any Related Person thereto; and (f) Liens that will attach to the proceeds of the sale under this Agreement pursuant to section 363 of the Bankruptcy Code or will not survive the Closing.

"Person" shall mean any individual, corporation (including a nonprofit corporation), partnership, limited liability company, joint venture, trust, estate, association, organization, or other business entity and any governmental body, agency, or regulatory authority.

"Physician" means any physician or physician extender who during 2009 provided services to the Sellers and the Sellers' patients for which such such physician and the Sellers were paid or reimbursed, in the aggregate from all sources, more than $150,000.

"Related Agreements" shall mean each other related certificate, instrument and agreement required pursuant to this Agreement and to which either Sellers or Buyer are parties thereto.

"Related Person" shall mean, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"Release" shall mean any release, spill, emission, leaking, pumping, emptying, dumping, injection, deposit, disposal, discharge, dispersal, leaching, or migration of Hazardous Materials into or within the environment.

{2394643:10}

"Retained Professional" shall mean all professionals retained pursuant to an Order entered by the Bankruptcy Court.

"Schedule" shall mean any schedule to this Agreement.

"Sellers' Knowledge" shall mean the actual conscious knowledge of [Sellers' current Interim Chief Restructuring Officer, Interim Chief Financial Officer and Comptroller, only to the extent that such individual is affiliated with such a Seller or Sellers].

"Surviving Representations" shall mean those representatives and warranties made pursuant to Sections 4.1(l), (m) and (n) of this Agreement.

"Taxes" or "Tax" shall mean (i) all federal, state, county and local sales, use, excise, property, recordation, transfer, and conveyance taxes, (ii) all state, county and local taxes, levies, fees, assessments or surcharges (however designated, including privilege taxes, room or bed taxes and user fees) which are based on the gross receipts, net operating revenues or patient days of a Sellers' facility for a period ending on, before or including the Closing Date or a formula taking any one of the foregoing into account, and (iii) any interest, penalties and additions to tax attributable to any of the foregoing.

In addition to those terms defined above, the following terms shall have the respective meanings given thereto in the Sections indicated below:

| Defined Term | Section |
|---|---|
| Absent Employees | 5.1(h)(i) |
| Acquired Assets | 1.1 |
| Agreement | Preamble |
| Agreed Procedures | 2.3(a) |
| Approved Cure Cost | 1.5(b) |
| Arbitrator | 2.4(c) |
| Assigned Contract Motion | 1.5(a) |
| Assigned Contract Order | 1.5(b) |
| Assigned Contracts | 1.1(d) |
| Assumed Accounts Payable | 1.3(d) |
| Assumed Accrued Benefits | 1.3(c) |
| Assumed Liabilities | 1.3 |
| Assumed Provider Agreements | 1.1(m) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| BCH | Preamble |
| BCP | Preamble |
| Break-Up Fee | 8.2(d) |
| Business | Recitals |
| Business Records | 1.1(j) |
| Buyer | Preamble |
| Buyer Indemnified Parties | 9.3 |
| Buyer Plan | 5.1(h)(iv) |

| | |
|---|---|
| Buyer's Cure Cost | 1.5(e) |
| Buyer's Estimated Net Working Capital | 2.3(a) |
| Buyer's Final Net Working Capital | 2.4(b) |
| CAH | 1.1(m) |
| Cash Purchase Price | 2.1 |
| Closing | 3.1 |
| Closing Date | 3.1 |
| COBRA | 5.1(h)(iii) |
| Contracts | 1.1(d) |
| CMS | 5.1(c) |
| Cure Costs | 1.3(a) |
| Deposit | 2.2(b) |
| Disclosed Condition | 4.1(m) |
| Document Retention Period | 5.1(f)(ii) |
| Equipment | 1.1(b) |
| Escrow Agent | 2.2(c) |
| Escrow Agreement | 2.2(a) |
| Escrow Funds | 2.2(c) |
| Estimated Net Working Capital | 2.3(a) |
| Excluded Assets | 1.2 |
| Excluded Liabilities | 1.4 |
| Execution Date | Preamble |
| Final Net Working Capital | 2.4(a) |
| Financial Statements | 4.1(j) |
| HIPAA | 5.1(f)(vi) |
| Hired Employees | 5.1(h)(i) |
| Hospital | 1.1(m) |
| Hospital Records | 5.1(f)(i) |
| Indemnification Escrow Agreement | 2.2(c) |
| Intangible Assets | 1.1(i) |
| Inventory | 1.1(c) |
| Leased Real Property | 1.1(a) |
| Leases | 1.1(d) |
| Medicare | 1.1(m) |
| Noticed Contracts | 1.5(a) |
| OBP | 5.1(c) |
| ODH | 5.1(c) |
| ODJFS | 5.1(c) |
| OIG | 5.3(k) |
| ORC | 5.1(b) |
| Owned Real Property | 1.1(a) |
| PBGC | 5.3(i) |
| pdf | 10.5 |
| Petition Date | Recitals |
| Plans | 4.1(o) |
| Prepayments | 1.1(f) |
| Procedures Order | 6.9 |
| Proposed Cure Cost | 1.5(a) |
| Purchase Price | 2.1 |

{2394643:10}                                    42

| | |
|---|---|
| Real Property | 1.1(a) |
| Receivables | 1.1(e) |
| Reference Net Working Capital | 2.3(b) |
| Retained Employees | 5.1(h)(i) |
| Retained Hospital Records | 5.1(f)(i) |
| Sale Order | Recitals |
| Seller(s) | Preamble |
| Seller Plan | 5.1(h)(iv) |
| Seller's Cure Cost | 1.5(f) |
| Sellers' Estimated Net Working Capital | 2.3(a) |
| Sellers' Final Net Working Capital | 2.4(a) |
| Submissions | 2.4(c) |
| Transferred Hospital Records | 5.1(f)(i) |
| WARN Act | 5.1(h)(vi) |
| Warranties | 1.1(h) |

[SIGNATURE PAGE FOLLOWS]

10-61078-rk    Doc 375-1    FILED 10/22/10    ENTERED 10/22/10 10:16:40    Page 47 of 49

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the date first above written.

BUCYRUS COMMUNITY HOSPITAL, INC.

By: _____

Name: _____

Title: _____


BUCYRUS COMMUNITY PHYSICIANS, INC.

By: _____

Name: _____

Title: _____


**SELLERS**


**GCH ACQUISITION SUB**

By: _____

Name: _____

Title: _____

**BUYER**

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the date first above written.

**BUCYRUS COMMUNITY HOSPITAL, INC.**

By:_____

Name:_____

Title:_____

**BUCYRUS COMMUNITY PHYSICIANS, INC.**

By:_____

Name:_____

Title:_____


**SELLERS**

**GCH ACQUISITION SUB.**

By: _____

Name: _Jerome Morasko_

Title: _President/ CEO_

**BUYER**