**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION, CANTON**

| | |
|---|---|
| In re: ) | |
| ) | Case Nos. 10-61078 and 10-61081 |
| BUCYRUS COMMUNITY HOSPITAL, INC. ) | (Jointly Administered under |
| <u>et. al.</u>,[1] ) | Case No. 10-61078) |
| ) | |
| Debtors. ) | Chapter 11 |
| ) | |
| ) | Judge Russ Kendig |

_____

**DISCLOSURE STATEMENT FOR THE DEBTORS' CHAPTER 11 PLAN OF LIQUIDATION**
_____

MCDONALD HOPKINS LLC

SHAWN M. RILEY (0037235)
PAUL W. LINEHAN (0070116)
MELISSA S. GIBERSON (0082413)
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114-2653
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
Email:  sriley@mcdonaldhopkins.com
        plinehan@mcdonaldhopkins.com
        mgiberson@mcdonaldhopkins.com


Counsel to the Debtors and Debtors in Possession

---

[1] The Debtors include:  Bucyrus Community Hospital, Inc. (Employer Tax I.D. No. 34-4468311) and Bucyrus Community Physicians, Inc. (Employer Tax I.D. No. 20-0232621).

{2578808:}

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION, DISCLAIMER AND SUMMARY OF TREATMENT OF CLAIMS AND INTEREST ........................................................................................................1

II. SUMMARY OF TREATMENT OF CLAIMS UNDER THE PLAN .............................2

    A.    Introduction ..............................................................................................................2

    B.    Explanation of Chapter 11 .......................................................................................2

    C.    Preliminary Statement and Summary of Recoveries...............................................3

    D.    Proposed Treatment .................................................................................................3

          1.    Overview of Treatment Under the Plan .......................................................3
          2.    Summary of Classification and Treatment Under the Plan ..........................3

    E.    Who Is Entitled to Vote on the Plan .........................................................................5

III. THE DEBTORS AND THE CHAPTER 11 CASES ......................................................5

    A.    Business Overview and History ...............................................................................5

    B.    Prepetition Structure ................................................................................................6

    C.    Boards of Managers and Executive Officers............................................................6

    D.    Prepetition Debt Structure .......................................................................................6

          1.    Prepetition Secured Obligations ..................................................................6
          2.    Repayment of Obligations ...........................................................................7

IV. ACTIVITIES WITHIN THE CHAPTER 11 CASES ....................................................7

    A.    Reasons for Chapter 11 Filing.................................................................................7

    B.    The Chapter 11 Cases .............................................................................................8

          1.    First Day Relief.............................................................................................8
          2.    The Debtors' Professional Advisors.............................................................8
          3.    Appointment of the Creditors' Committee ...................................................8
          4.    Patient Care Ombudsman .............................................................................8
          5.    Exclusivity....................................................................................................8
          6.    Bar Date .......................................................................................................8
          7.    Administrative Bar Date ...............................................................................9
          8.    Postpetition Operations.................................................................................9
          9.    Debtor-in-Possession Financing...................................................................9
          10.    Post-Petition Grant of Adequate Protection Liens.......................................9
          11.    Interim Management Structure .....................................................................9
          12.    Adversary Proceeding 10-06088...................................................................9
          13.    Sale and Marketing Efforts.........................................................................10
          14.    Asset Sale ...................................................................................................10

    C.    Executory Contracts and Unexpired Leases...........................................................10

          1.    Assumption of Contracts and Leases..........................................................10
          2.    Rejection of Contracts and Leases..............................................................11

    D.    Objections to Claims ..............................................................................................11

    E.    Distributions Prior to Effective Date.......................................................................11

    F.    Avoidance Actions .................................................................................................11

V.  SUMMARY OF THE PLAN OF LIQUIDATION .......................................................11

10-61078-rk    Doc 592    FILED 06/27/11    ENTERED 06/27/11 19:27:12    Page 2 of 37

|  | A. | Overview | 11 |
|---|---|---|---|
|  | B. | Overall Structure of the Plan | 11 |
|  | C. | Classification and Treatment of Claims | 12 |
|  |  | 1. Payment of Administrative Claims | 12 |
|  |  | 2. Payment of Priority Tax Claims | 12 |
|  |  | 3. Class 1: Other Priority Claims – Unimpaired | 13 |
|  |  | 4. Class 2: Other Secured Claims – Unimpaired | 13 |
|  |  | 5. Class 3: Declaration Action Claims – Unimpaired | 13 |
|  |  | 6. Class 4: HUD Secured Claims – Impaired | 13 |
|  |  | 7. Class 5: General Unsecured Claims – Impaired | 13 |
|  |  | 8. Class 6: HUD Unsecured Claims – Impaired. | 13 |
|  |  | 9. Class 7: Intercompany Claims – Impaired | 13 |
|  |  | 10. Class 8: Interests – Impaired | 13 |
|  |  | 11. Special Provisions Relating to the Rights of Setoff of Creditors | 14 |

| VI. | MEANS FOR IMPLEMENTATION OF THE PLAN | | 14 |
|---|---|---|---|
|  | A. | Confirmation Exhibits | 14 |
|  | B. | Winddown of Debtors | 14 |
|  | C. | Plan Administrator | 14 |
|  |  | 1. Appointment of the Plan Administrator | 14 |
|  |  | 2. Duties of the Plan Administrator | 14 |
|  |  | 3. Compensation; No Bond | 14 |
|  |  | 4. No Fiduciary or Agency Relationship | 15 |

| VII. | SPECIAL PROVISIONS | | 15 |
|---|---|---|---|
|  | A. | Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims | 15 |
|  | B. | Liquidation of Tort Claims | 15 |
|  | C. | Preservation of Causes of Action; Avoidance Actions | 15 |
|  | D. | Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes | 15 |
|  | E. | Comprehensive Settlement of Claims and Controversies | 15 |
|  | F. | Executory Contracts and Unexpired Leases | 16 |
|  |  | 1. Assumption and Assignment | 16 |
|  |  | 2. Cure of Defaults | 16 |
|  |  | 3. Bar Date for Rejection Damage Claims | 16 |
|  |  | 4. Approval of Rejection | 16 |
|  | G. | Provisions Governing Distributions | 16 |
|  |  | 1. Distributions for Claims Allowed as of the Effective Date | 16 |
|  |  | 2. Method of Distributions to Holders of Claims | 16 |
|  |  | 3. Delivery of Distributions and Undeliverable or Unclaimed Distributions | 16 |
|  |  | 4. Timing and Calculation of Amounts to be Distributed | 17 |
|  |  | 5. Other Provisions Applicable to Distributions in All Classes | 17 |
|  |  | 6. Holders of Record | 18 |
|  |  | 7. Means of Cash Payment | 18 |
|  |  | 8. Withholding Requirements | 18 |
|  |  | 9. Setoffs | 18 |
|  | H. | Procedures for Resolving Disputed Claims | 19 |
|  |  | 1. Treatment of Disputed Claims | 19 |
|  |  | 2. Prosecution of Objections to Claims | 19 |
|  |  | 3. Distributions on Account of Disputed Claims Once Allowed | 20 |

| | I. | Consolidation of Certain Debtors | 20 |
| | | 1. | Limited Consolidation for Certain Purposes | 20 |
| | | 2. | Order Granting Consolidation for Certain Purposes | 20 |
| | J. | Confirmation of the Plan | 20 |
| | | 1. | Conditions Precedent to Confirmation | 20 |
| | | 2. | Conditions Precedent to the Effective Date | 20 |
| | | 3. | Waiver of Conditions to Confirmation or Effective Date | 21 |
| | | 4. | Cramdown | 21 |
| | | 5. | Effect of Nonoccurrence of Conditions to the Effective Date | 21 |
| | | 6. | Effect of Confirmation of the Plan | 21 |
| | | 7. | Request for Waiver of Stay of Confirmation Order | 22 |
| | K. | Summary of Other Provisions of the Plan | 22 |
| | | 1. | Modification of the Plan | 22 |
| | | 2. | Revocation of the Plan | 22 |
| | | 3. | Severability of Plan Provisions | 23 |
| | | 4. | Dissolution of Creditors' Committee | 23 |
| | | 5. | Successors and Assigns | 23 |

VIII. RETENTION OF JURISDICTION ........................................................................23

IX. RISK FACTORS TO BE CONSIDERED .................................................................24

    A. Failure to Satisfy Vote Requirement ................................................................24

    B. Non-Confirmation or Delay of Confirmation of the Plan .................................25

    C. Non-Consensual Confirmation .........................................................................25

    D. Risk of Non-Occurrence of the Effective Date .................................................25

    E. Classification and Treatment of Claims ............................................................25

X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........26

    A. U.S. Federal Income Tax Consequences to the Debtors ...................................26

    B. U.S. Federal Income Tax Consequences to Holders of Claims ..........................26

        1. General Treatment of Holders of Claims ...............................................27

        2. Bad Debt Deduction ..............................................................................27

    C. Information Reporting and Backup Withholding ...............................................27

    D. Importance of Obtaining Professional Tax Assistance ......................................28

XI. FEASIBILITY OF THE PLAN AND BEST INTEREST OF CREDITORS .................28

    A. Feasibility of the Plan ......................................................................................28

    B. Acceptance of the Plan .....................................................................................28

    C. Best Interests Test ............................................................................................28

    D. Application of the 'Best Interests' of Creditors Test to the Liquidation Analyses and the Valuation ....................................................................................................28

    E. Confirmation Without Acceptance of All Impaired Classes: The 'Cramdown' Alternative ........29

XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ....29

XIII. THE SOLICITATION; VOTING PROCEDURE ......................................................30

    A. Parties in Interest Entitled to Vote ..................................................................30

    B. Voting Procedures ...........................................................................................30

C.      Waivers of Defects, Irregularities, Etc. ................................................................30

D.      Withdrawal of Ballots; Revocation ......................................................................30

E.      Further Information; Additional Copies ...............................................................31

XIV.    CONCLUSION AND RECOMMENDATION ......................................................................31

**TABLE OF APPENDICES**

| Appendix | Name |
|---|---|
| Appendix A | DEBTORS' CHAPTER 11 PLAN OF LIQUIDATION |
| Appendix B | DISCLOSURE STATEMENT ORDER |
| Appendix C | VOTING INSTRUCTIONS AND PROCEDURES |

{2578808:}

## I. INTRODUCTION, DISCLAIMER AND SUMMARY OF TREATMENT OF CLAIMS AND INTEREST

Bucyrus Community Hospital, Inc. ("BCH") and its affiliated Debtor, Bucyrus Community Physicians, Inc. ("BCP" and together with BCH, the "Debtors" or the "Company") in chapter 11 Case Number 10-61078 and chapter 11 Case Number 10-61081, jointly administered as Case Number 10-61078 (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Northern District of Ohio ("Bankruptcy Court") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), provide this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the Debtors' Chapter 11 Plan of Liquidation (the "Plan"). The Plan is being proposed by the Company and was filed with the Bankruptcy Court on June 27, 2011. A copy of the Plan is annexed as <u>Appendix A</u> to this Disclosure Statement.

The Plan generally provides for the liquidation of the Debtors' assets and distribution of proceeds to creditors in accordance with the Bankruptcy Code. **THE DEBTORS RECOMMEND ACCEPTANCE OF THE PLAN AND URGE CREDITORS ENTITLED TO VOTE ON THE PLAN TO VOTE AND ACCEPT IT**.

Except as otherwise provided herein, capitalized terms used, but not otherwise defined, in this Disclosure Statement have the meanings ascribed to them in the Plan. Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

On _____, 2011, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of the Debtors' creditors and interest holders to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.

The Disclosure Statement Order, a copy of which is attached as <u>Appendix B</u>, sets forth deadlines for voting to accept or reject the Plan and concerning procedures to be followed to object to confirmation of the Plan, and the record date for voting purposes. A Ballot for the acceptance or rejection of the Plan is enclosed with each Disclosure Statement submitted to a holder of a Claim that is entitled to vote to accept or reject the Plan. In addition, voting instructions are attached hereto as <u>Appendix C</u>. THE BANKRUPTCY COURT HAS SCHEDULED A HEARING ON _____, 2011 AT ____ _.M. (EASTERN TIME) TO CONSIDER WHETHER TO CONFIRM THE PLAN.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek chapter 11 protection, significant events that have occurred during the Debtors' Chapter 11 Cases, and the closing of the sale of substantially all of Debtors' operating assets to GCH Acquisition Sub. This Disclosure Statement also describes terms and provisions of the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims entitled to vote under the Plan must follow for their votes to be counted.

FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS, APPENDICES, AND SCHEDULES THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN CONTROL.

NO PERSON IS AUTHORIZED BY ANY OF THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY ANY OF THE DEBTORS.

{2578808:}

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY CREDITOR DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE HISTORY, BUSINESS, AND OPERATIONS OF THE DEBTORS AND THE HISTORICAL FINANCIAL INFORMATION REGARDING THE DEBTORS IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN BUT, AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS, IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN, AND NOTHING STATED HEREIN WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING ARTICLE IX, "RISK FACTORS TO BE CONSIDERED," OF THIS DISCLOSURE STATEMENT, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, ALL INFORMATION CONTAINED HEREIN HAS BEEN PROVIDED BY THE DEBTORS.

## II. SUMMARY OF TREATMENT OF CLAIMS UNDER THE PLAN

### A. Introduction

The Debtors are distributing this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to provide the Debtors' creditors with adequate information so that they can make an informed judgment on whether to accept or reject the Plan. Please read the Disclosure Statement and Plan carefully and follow the instructions on how to vote on the Plan.

### B. Explanation of Chapter 11

Pursuant to chapter 11 of the Bankruptcy Code, a debtor may reorganize or liquidate its assets for the benefit of its creditors and interest holders. In a chapter 11 case, the debtor typically remains in control of the estate as the "debtor in possession." Upon filing a petition for chapter 11 relief and during the pendency of a case, the Bankruptcy Code imposes an automatic stay against the debtor or its assets. The automatic stay provisions of section 362 of the Bankruptcy Code, unless modified by court order, will generally prohibit or restrict attempts by creditors to collect or enforce any claims that arose prior to the commencement of the chapter 11 case against the debtor or its assets.

The Bankruptcy Code provides for the formation of an official committee of unsecured creditors in a chapter 11 case to represent the interests of creditors in the case. On March 26, 2010, the United States Trustee appointed the Creditors' Committee.

The provisions of the Bankruptcy Code are designed to encourage the parties in interest in a chapter 11 proceeding to negotiate the terms of the plan of reorganization or liquidation so that it may be confirmed. A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against a debtor. After the chapter 11 case

10-61078-rk    Doc 592    FILED 06/27/11    ENTERED 06/27/11 19:27:12    Page 8 of 37

has been filed, the holders of the claims against or interests in a debtor, whose claims or interests are impaired under the plan, may vote to accept or reject the plan. Section 1125 of the Bankruptcy Code requires a debtor, before soliciting acceptances of the proposed plan, to prepare a disclosure statement containing adequate information of the kind, and in such detail, as to enable a hypothetical reasonable investor to make an informed judgment on the plan.

## C.     Preliminary Statement and Summary of Recoveries

On March 19, 2010 (the 'Petition Date"), the Debtors each filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continued in the management and possession of their property as debtors in possession. No trustee has been appointed for the Debtors. On April 22, 2010, the United States Trustee appointed Brent Martin and Healthcare MCR as the Patient Care Ombudsman in these Chapter 11 Cases.

The primary objective of the Plan is to provide a mechanism for completing the liquidation of the Debtors' remaining assets, including Causes of Action held by or in favor of the Debtors, reconciling and fixing the claims asserted against the Debtors and distributing the net liquidation proceeds in conformity with the distribution scheme provided by the Bankruptcy Code. As described below, a substantial portion of Debtors' assets were sold to GCH Acquisition Sub, an affiliate of Galion Community Hospital pursuant to the Order of the Bankruptcy Court issued on December 14, 2010; the Sale closed on December 31, 2010. Certain assets were excluded from the Sale, including but not limited to cash, [insurance proceeds, and amounts due to a Debtor from intercompany transactions.] The Debtors have ceased operations as a healthcare provider (such services now being provided by GCH Acquisition Sub) and the Debtors continue to wind down their affairs. Because the Plan is a plan of liquidation, pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtors will not receive a discharge, and will not engage in business after a final decree has been entered and their Chapter 11 Cases closed. The Allowed Claims of general unsecured creditors will not be paid in full under the Plan due to insufficient fund from the liquidation of the Debtors' assets.

## D.     Proposed Treatment

### 1.     Overview of Treatment Under the Plan

As contemplated by the Bankruptcy Code, Administrative Claims and Priority Tax Claims (as defined in the Plan) are not classified under the Plan. Allowed Administrative Claims are to be paid in full in accordance with the terms of the Plan. See Article V, Section C.1 of this Disclosure Statement for a summary of the treatment proposed under the Plan for Administrative Claims. See Article V, Section C.2 of this Disclosure Statement for a summary of the treatment proposed under the Plan for Priority Tax Claims.

The Plan further provides that all other Priority Claims (Class 1), Other Secured Claims (Class 2) and Declaration Action Claims (Class 3) will remain unimpaired.

The table below summarizes the classification and treatment of the prepetition Claims under the Plan. For certain classes of Claims, estimated percentage recoveries are also set forth below. Estimated percentage recoveries have been calculated based upon a number of assumptions, for purposes of the Plan, as discussed below.

The Debtors intend to seek to consummate the Plan and cause the Effective Date to occur as quickly as practicable. The Debtors believe that the Plan provides distributions to all Classes of Claims that reflect an appropriate resolution of the Claims, taking into account the differing nature and priority of such Claims.

### 2.     Summary of Classification and Treatment Under the Plan

The recoveries listed below for Class 4 HUD Secured Claims, Class 5 General Unsecured Claims and Class 6 HUD Unsecured Claims depend on the amount of cash available for distribution. It is not possible at this time to definitively state such amount, as it depends on: (a) the liquidated value of the Debtors' remaining assets, (b) the amount of Allowed Administrative Claims and Allowed Priority Tax Claims; and (c) recoveries, if any, which may or may not be obtained from Causes of Action. The Debtors have made a good faith estimate of that amount, which is used to calculate the estimated recoveries. In making that estimate, no value was ascribed to any Causes of Action.

10-61078-rk     Doc 592     FILED 06/27/11     ENTERED 06/27/11 19:27:12     Page 9 of 37

| Description and Class of Claims | Estimated Allowed Amount[2] | Summary of Treatment | Estimated Projected Recovery |
|---|---|---|---|
| **Class 1 Other Priority Claims**<br><br>Class 1 consists of all Non-Tax Priority Claims and is Unimpaired. | **$35,175.00** | Each holder of an Allowed Priority Claim will receive cash payment in the amount of its Allowed Claims. | **100%** |
| **Class 2 Other Secured Claims**<br><br>Class 2 consists of all Other Secured Claims and is Unimpaired. | **$148,213.04** | Each holder of an Allowed Secured Claim will receive, at the option of the Debtors:<br>1. Net proceeds of the sale of the property securing such Claim, up to the Allowed amount of the Claim;<br>2. Return of the property securing the Claim; or<br>3. Cash equal to the value of the property securing the Claim, up to the Allowed amount of such Claim. | **100%** |
| **Class 3 Declaration Action Claims**<br><br>Class 3 consists of the Declaration Action Claims and is Unimpaired. | **$524,000.00** | Creation and funding of the Litigation Escrow. | **100%** |
| **Class 4 HUD Secured Claims**<br><br>Class 4 consists of HUD Secured Claims and is Impaired. | **$21,737,405.38** | Cash payment of $5,558,792 made on January 3, 2011 from the Net Sale Proceeds (additional disbursements possible from Net Sale Proceeds); Remainder Claim to be afforded treatment as a Class 6 Claim. | **25.57%** |
| **Class 5 General Unsecured Claims**<br><br>Class 5 consists of the General Unsecured Claims and is Impaired. | **$7,620,487** | Creation and funding of the Committee Escrow; implementation of procedures for remittance of the D&O Proceeds and proceeds from Causes of Action, if any. | **0-3.28%**[*] |

---

[2] The dollar amounts included in the following table are estimates only and do not constitute an admission by the Debtors as to the validity or amount of any particular Claim. The Debtors reserve all rights to dispute the validity or amount of any Claim that has not already been established by the Bankruptcy Court. The summary of estimated distributions under the Plan set forth below lists both the estimated allowed amount of Claims in each Class and an estimated percentage recovery for such Class. The estimated aggregate amounts of all Classes of Claims are based on the Debtors' good faith estimates of the aggregate amount of such claims upon resolution of all such Claims that are Disputed Claims, based on all currently known information. Certain of those Disputed Claims are material, and the total asserted amount of all such Claims, including Disputed Claims, is materially in excess of the total amount of Allowed Claims assumed in the estimates listed below. The amount of any Disputed Claim that is ultimately allowed by the Bankruptcy Court may be significantly more or less than the estimated allowed amount of such Claim. For these reasons, no representation can be or is being made with respect to whether the estimated allowed amount of Claims in each Class will be accurate or whether the estimated percentage recoveries shown on the table below will be realized by the holder of an Allowed Claim in any particular Class.

[*] Estimated projected recovery assumes no available D&O Proceeds or proceeds from Causes of Action.

| Description and Class of Claims | Estimated Allowed Amount[2] | Summary of Treatment | Estimated Projected Recovery |
|---|---|---|---|
| **Class 6 HUD Unsecured Claims**<br><br>Class 6 consists of the Remainder Claim and the General Claim and is Impaired. | **$20,320,227** | Implementation of procedures for remittance of the D&O Proceeds from Causes of Action, if any. | **0%** |
| **Class 7 Intercompany Claims**<br><br>Class 7 consists of Intercompany Claims and is Impaired. | **$0.00** | Elimination of Claims; no distribution contemplated. | **0%** |
| **Class 8 Interests**<br><br>Class 8 consists of all Interests and is Impaired. | **$0.00** | Elimination of Interests; no distribution contemplated. | **0%** |

THE DEBTORS HAVE APPROVED THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY AND RECOMMEND THAT ALL CREDITORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.

E.     Who Is Entitled to Vote on the Plan

Only impaired classes receiving a distribution under the Plan are entitled to vote on the Plan.  As such, the HUD Secured Claims (Class 4), the Holders of General Unsecured Claims (Class 5) and the HUD Unsecured Claims (Class 6), are the only Classes of Creditors entitled to vote on the Plan.  Holders of Intercompany Claims (Class 7) and Interests (Class 8) are not entitled to vote because no distributions will be paid under the Plan on account of Intercompany Claims or Interests.  Holders of other Priority Claims (Class 1), other Secured Claims (Class 2), and Declaration Action Claims (Class 3) are unimpaired and deemed to accept the Plan.

## III.     THE DEBTORS AND THE CHAPTER 11 CASES

The following overview is a general summary only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.

A.     Business Overview and History

Founded in 1931, Bucyrus Community Hospital, Inc., is an Ohio not-for-profit corporation.  Prior to December 31, 2010, BCH operated a 25 bed critical access hospital, and served as the parent organization of an affiliated physician group, BCP.  BCH proved a broad range of acute care services, including but not limited to surgery and recovery, oncology, cardiac and pulmonary rehabilitation, and imaging. In addition to operation of the main hospital campus, as of the Petition Date, BCH also leased certain real property to various employed and non-employed physicians for the operation of specified medical practices.  In 2003, BCH received its designation as a CAH from the Ohio Department of Health, in accordance with the Ohio Medical Rural Hospital Flexibility Program. Although BCH has previously been affiliated with or managed by various regional health systems, BCH has operated independently since 1999.  BCP was established in 2006 as a wholly-owned subsidiary of BCH, primarily to facilitate recruitment of physicians and operate associated clinical practices in and around the Bucyrus, Ohio community.

The Company's primary service area consists of the City of Bucyrus, Ohio (zip code 44820).  The City of Bucyrus alone accounted for more than 84% of BCH's Medicare admissions in calendar year 2008.  The Company's secondary service area consists of the community of New Washington, a village of more than 1,000 individuals located approximately 12 miles north of the City of Bucyrus.  For the year ended December 31, 2009, the Debtors' payor mix, based on revenue, was comprised of 51.2% attributable to Medicare, 30.5% to managed care plans, 12.2% Medicare and 6.1% self-pay patients.

### B. Prepetition Structure

The ownership structure of the Debtors is relatively straightforward: Debtor BCH is the sole shareholder of debtor BCP.

### C. Boards of Managers and Executive Officers

Following is a list of the members of the board of trustees of BCH as of the Petition Date.

|     | Name | Title |
| --- | --- | --- |
| 1.  | Glen A. McMurray, DDS | Chairman, Board of Trustees |
| 2.  | David Cory | Vice Chairman, Board of Trustees |
| 3.  | Thomas Holtshouse | Secretary, Board of Trustees |
| 4.  | Larry Morrison | Treasurer, Board of Trustees |
| 5.  | David Auck | Trustee, Board of Trustees |
| 6.  | Keith Blair, MD | Trustee, Board of Trustees |
| 7.  | Thomas P. Moore | Trustee, Board of Trustees |
| 8.  | John Rindfuss | Trustee, Board of Trustees |
| 9.  | Michael Johnson, MD | Trustee, Board of Trustees |
| 10. | Carolyn Kaple | Trustee, Board of Trustees |
| 11. | Phil Harris | Trustee, Board of Trustees |

### D. Prepetition Debt Structure

#### 1. Prepetition Secured Obligations

The Debtors' Prepetition secured debt structure consisted primarily of indebtedness incurred for purposes of funding a facilities modernization plan, as well as term and line facilities to fund general operations and capital expenses, as follows:

##### a. The HUD Facility

A Building Loan Agreement (the "Building Loan") dated as of July 21, 2005 between BCH and Lancaster Pollard Mortgage Company ("Lancaster Pollard") in the original principal amount of $25,945,000. The Building Loan was insured by the U.S. Department of Housing and Urban Development ("HUD"), pursuant to the Section 242 Mortgage Insurance Program for hospitals (the "HUD Insurance"). In September of 2007, Lancaster Pollard made a supplemental loan of approximately $1,000,000 (the "Supplemental Loan", and together with the Building Loan and the HUD Insurance, the "HUD Facility") to BCH. As of the Petition Date, the principal balance of the HUD Facility was approximately $25,897,393.

On July 21, 2010, Lancaster Pollard notified the Debtors that the HUD Facility had been assigned, effective as of July 21, 2010. Accordingly, upon information and belief, HUD is the sole remaining secured party with respect to the HUD Facility.

##### b. The United Facilities[3]

A Promissory Note dated as of February 26, 2008 (the "Term Note") to secure a term note facility in the original principal amount of $250,000 (the "Term Loan") with United Bank, Division of the Park National Bank f/k/a United Bank, N.A. ("United"). As of the Petition Date, the principal balance of the Term Loan was approximately $24,000.

---

[3] The Term Facility and the Line Facility, as defined herein, collectively, the "United Facilities".

An additional Promissory Note bearing loan number 40111979, dated as of June 30, 2009 (the "Line Note") to secure a line of credit in the original principal amount of $500,000 (the "Line of Credit"), as amended. As of the Petition Date, the principal balance of the Line of Credit was approximately $500,000.

c.      The First Federal Facilities

A Loan Agreement dated as of July 27, 2006 between BCP and First Federal Community Bank ("FFCB") in the original principal amount of $57,475 (the "Equipment Loan"). As of the Petition Date, the principal balance of the Equipment Loan was approximately $17,072.

A Loan Agreement dated as of September 29, 2006 between BCP and FFCB in the original principal amount of $75,000 (the "Acquisition Loan"). As of the Petition Date, the principal balance of the Acquisition Loan was approximately $27,117.

A Loan Agreement dated as of October 13, 2006 between BCP and FFCB in the original principal amount of $100,500 (the "Second Acquisition Loan"). As of the Petition Date, the principal balance of the Second Acquisition Loan was approximately $38,024.

**2.     Repayment of Obligations**

As of the date of this Disclosure Statement, HUD has received $5,558,792 in Net Sale Proceeds in partial satisfaction of BCH's obligations under the HUD Facility. Additionally, $524,000 has been remitted to the Litigation Escrow in full satisfaction of the Line Note and Term Note, which funds will be disbursed in accordance with the Litigation Escrow Agreement upon resolution of Adversary Proceeding 10-06088 regarding the nature, extent and priority of the security interests alleged by United.

## IV.    ACTIVITIES WITHIN THE CHAPTER 11 CASES

### A.    Reasons for Chapter 11 Filings

In 2004, BCH proposed a master plan to modernize and expand its facilities (the "Modernization Plan"). The Modernization Plan proposed additions to existing facilities totaling nearly 60,000 square feet, enabling BCH to move, expand and renovate nearly all major departments. The Modernization Plan was funded with the Building Loan, as enhanced by the HUD Insurance. The Modernization Plan did not produce the expected results, in significant part because of significant construction delays and cost overruns, necessitating the incurrence of additional debt in the form of the Supplemental Loan. Additional overages and unexpected building costs, in an amount well over an additional $1 million, were paid out-of-pocket by BCH.

Despite an 18% increase in operating revenue for the period of 2006-2008, the transfer of physician contracts from BCH to BCP resulted in a significant growth in expenses of BCP, which BCP was unable to cover solely from the revenues of BCP. Ultimately, BCP's expense growth resulted in more than $6 million in financial support provided by BCH to BCP since 2006, significantly depleting BCH's cash resources. Despite efforts to streamline operations between BCH and BCP, BCH reported a decline in operating revenue in 2009, ending the year at approximately 6.12% below 2008 levels. BCP experienced a similar level of revenue growth during the periods between 2006 and 2008, and a similar decline in yearly revenues for 2009.

As of December 2009, Crawford County posted a nearly 14% unemployment rate, nearly four percent higher than the 10% unemployment rate of the State of Ohio. This resulted in a decline in managed care revenues for the first two months of 2010, coupled with an increase in self-pay revenue. As of the Petition Date, self-pay revenue had already increased to 8.0% for 2010 to date, up from the 5.2% experienced during the first two months of 2009.

In response to its deteriorating financial position, BCH implemented a number of cost cutting measures during early 2009. These initiatives led BCH to report an early $2 million loss for fiscal year 2009. While 2009 represented an approximately $2 million improvement over 2008 results, management was unable to further reduce expenses in a manner sufficient to generate positive cash flow from operations. Without sufficient operating cash flow, BCH was unable to meet its long-term debt and capital lease obligations, defaulting on the HUD Facility and the United Line of Credit. BCH also drew down cash reserves and began defaulting on payments to various

10-61078-rk    Doc 592    FILED 06/27/11    ENTERED 06/27/11 19:27:12    Page 13 of 37

suppliers and vendors. These factors ultimately drove the decision to enter protection under chapter 11 of the Bankruptcy Code.

## B. The Chapter 11 Cases

After evaluating their alternatives and consulting with their advisors, the Debtors determined that the interests of their creditors, patients and employees were best served by attempting to reorganize under the Bankruptcy Code. On the Petition Date, the Debtors each filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court in an effort to preserve and maximize the value of their chapter 11 estates and as authorized and directed by the Board of Trustees of the Debtors. At that time, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors were stayed under section 362 of the Bankruptcy Code. The Debtors continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### 1. First Day Relief

On the Petition Date, the Debtors filed "first day" motions with the Bankruptcy Court seeking certain relief in order to continue uninterrupted operations, including payment of prepetition wages and trust fund taxes and the acquisition of the use of cash collateral, among other things. Such relief helped to facilitate the administration of the Chapter 11 Cases.

### 2. The Debtors' Professional Advisors

The Debtors have been advised by the following: McDonald Hopkins LLC as the Debtors' chapter 11 counsel; Quorum Health Resources, LLC as Provider of Hospital Administrative Services, Chief Restructuring Officer and Interim Management Personnel and MelCap Partners, LLC ("MelCap") as the Debtors' Investment Banker; Arnett and Foster PLLC as the Debtors' independent auditors; Jones Day as special counsel; and Frantz Ward LLP as special counsel, primarily as compliance and corporate counsel.

### 3. Appointment of the Creditors' Committee

On March 26, 2010, the Office of the United States Trustee appointed the Creditors' Committee. On May 19, 2010, the Bankruptcy Court entered an order approving the retention of Frost Brown Todd LLC as counsel to the Creditors' Committee.

### 4. Patient Care Ombudsman

On April 22, 2010, the Office of the United States Trustee appointed Brent Martin and Healthcare MCR as the Patient Care Ombudsman. On May 19, 2010, the Bankruptcy Court entered an order approving the retention of Schottenstein Zox & Dunn Co., LPA as counsel to the Patient Care Ombudsman.

### 5. Exclusivity

On June 21, 2010, the Debtors filed their Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending the Time Periods During Which the Debtors Have the Exclusive Right to File a Plan and to Solicit Acceptances Thereto, Docket No. 232. On July 15, 2010, the Bankruptcy Court entered an order (a) extending the Debtors' exclusive period to file a chapter 11 plan under section 1121(d) of the Bankruptcy Code to November 16, 2010 (the "Exclusivity Period"); (b) extending the Debtors' exclusive period to solicit acceptance to such plan pursuant to section 1121(c) of the Bankruptcy Code to January 13, 2011 (the "Solicitation Period"). The Exclusivity Period and the Solicitation Period have both subsequently expired.

### 6. Bar Date

The Bankruptcy Court established a bar date for filing proofs of Claim. Generally, proofs of Claim were required to be filed no later than October 18, 2010.

### 7. Administrative Bar Date

The Bankruptcy Court established an Administrative Claims Bar Date of March 18, 2011 (Docket No. 531). The Administrative Claims Bar Date applies to each and every administrative expense claim incurred or arising on or before December 31, 2010 with the exception of the following: (i) professionals pursuant to sections 330, 331 and 503(b) of the Bankruptcy Code; (ii) claims of the U.S. Trustee under section 28 U.S.C. § 1930(a)(6); and (iii) any administrative expense previously approved by the Bankruptcy Court. The Debtors published the Administrative Claims Bar Date in the Plain Dealer and The Bucyrus Telegraph Forum.

### 8. Postpetition Operations

Immediately following the Petition Date, the majority of the Debtors' time was spent on stabilizing their business operations and completing the transition to operating as chapter 11 debtors in possession. The Debtors worked diligently with various key parties to achieve these tasks through various means, including: (a) implementing various forms of relief granted by the Bankruptcy Court on the Petition Date to allow the Debtors to maintain business as usual to the fullest extent possible; (b) negotiating for the use of cash generated by the Debtors' businesses; (c) analyzing various issues relating to executory contracts; (d) obtaining critical postpetition financing, (e) marketing the Debtors' operations for a potential Sale; and (f) formulating an overall restructuring strategy, including a sale of substantially all assets.

### 9. Debtor-in-Possession Financing

On June 18, 2010, the Bankruptcy Court entered an order (Docket No. 230) authorizing the Debtors to enter into a $3,500,000 debtor-in-possession financing facility (the "DIP Facility") with Stearns Healthcare Finance ("Stearns"). As security for the DIP Facility, Stearns was granted a priming, first-priority lien in all of BCH's accounts receivable. The first $524,000 drawn on the DIP Facility were used to fund the Litigation Escrow. On January 3, 2011, the obligations of BCH under the DIP Facility were paid in full from the proceeds of the Sale. Neither BCH nor BCP have any continuing obligations to Stearns under the DIP Facility.

### 10. Post-Petition Grant of Adequate Protection Liens

In accordance with the terms of that certain Order Authorizing, Until July 2, 2010, the Debtors to (A) Use Cash Collateral Pursuant to 11 U.S.C. § 363 and (B) Provide Adequate Protection Pursuant to 11 U.S.C. § 361 and 363, as the same has been supplemented and amended from time to time (the "Final Cash Collateral Order"), the Debtors granted certain replacement liens to each of Lancaster Pollard, United, and FFCB, in each case to the same priority, extent and type of collateral as the liens held by each of Lancaster Pollard, United and FFCB prior to the Petition Date. These replacement liens, as well as certain adequate protection payments made to Lancaster Pollard and United, provided adequate protection to each of Lancaster Pollard, United and FFCB during the pendency of these Chapter 11 Cases.

### 11. Interim Management Structure

Prior to the Petition Date, the Debtors engaged Quorum Health Resources, LLC ("QHR") to provide consulting services. Subsequent to this retention, the then-presiding chief executive officer and chief financial officer separated from employment with the Debtors. As a result of these separations, the Debtors requested that QHR provide certain interim management and hospital administrative services. Accordingly, Mr. Scott Landrum was appointed interim chief executive officer of the Debtors, and Mr. Dan Hamman was appointed interim chief financial officer of the Debtors. These appointments were confirmed subsequent to the Petition Date by order, entered June 7, 2010 (Docket No. 212). Mr. Hamman was subsequently replaced by Mr. David Britton as chief financial officer. Mr. Britton and Mr. Landrum continued to provide interim management services through the Closing Date. Following the Closing Date, Mr. Jerry Meyer (also of QHR) and who had been engaged by the Debtors as interim comptroller prior the Petition Date) served (and continues to serve) as Chief Transitional Officer.

### 12. Adversary Proceeding 10-06088

On August 30, 2010, United commenced adversary proceeding 10-06088 (the "Adversary Proceeding") with the filing of its Complaint for Declaratory Relief [to Determine Lien Priority] (sic), as amended (the "Complaint"). The Complaint, naming Lancaster Pollard, HUD and BCH as defendants, seeks a determination of

the validity and priority of the liens purported to have been granted to United in connection with the Line of Credit. As of the filing of this Disclosure Statement, HUD has been dismissed as a defendant, but the Adversary Proceeding is continuing. Approximately $524,000 maintained in the Litigation Escrow will be released to the Prevailing Party at the conclusion of the Adversary Proceeding, in accordance with the terms of the Litigation Escrow Agreement and the Plan. As part of the Adversary Proceeding, Lancaster Pollard has asserted certain crossclaims against BCH, for which an unsecured proof of claim was filed.

### 13. Sale and Marketing Efforts

On July 2, 2010, the Debtors engaged MelCap Partners LLC as their investment banker. MelCap was charged with assisting the Debtors in pursuing a sale. MelCap spent significant time identifying and contacting potential bidders, soliciting bids, and helping Debtors select a lead bidder for the sale of the Debtors' assets.

### 14. Asset Sale

In October, 2010, the Debtors, in conjunction with their advisors, determined that a viable offer, in the amount of $8,000,000, for the purchase of substantially all of the assets of the Debtors had been submitted by GCH Acquisition Sub, an affiliate of Galion Community Hospital. Accordingly, the Debtors entered into an asset purchase agreement with GCH Acquisition Sub (the "Stalking Horse APA"). On October 22, 2010, the Debtors filed a motion with the Bankruptcy Court seeking approval (i) of the Stalking Horse APA, (ii) of certain auction and bidding procedures, designed to ensure that the Debtors were able to maximize value as a result of the sale and auction process, and (iii) scheduling an auction, among other things.

On November 5, 2010, the Bankruptcy Court entered an Order (Docket No. 400) approving the Stalking Horse APA, and fixing the deadline by which potential bidders must submit bids as of December 3, 2010 at 5:00 p.m. BCH Medical Holding, LLC submitted a competing bid for substantially all of the Debtors' assets prior to December 3, 2010, and an auction was held at the offices of McDonald Hopkins LLC on December 7, 2010 at 10:00 a.m. Following the receipt of multiple bids and counter bids, the Debtors, in consultation with HUD, determined that GCH Acquisition Sub (the "Purchaser") had submitted the highest and best bid for the purchase of substantially all of the assets of the Debtors, in the amount of $10,320,000. Such final bid of the Purchaser was declared the prevailing bid, with the final bid of BCH Medical Holdings, LLC declared the back-up bid. Following the auction, the Debtors and the Purchaser entered into that certain First Amended Asset Purchase Agreement.

On December 9, 2010, the Bankruptcy Court held a hearing to approve the sale of substantially all of the assets of the Debtors pursuant to the First Amended Asset Purchase Agreement. Following the hearing, the Sale Order was entered on December 14, 2010, and the Debtors and the Purchaser worked to satisfy the closing conditions contained in the First Amended Asset Purchase Agreement.

The Sale contemplated by the Sale Order and the First Amended Asset Purchase Agreement closed on December 31, 2010 at 11:59 p.m. Immediately following the closing, the Debtors received a cash payment of $10,320,000.

### C.   Executory Contracts and Unexpired Leases

### 1.   Assumption of Contracts and Leases

The Debtors filed numerous motions with the Bankruptcy Court seeking authority for the Debtors to assume and assign certain agreements to the Purchaser. The Bankruptcy Court entered several Orders prior to the Closing Date authorizing, but not directing, the Debtors to assume and assign certain of their agreements to the Purchaser. Subsequent to the Closing Date, the Debtors provided notice of the agreements ultimately assumed and assigned in accordance with the prior Bankruptcy Court Orders. Subsequent to the Closing Date, certain additional contracts were assumed by the Debtors and assigned to the Purchaser. In accordance with the terms of the Asset Purchase Agreement, the Purchaser paid any and all necessary cure costs as part of the assumption and assignment of the assigned executory contracts.

### 2. Rejection of Contracts and Leases

The Debtors reviewed various executory contracts and unexpired leases and concluded that certain contracts and leases were not beneficial to the estates. The costs associated with maintaining and/or marketing such contracts and leases, in addition to the cure amounts that would be required to be paid if the contracts and leases were to be assumed and assigned, would be significantly greater than any potential value that might be realized by any future sale or sublease of such contracts and leases. Accordingly, the Debtors filed motions and obtained Orders from the Bankruptcy Court authorizing and directing rejection of such executory contracts and unexpired leases.

### D. Objections to Claims

The Debtors expect to file several omnibus motions seeking to disallow and expunge Claims based upon a number of grounds, including: (i) Claims that were amended and replaced by subsequently filed Claims, (ii) Claims that were duplicate in nature, (iii) Claims that were filed alleging an incorrect class or priority, and (iv) Claims which had been previously satisfied. The Debtors have reserved their right to file such additional motions for the disallowance and expungement of claims as the Debtors deem necessary or advisable.

### E. Distributions Prior to Effective Date

Prior to the Effective Date, substantially all of the Debtors' Assets have been liquidated and converted to Cash and will distributed in a manner described in the Plan. As described above, as of the date of this Disclosure Statement, the Debtors have caused $524,000 to be paid to the Litigation Escrow (in accordance with the terms of the Order authorizing the DIP Facility), $250,000 to be paid for funding of the Committee Escrow (in accordance with the terms of the Sale Order), and have delivered $5,558,792 to HUD on account of its Class 4 Claims. Post-petition obligations not paid by the Debtors in ordinary course prior to closing have been or will be paid by the Purchaser.

### F. Avoidance Actions

Except for the limited actions against the Debtors' officers and directors (described as the D&O Actions, which shall be pursued at the direction and discretion of the Creditors' Committee) avoidance actions otherwise available to the Debtors under chapter 5 of the Bankruptcy Code or otherwise shall not be preserved or pursued.

## V. SUMMARY OF THE PLAN OF LIQUIDATION

### A. Overview

The implementation of, and the distribution required under the Plan will be accomplished promptly by the Debtors' on the Effective Date. As discussed below, the remaining assets and liabilities of all of the Debtors will be substantially consolidated. On the Effective Date, the Liquidating Trust Assets will be transferred to the Liquidating Trust for distribution under the Plan.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

### B. Overall Structure of the Plan

The Plan follows the closing of a Sale of most of the Debtors' operating assets to GCH Acquisition Sub and contemplates the liquidation of the unsold assets and distribution of the proceeds of the Sale pursuant to the Plan. The Debtors believe that the Plan provides the highest, best and most timely possible recovery to the Debtors' Claim holders. Under the Plan, Claims against the Debtors are divided into different Classes. If the Plan is confirmed by the Bankruptcy Court and consummated, on the Distribution Date, and at certain times thereafter as Claims are resolved, liquidated or otherwise allowed, the Debtors will make distributions to and on behalf of certain Classes of

Claims as provided in the Plan. The Classes of Claims against the Debtors created under the Plan, the treatment of those Classes under the Plan, and distributions, if any, to be made under the Plan are described below.

Under the Plan, there are five classes of Impaired Claims (Class 4 HUD Secured Claims, Class 5 General Unsecured Claims, Class 6 HUD Unsecured Claims, Class 7 Intercompany Claims, and Class 8 Interests). All other Claims are unimpaired. Holders of Class 1 Non-Tax Priority Claims, Class 2 Other Secured Claims, and Class 3 Declaratory Action Claims, will be unimpaired by the Plan.

### C.    Classification and Treatment of Claims

#### 1.    Payment of Administrative Claims

##### a.    Administrative Claims in General

Except as otherwise specified in Plan Section 2.1.1, and subject to the Bar Date provisions in the Plan, unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim will receive, in full satisfaction of its Allowed Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim on the later of (i) the Effective Date or (ii) the date on which such Administrative Claim becomes an Allowed Administrative Claim.

##### b.    Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash equal to the amount of such Allowed Administrative Claims.

##### c.    Bar Dates for Administrative Claims

###### (i)    General Administrative Claims Bar Date Provisions

On February 9, 2011, the Bankruptcy Court entered an order establishing an Administrative Claims Bar Date of March 18, 2011 at 4:00 p.m. (E.S.T.), Docket No. 531. The Administrative Claims Bar Date applies to each and every administrative expense claim incurred or arising on or before December 31, 2010 with the exception of the following: (i) Professionals pursuant to sections 330, 331 and 503(b) of the Bankruptcy Code; (ii) claims of the U.S. Trustee under section 28 U.S.C. § 1930(a)(6); and (iii) any administrative expense previously approved by the Bankruptcy Court. The Debtors published the Administrative Claims Bar Date in the Plain Dealer and the Bucyrus Telegraph Forum.

###### (ii)    Bar Dates for Professional Compensation

All unpaid Fee Claims incurred by Professionals prior to the Effective Date will be subject to final allowance or disallowance upon application to the Bankruptcy Court pursuant to sections 328, 330 or 503(b)(4) of the Bankruptcy Code. Final applications for Fee Claims for services rendered in connection with the Chapter 11 Cases will be filed with the Bankruptcy Court no later than 45 days after the Effective Date. Objections to any Fee Claims must be filed and served on the Notice Parties and the requesting party by the later of: (a) 75 days after the Effective Date; (b) 30 days after the filing of the applicable request for payment of the Fee Claims; and (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims. To the extent necessary, the Confirmation order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

#### 2.    Payment of Priority Tax Claims

##### a.    Priority Tax Claims

Each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, Cash equal to the amount of such Allowed Priority Tax Claim, on the later of (a) the Effective Date or (b) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim.

b.      Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Plan Section 2.1.2.a, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class 5 (General Unsecured Claims), as applicable, if not subordinated to Class 5 Claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Plan Administrator or their respective property (other than as a holder of a Class 5 Claim).

### 3.      Class 1:  Other Priority Claims – Unimpaired

Each Holder of an Allowed Other Priority Claim will receive, in full satisfaction of its Other Priority Claim, cash equal to the amount of such Allowed Other Priority Claim on the later of (a) the Effective Date or (b) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim.

### 4.      Class 2:  Other Secured Claims – Unimpaired

Unless the Holder of such Claim and the applicable Debtor agree to a different treatment, 30 days after the later of (a) the Effective Date and (b) the date on which the Claim is Allowed, in full satisfaction of its Allowed Claim, each Holder of an Allowed Other Secured Claim will receive, at the option of the Debtors: (x) the net proceeds of the sale of the property securing such claim, up to the Allowed amount of such claim; (y) the return of property securing such claim; or (z) Cash equal to the value of the property securing such claim, up to the value of the Allowed Secured Claim.

### 5.      Class 3:  Declaration Action Claims – Unimpaired

On the Effective Date, the Prevailing Party shall be deemed to have been paid in full by reason of the creation and funding of the Litigation Escrow.

### 6.      Class 4: HUD Secured Claims – Impaired

On the Effective Date, HUD will be deemed to have its Secured Claims satisfied by reason of its receipt of (i) the Net Sale Proceeds and (ii) the Remainder Claim, to be treated in accordance with the Plan Section 2.2.6.

### 7.      Class 5:  General Unsecured Claims – Impaired

On the Effective Date, each Holder of a General Unsecured Claim shall be deemed to have had its Claim satisfied by reason of the creation and funding of the Committee Escrow and by implementation of procedures for remittance of the D&O Proceeds and proceeds from Causes of Action, if any, in accordance with the terms of the Settlement Agreement and Plan Exhibit E.

### 8.      Class 6:  HUD Unsecured Claims – Impaired.

On the Effective Date, HUD will be deemed to have its Remainder Claim and its General Claim satisfied by implementation of procedures for remittance of the D&O Proceeds and proceeds from Causes of Action, if any, in accordance with the terms of the Settlement Agreement and Plan Exhibit E.

### 9.      Class 7:  Intercompany Claims – Impaired

On the Effective Date, all Intercompany Claims will be cancelled.  Intercompany Claims are not entitled to any distributions under the Plan.

### 10.      Class 8:  Interests – Impaired

On the Effective Date, all Interests will be cancelled.  Interests are not entitled to any distributions under the Plan.

11. **Special Provisions Relating to the Rights of Setoff of Creditors**

Nothing in the Plan will expand or enhance a creditor's right of setoff, which will be determined as of the Petition Date. Nothing in the Plan is intended to, or will be interpreted to, approve any creditor's effectuation of a postpetition setoff without the prior written consent of the Debtors, unless prior Bankruptcy Court approval has been obtained.

## VI. MEANS FOR IMPLEMENTATION OF THE PLAN

### A. Confirmation Exhibits

All Confirmation Exhibits to the Plan will be filed with the Bankruptcy Court no later than 10 days before the Confirmation Hearing.

### B. Winddown of Debtors

As soon as practicable subsequent to the Effective Date, each of the Debtors will take all necessary steps to effect their winddown and dissolution.

### C. Plan Administrator

#### 1. Appointment of the Plan Administrator

As of the Effective Date, the Plan Administrator shall be appointed to implement the Plan

#### 2. Duties of the Plan Administrator

Consistent with the terms and conditions set forth in the Plan, the Settlement Agreement and the Committee Escrow Agreement, the Plan Administrator will be empowered to:

a. receive, hold, invest and utilize the Settlement Funds in accordance with the terms and conditions of the Plan, the Settlement Agreement and the Committee Escrow Agreement;

b. investigate and prosecute, on behalf of the Debtors and their Estates, the Causes of Action identified at Confirmation Exhibit 3.4.3 (including, without limitation, the D&O Actions);

c. object to or compromise any Claim asserted by a General Unsecured Creditor in these Chapter 11 Cases;

d. resolve any Disputed Claims in accordance with the provisions of the Plan;

e. receive, hold invest and disburse any remaining Settlement Funds, D&O Proceeds and proceeds from Causes of Action, if any, in accordance with the provisions of the Plan, the Settlement Agreement, the Committee Escrow Agreement, and Plan Exhibit E; and

f. take any and all such other necessary or reasonable acts to implement the terms of the Plan.

#### 3. Compensation; No Bond

The Plan Administrator shall serve without bond. The Plan Administrator shall be entitled to compensation in the amount of $275 an hour, and shall be entitled to seek reimbursement for reasonable and necessary out-of-pocket costs (including attorneys' fees) in each case solely from the Settlement Funds. In no event shall the Debtors or their Estates bear any liability for compensation or reimbursement of the Plan Administrator.

10-61078-rk    Doc 592    FILED 06/27/11    ENTERED 06/27/11 19:27:12    Page 20 of 37

### 4. No Fiduciary or Agency Relationship

The Plan Administrator will act only in accordance with the terms and conditions of the Plan, the Settlement Agreement and the Committee Escrow Agreement. The Plan Administrator shall not constitute, nor be deemed to constitute, an agent or fiduciary of the Debtors or their Estates.

## VII. SPECIAL PROVISIONS

### A. Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims

Distributions under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law. Nothing in Plan Section 3.4.1 constitutes a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' insurance carriers.

### B. Liquidation of Tort Claims

All Tort Claims will be liquidated, determined or otherwise resolved in accordance with the provisions of section 502(c) of the Bankruptcy Code and will be subject to the Claims allowance process set forth in the Plan.

### C. Preservation of Causes of Action; Avoidance Actions

On the Effective Date, the Debtors will transfer to the Plan Administrator the Causes of Action identified at Plan Confirmation Exhibit 3.4.3, and the Plan Administrator may enforce any such Cause of Action so transferred. All other Causes of Action that the Debtors or the Estates may hold against any entity, including Avoidance Actions (except to the extent such Avoidance Action may also constitute a D&O Action), shall be expressly released under the Plan. Notwithstanding anything contained in Plan Section 3.4.3 or the Plan to the contrary, the Debtors or the Plan Administrator, as the case may be, may assert any Avoidance Action as a defense as and where applicable.

### D. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Chief Restructuring Officer or Financial Transition Officer of each Debtor and the Plan Administrator, as the case may be, will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax, sales or use Tax or similar Tax: (a) the creation of any mortgage, deed of trust, lien or other security interest; (b) the making or assignment of any lease or sublease; or (c) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing or pursuant to the Plan.

### E. Comprehensive Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Article VIII of the Plan, will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

### F. Executory Contracts and Unexpired Leases

#### 1. Assumption and Assignment

Each Executory Contract, Unexpired Lease or other agreement listed on Plan Confirmation Exhibit 4.1 has been assigned to the Purchaser prior to the Effective Date. All other Executory Contracts, Unexpired Leases or other agreements will be deemed rejected.

#### 2. Cure of Defaults

Upon information and belief, all Cure Amounts have been satisfied by the Purchaser in accordance with the terms and procedures of the Sale and related process.

#### 3. Bar Date for Rejection Damage Claims

To the extent not previously rejected in accordance with an Order of the Bankruptcy Court, Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to Plan Section 4.1 must be Filed with the Bankruptcy Court and served on the Debtors, and on and after the Effective Date, the Plan Administrator, by no later than 30 days after the later of (a) notice of entry of an order approving the rejection of such Executory Contract or Unexpired Lease, (b) notice of entry of the Confirmation Order or (c) notice of an amendment to Plan Confirmation Exhibit 4.1, and upon allowance, shall be an Allowed General Unsecured Claim. Any Claims not Filed within such applicable time periods will be forever barred from receiving a distribution from the Debtors, the Estates, or the Plan Administrator.

#### 4. Approval of Rejection

Entry of the Confirmation Order will constitute, pursuant to sections 365 and 1123 of the Bankruptcy Code, the approval of the rejection of all Executory Contracts and Unexpired Leases pursuant to Plan Section 4.1, to the extent not previously assumed or rejected by Order of the Bankruptcy Court.

### G. Provisions Governing Distributions

#### 1. Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in Article V of the Plan, distributions of Cash to be made on the Effective Date to holders of Claims as provided by Article II that are Allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than 30 days after the Effective Date; or, with respect to undeliverable distributions, when the provisions of Plan Section 5.4.4 are satisfied. Distributions on account of Claims that become Allowed, after the Effective Date will be made pursuant to Plan Section 6.3.

#### 2. Method of Distributions to Holders of Claims

The Debtors or the Plan Administrator will make all distributions of Cash and other instruments or documents required under the Plan. The Plan Administrator will serve without bond.

#### 3. Delivery of Distributions and Undeliverable or Unclaimed Distributions

##### a. Delivery of Distributions

(i) Distributions to holders of Allowed Claims will be made: (i) at the addresses set forth on the respective proofs of Claim or request for payment of Administrative Claim Filed by holders of such Claims, as applicable; (ii) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim Filed with the Bankruptcy Court; (iii) at the addresses set forth in any written notice of address change Filed with the Bankruptcy Court; (iv) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed; or (v) if clauses (i) through (iv) are not applicable, at the last address known or directed by such holder after such Claim becomes an Allowed Claim.

b. Undeliverable Distributions Held by the Plan Administrator

(i) *Holding of Undeliverable Distributions*. Subject to Plan Section 5.3.2.c, distributions returned to the Plan Administrator or otherwise undeliverable will remain in the possession of the Plan Administrator pursuant to Plan Section 5.3.2.a, until such time as a distribution becomes deliverable.

(ii) *After Distributions Become Deliverable*. On each Distribution Date, the Plan Administrator will make all distributions that became deliverable to holders of Allowed Claims at the next Distribution Date; *provided, however,* that the Plan Administrator may, in its sole discretion, establish a record date prior to each periodic Distribution Date, such that only Allowed Claims as of the record date will participate in such periodic distribution. Notwithstanding the foregoing, the Plan Administrator reserves the right, to the extent it determines a distribution on any periodic Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a periodic Distribution Date.

(iii) *Failure to Claim Undeliverable Distributions*. Any holder of an Allowed Claim that does not assert its right to an undeliverable distribution prior to the date that is 60 days prior to the Final Distribution Date will be forever barred from asserting any such Claim against a Debtor, the Plan Administrator, and their respective property or accounts. In such cases, unclaimed distributions held by the Plan Administrator will be retained by the Plan Administrator for distribution to other creditors. Any unclaimed distributions or any distributions that are returned as undeliverable and unclaimed pursuant to Plan Section 5.3.2.c will be delivered to the Committee Escrow free of any restrictions thereon. Nothing contained in the Plan will require a Debtor or the Plan Administrator to attempt to locate any holder of an Allowed Claim.

4. **Timing and Calculation of Amounts to be Distributed**

a. Distributions on Account of Allowed Claims in Class 1 and Class 2

Distributions to be made to holders of Allowed Claims classified in Class 1 or Class 2 under the Plan will be made within 30 days of such Claim becoming an Allowed Claim.

b. Distributions on Account of Allowed Claims in Class 3

Distributions to be made on account of Allowed Claims classified in Class 3 under the Plan will be deemed to have been made by the funding of the Litigation Escrow.

c. Distributions on Account of Allowed Claims in Class 4

Distributions to be made on account of Allowed Claims classified in Class 4 under the Plan will have been made on the Closing Date, or as soon as is reasonably practical.

d. Distributions on Account of Allowed Claims in Class 5

Distributions to be made on account of Allowed Claims classified in Class 5 under the Plan will be deemed to have been made by the funding of the Committee Escrow and with respect to D&O Proceeds and proceeds from Causes of Action, if any, as soon as is reasonably practical in accordance with the terms and conditions of the Settlement Agreement and Plan Exhibit E.

e. Distributions on Account of Allowed Claims in Class 6

Distributions to be made on account of Allowed Claims classified in Class 6 under the Plan, if any, will be made as soon as reasonably practical in accordance with the terms and conditions of the Settlement Agreement and Plan Exhibit E.

5. **Other Provisions Applicable to Distributions in All Classes**

a. Postpetition Interest

No interest will have accrued on any Claim that is not an Allowed Secured Claim that is oversecured on and after the Petition Date.

b.      Allocation of Distributions

All distributions to a holder of an Allowed Claim that has components of principal and interest will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such distributions, if any, will be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

6.      **Holders of Record**

Transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 for which a notice of transfer has been Filed on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date. No transfers Filed with the Bankruptcy Court after the Distribution Record Date shall be recognized by the Plan Administrator.

7.      **Means of Cash Payment**

Except as otherwise specified in the Plan, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the Debtors or the Plan Administrator, as applicable, by wire transfer, electronic funds or ACH from a domestic bank; *provided, however*, that Cash payments to foreign holders of Allowed Claims may be made, at the option of the Plan Administrator, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

8.      **Withholding Requirements**

a.      Withholding

In connection with the Plan, to the extent applicable, the Plan Administrator will comply with all applicable Tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to applicable withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Plan Administrator will be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding Taxes or establishing any other mechanisms the Plan Administrator believes are reasonable and appropriate, including requiring Claim holders to submit appropriate Tax and withholding certifications. To the extent any Claim holder fails to submit appropriate Tax and withholding certifications as required by the Plan Administrator, such Claim holder's distribution will be deemed undeliverable and subject to Plan Section 5.3.2.

b.      Distributions

Notwithstanding any other provision of the Plan, each entity receiving a distribution of Cash pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of the distribution, including income, withholding and other Tax obligations.

c.      Allocations

The Debtors and the Plan Administrator, as applicable, reserve the right to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances.

9.      **Setoffs**

Except with respect to claims of a Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, each Debtor (or the Plan Administrator on behalf of a Debtor) may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the applicable Debtor may hold against the holder of such Allowed Claim; *provided,*

*however*, that neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the applicable Debtor or the Plan Administrator of any claims, rights and causes of action that the Debtors may possess against a Claim Holder, which are expressly preserved under Plan Section 3.4.3.

### H.    Procedures for Resolving Disputed Claims

#### 1.    Treatment of Disputed Claims

##### a.    Tort Claims

Each Tort Claim will be resolved in accordance with Plan Section 3.4.2.

##### b.    Disputed Insured Claims

The resolution of Disputed Insured Claims, including Tort Claims, will be subject to the provisions of Plan Section 3.4.1 and 3.4.2.

##### c.    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever.

#### 2.    Prosecution of Objections to Claims

##### a.    Objections to Claims

All objections to Claims will be Filed and served on the holders of such Claims, and any amendment to the Schedules to reduce the scheduled Claim of such holder, will be made by the Debtors or the Plan Administrator by the Claims Objection Bar Date. If an objection has not been Filed to a Claim or an amendment has not been made to the Schedules with respect to a scheduled Claim by the Claims Objection Bar Date, the particular Claim will be treated as an Allowed Claim if such Claim has not been allowed earlier.

##### b.    Authority to Prosecute Objections

On or after the Effective Date, the Plan Administrator shall have the sole authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims.

##### c.    Authority to Amend Schedules

The Debtors or the Plan Administrator, as applicable, will have the authority to amend the Schedules with respect to any Claim, and to make distributions based on such amended Schedules without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors or the Plan Administrator will provide the holder of such Claim with notice of such amendment, and such holder will have 30 days to File an objection to such amendment with the Bankruptcy Court. Notwithstanding anything in Plan Section 6.2.3 or the Plan to the contrary, the Plan Administrator will have the authority to object to the amount of any Claim indicated on the Schedules if the Plan Administrator determines in good faith that the Claim is invalid or has previously been paid or satisfied.

##### d.    Request for Extension of Claims Objection Bar Date

Upon motion to the Bankruptcy Court, the Plan Administrator may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to a specific list of Claims. Any extension granted by the Bankruptcy Court will not be considered to be a Plan modification under section 1127 of the Bankruptcy Code.

### 3. Distributions on Account of Disputed Claims Once Allowed

Distributions on account of Disputed Claims that become Allowed Claims after the Effective Date will be made in accordance with Article V of the Plan.

## I. Consolidation of Certain Debtors

### 1. Limited Consolidation for Certain Purposes

Pursuant to the Confirmation Order, the Bankruptcy Court will approve the Debtors' election to treat the Estates as if they were consolidated. Accordingly, for purposes of implementing the Plan, pursuant to such order: (1) all Assets and Liabilities of the Debtors will be treated as if they are pooled; and (2) with respect to any guarantees by one Debtor of the obligations of any Debtor, and with respect to any joint or several liability of any Debtor, the holder of any Claims for such obligations will receive a single recovery on account of any such joint obligations of the Debtors, in each case except to the extent otherwise provided in the Plan.

Such election to treat the Estates as if they were consolidated solely for the purpose of implementing the Plan will not affect: (1) the legal and corporate structures of the Debtors; and (2) distributions from any insurance policies or proceeds of such policies. In addition, such election to treat the Estates as consolidated for the purpose of implementing the Plan will not constitute a wavier of the mutuality requirement for setoff under section 553 of the Bankruptcy Code, except to the extent otherwise expressly waived by the Debtors.

### 2. Order Granting Consolidation for Certain Purposes

The Plan serves as a motion seeking entry of an order consolidating the Debtors as described and to the limited extent set forth in Plan Section 7.1. Unless an objection to such consolidation is made in writing by any creditor affected by the Plan, Filed with the Bankruptcy Court and served on the parties listed on Plan Exhibit D on or before the date fixed by the Bankruptcy Court for objecting to Confirmation of the Plan, the consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto shall occur at or before the Confirmation Hearing.

In the event that the Bankruptcy Court does not approve the Debtors' election to treat the Estates as if they are consolidated, (1) the Plan will be treated as a separate plan of liquidation for each Debtor, and (2) the Debtors will not be required to re-solicit votes with respect to the Plan.

## J. Confirmation of the Plan

### 1. Conditions Precedent to Confirmation

The following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived pursuant to Plan Section 8.3:

    a. The Confirmation Order will be reasonably acceptable in form and substance to the Debtors and the Creditors' Committee.

    b. The Plan will not have been materially amended, altered or modified from the Plan as Filed, unless such material amendment, alteration or modification has been made in accordance with Plan Section 10.1.

    c. All Confirmation Exhibits to the Plan are in form and substance reasonably satisfactory to the Debtors.

### 2. Conditions Precedent to the Effective Date

The Effective Date will not occur, and the Plan will not be consummated, unless and until each of the following conditions have been satisfied or duly waived pursuant to Plan Section 8.3:

a.    The Bankruptcy Court will have entered the Confirmation Order, and the Confirmation Order will be a Final Order.

b.    No stay of the Confirmation Order will then be in effect.

c.    The Plan Administrator will have been appointed and will have accepted such appointment.

d.    The Plan and all Confirmation Exhibits to the Plan will not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section 10.1 of the Plan.

### 3.    Waiver of Conditions to Confirmation or Effective Date

The conditions to Confirmation and the conditions to the Effective Date may be waived in whole or in part at any time by the Debtors (after consultation with the Creditors' Committee) without an order of the Bankruptcy Court.

### 4.    Cramdown

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that has not accepted or is deemed not to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

### 5.    Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Plan Section 8.3, then upon motion by the Debtors made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; *provided*, *however*, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied or waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Plan Section 8.5: (1) the Plan will be null and void in all respects, including with respect to the releases described in Plan Section 8.6.2; and (2) nothing contained in the Plan will (a) constitute a waiver or release of any Claims by or against any Debtor or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

### 6.    Effect of Confirmation of the Plan

a.    Discharge of Claims and Termination of Interests

Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against the Debtors; *provided, however,* that no holder of a Claim against the Debtors may, on account of such Claim, seek or receive any payment or other distribution from, or seek recourse against, the Debtors, the Plan Administrator or property of the Estates, except as expressly provided in the Plan.

b.    Releases

Each and every entity receiving a distribution pursuant to the Plan on account of its Allowed Claim will be deemed to forever release and waive all claims, demands, debts, rights, causes of action, and liabilities in connection with or related to any of the Debtors, the Chapter 11 Cases, or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, that are based in whole or in part on any act, omission, or other occurrence taking place on or prior to the Effective Date, against the Debtors, their current senior management, and current and former members of the Creditors' Committee (in their capacity as members thereof), to the fullest extent permitted under applicable law. Notwithstanding anything in the Plan or in the releases described above to the contrary, nothing in the Plan will be construed to release, and the Debtors do not release, any rights of the respective Debtors: (a) to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder; (b) to

litigate Disputed Claims, including without limitation to make any claim, or demand or allege and prosecute any cause of action against any holder of any Disputed Claims; and (c) to litigate claims and causes of action not specifically released herein, including claims and causes of action contained in any adversary complaint, including but not limited to the Declaratory Action, as may be filed by the Debtors or the Creditors' Committee during the pendency of the Chapter 11 Cases that has not been withdrawn or dismissed prior to the Confirmation Date.

### c. Injunction

Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, currently hold, or may hold a Claim or other debt or liability against the Debtors or an Interest or other right of an equity security holder are permanently enjoined from taking any of the following actions on account of any such Claims, debts, or liabilities, Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Released Parties or their property; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Released Parties or their property; (c) creating, perfecting, or enforcing any lien or encumbrance against the Released Parties or their property; (d) asserting a right of subordination of any kind against any debt, liability, or obligation due to the Released Parties or their property; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

### d. Exculpation

Subject to the occurrence of the Effective Date, none of the Exculpated Parties will have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases and the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan; *provided, that* the Exculpated Parties will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; *provided, further,* that nothing in the Plan will, or will be deemed to, release the Exculpated Parties, or exculpate the Exculpated Parties with respect to, their respective obligations or covenants arising pursuant to the Plan.

### 7. Request for Waiver of Stay of Confirmation Order

The Plan will serve as a motion seeking a waiver of the stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to the request for waiver should be Filed with the Bankruptcy Court and served on the parties listed on Plan Exhibit D on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

### K. Summary of Other Provisions of the Plan

The following paragraphs summarize certain other significant provisions of the Plan. The Plan should be referred to for the complete text of these and other provisions of the Plan.

### 1. Modification of the Plan

Subject to the restrictions on alteration, amendment and modification set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before the Effective Date.

### 2. Revocation of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (1) constitute a waiver or release of any Claims by or against any Debtor; (2) prejudice in any manner the rights of the Debtors, any Debtor or any other party in interest; or (3) constitute an admission of any sort by the Debtors, any Debtor or any other party in interest.

### 3. Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 4. Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee and any other official committees appointed in the Chapter 11 Cases will dissolve, and the members of the Creditors' Committee and their respective Professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases. The Professionals retained by the Creditors' Committee and the respective members thereof will not be entitled to assert any Fee Claim against the Debtors or their Estates for any services rendered or expenses incurred after the Effective Date in their capacity as professionals for the Creditors' Committee, except to the extent necessary to File, prepare and defend any fee application.

### 5. Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

## VIII. RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

A. Allow, disallow, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims;

B. Resolve any issues arising under the Asset Purchase Agreement or the Sale Order;

C. Either grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

D. Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

E. Ensure that distributions on account of Allowed Claims are accomplished pursuant to the provisions of the Plan;

F. Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and either grant or deny any applications involving any Debtor that may be pending on the Effective Date or brought thereafter;

G. Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Litigation Escrow Agreement, the Committee Escrow Agreement, this Disclosure Statement or the Confirmation Order;

H. Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Committee Escrow Agreement or any contract,

instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan, the Litigation Escrow Agreement, the Committee Escrow Agreement or any entity's rights arising from or obligations incurred in connection with the Plan, the Litigation Escrow Agreement, the Committee Escrow Agreement or other such documents;

I.        Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify this Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, this Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, this Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

J.        Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

K.        Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

L.        Determine any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, this Disclosure Statement or the Confirmation Order;

M.        Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

N.        Enter a final decree or decrees closing the Chapter 11 Cases;

O.        Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

P.        Hear all matters arising out of the consummation of the Sale;

Q.        Recover all assets of the Debtors and their Estates, wherever located; and

R.        Hear any other matter not inconsistent with the Bankruptcy Code.

## IX.        RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS INFORMATION, HOWEVER, SHOULD NOT BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND/OR ITS IMPLEMENTATION.

### A.        Failure to Satisfy Vote Requirement

If the Debtors obtain the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Debtors intend, as promptly as practicable thereafter, to seek confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may be forced to pursue an alternative liquidation plan or to convert the cases to a chapter 7 liquidation.

Pursuant to section 1126(c) of the Bankruptcy Code, impaired Classes of Claims are entitled to vote on the Plan.  An impaired Class will be determined to have accepted the Plan if at least two-thirds in amount and more than one-half in number of Allowed Claims (that actually vote) vote in favor of the Plan.  If such thresholds are not met, the Debtors will not be able to confirm the Plan as it is currently structured.  If the Plan is not accepted by an

10-61078-rk    Doc 592    FILED 06/27/11    ENTERED 06/27/11 19:27:12    Page 30 of 37

impaired Class, the Debtors have the right to modify the Plan to make it acceptable to a sufficient number and amount of holders of such Claims.

## B. Non-Confirmation or Delay of Confirmation of the Plan

The Bankruptcy Court, which sits as a court of equity, exercises substantial discretion. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of the Plan not be followed by a need for further financial reorganization and that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. In this case, substantially all of Debtors' assets were sold to the Purchaser, and therefore any of the remaining Sale Proceeds will be distributed through the Plan Administrators to the extent not previously distributed.

## C. Non-Consensual Confirmation

In the event any impaired Class of Claims does not accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class of claims has accepted the plan (with such acceptances being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan of liquidation "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. These requirements must be satisfied with respect to Classes 4, 5, 6, 7 and 8. The Debtors believe that the Plan satisfies these requirements.

## D. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether it will occur.

## E. Classification and Treatment of Claims

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim in a particular Class only if such Claim is substantially similar to the other Claims of such Class. The Debtors believe that all Claims have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors presently anticipate that they would seek (i) to modify the Plan to provide for whatever classification might be required for confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtors believe that under the Federal Rules of Bankruptcy Procedure the Debtors would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the claim of any creditor.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim of a particular Class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Debtors believe that they have complied with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

X.      **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**SUBSTANTIAL UNCERTAINTY EXISTS WITH RESPECT TO MANY OF THE TAX ISSUES DISCUSSED BELOW. THEREFORE, EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, AND OTHER TAX CONSEQUENCES OF THE PLAN. NO RULINGS HAVE BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.**

The discussion below summarizes certain anticipated U.S. Federal income tax consequences of the Plan to the Debtors and certain holders of Claims. This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. Federal income tax consequences described below.

This summary does not address all aspects of U.S. Federal income taxation that may be relevant to a particular holder of a Claim in light of its particular facts and circumstances or to certain types of holders of Claims subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding claims through a partnership or other pass-through entity, persons that have a "functional currency" other than the U.S. dollar, and persons who have acquired an equity interest or a security in a Debtor in connection with the performance of services). In addition, this summary does not discuss any aspects of state, local, or non-U.S. taxation.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution or transfer under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. Federal income tax consequences of the Plan and the transactions contemplated thereby. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below. No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto.

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.      **U.S. Federal Income Tax Consequences to the Debtors**

Due to their status as non-profit corporations and therefore exempt from federal income tax pursuant to Section 501 of the Tax Code, the Debtors do not expect that the Plan will result in any significant federal income tax consequences to the Debtors.

B.      **U.S. Federal Income Tax Consequences to Holders of Claims**

The U.S. Federal income tax consequences to holders of Claims arising from the distributions to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other things: (a) the type of consideration received by the holder of a Claim in exchange for the Claim; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless security deduction in respect of its Claim against the corporation; (d) whether such Claim constitutes a security; (e) whether the holder of a Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. Federal income tax on a net income

basis; (f) whether the holder of a Claim reports income on the accrual or cash basis; and (g) whether the holder of a Claim receives distributions under the Plan in more than one taxable year. For tax purposes, the modification of a Claim may represent an exchange of the Claim for a new Claim, even though no actual transfer takes place. In addition, where gain or loss is recognized by a holder of a Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long the Claim has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt or worthless stock or securities deduction with respect to the underlying Claim. A holder who purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

### 1. General Treatment of Holders of Claims

Pursuant to the Plan, the Debtors will transfer assets of the Debtors, either directly or indirectly, to holders of Allowed Claims in satisfaction and discharge of such Claims. Holders of such Claims will likely recognize gain or loss equal to the amount realized under the Plan in respect of their Claims less their respective tax bases in their Claims. The amount realized for this purpose will generally equal the sum of the cash and the fair market value of any other consideration received under the Plan in respect of their Claims. Any gain or loss recognized in the exchange will be capital or ordinary depending on the status of the Claim in the holder's hands.

To the extent that cash received or deemed received by a holder of a Claim is attributable to accrued interest on the Claim, the cash will be deemed made in payment of such interest. The federal income tax laws are unclear on how much consideration will be deemed attributable to accrued interest when partial payments are made on a debt on which both principal and interest are owed. To the extent that the holder of a Claim has not yet included the accrued interest in gross income, the cash deemed received in payment of such interest will generally be included in the holder's gross income for federal income tax purposes. To the extent the holder has previously included accrued interest on the Claim in gross income, the cash deemed received in payment of such interest generally will not be included in gross income. The holder of an Allowed Claim may be able to claim a deductible loss if the cash deemed received for the accrued interest is less than the amount the holder had previously included in gross income.

### 2. Bad Debt Deduction

The holder of an Allowed Claim who under the Plan will receive in respect of a Claim an amount less than the holder's tax basis in such Claim may be entitled to a bad debt deduction in some amount under section 166(a) of the Tax Code. The rules regarding the ability of a taxpayer, who believes that a debt owed to it will not be collected in full, to take a deduction related to such debt's partial or total worthlessness are very complex, as are rules relating to whether such deduction, if allowed, is a capital or ordinary loss. Moreover, the application and impact of such rules vary greatly depending upon a taxpayer's individual circumstances, including the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Claims are therefore urged to consult their tax advisors with respect to their ability to take such deduction.

### C. Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting to the IRS. Moreover, under certain circumstances, holders of Claims may be subject to "backup withholding" with respect to payments made pursuant to the Plan, unless such holder either (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct and the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder of a Claim's U.S. Federal income tax liability, and such holder may obtain a refund of

any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. Federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. Federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Each holder of a Claim is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on such taxpayer's tax returns.

### D. Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN POTENTIAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES COMPLEX, UNCLEAR AND UNCERTAIN AND MAY VARY DEPENDING ON A NUMBER OF DIFFERENT FACTORS, INCLUDING A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIMHOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## XI.   FEASIBILITY OF THE PLAN AND BEST INTEREST OF CREDITORS

### A. Feasibility of the Plan

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of a plan is not likely to be followed by further liquidation or financial reorganization of the debtors. The Plan contemplates that the Debtors will liquidate their remaining assets and will distribute all proceeds pursuant to further Bankruptcy Court order. As a result, the Plan satisfies section 1129(a)(ii).

### B. Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds (2/3) in dollar amount and more than one half (½) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. For example, Class 6 General Unsecured Creditors votes to accept the Plan only if two thirds (2/3) in amount and a majority in number actually voting in such Class cast their Ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

### C. Best Interests Test

Even if a plan is accepted by the holders of each class of claims, the Bankruptcy Code requires a Bankruptcy Court to determine that the plan is in the best interests of all holders of claims that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a Bankruptcy Court to find either that all members of an impaired class of claims have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

### D. Application of the 'Best Interests' of Creditors Test to the Liquidation Analyses and the Valuation

In this case, the Debtors' sold substantially all of their assets, with the remaining assets to be liquidated and distributed. A liquidation under chapter 7 would accomplish the same result but with the additional cost of filing and proceeding with a chapter 7 case.

Under the Plan, holders of Claims in Impaired Classes will receive the following distributions: Class 4 are expected to receive distributions totaling approximately 25.57% of their Allowed Claims; Class 5 are expected to receive distributions totaling approximately 0-3.28% of their Allowed Claims; Class 6 are expected to receive distributions totaling approximately 0% of their Allowed Claims; and Classes 7 and 8 are not entitled to receive distributions.

The recovery available in a chapter 7 liquidation would be substantially less because of the administrative costs. Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied because the Debtors believe that the members of each Impaired Class will receive greater or equal value under the Plan than they would in a chapter 7 liquidation. Although the Debtors believe that the Plan meets the "best interests test" of section 1129(a)(7) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will determine that the Plan meets this test.

### E. Confirmation Without Acceptance of All Impaired Classes: The 'Cramdown' Alternative

In view of a potential rejection of the Plan by certain Classes of Claims, the Debtors may have to seek confirmation of the Plan pursuant to the "cram down" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the debtors if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

The Debtors believe the Plan does not discriminate unfairly with respect to holders of Claims Classified in Class 4, Class 5, Class 6, Class 7 and Class 8.

A plan is fair and equitable as to a class of secured claims that rejects a plan if, among other things, the plan provides (a)(i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (ii) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

The Debtors believe that they will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to holders of Claims classified in Classes 4, 5, 6, 7 and 8. The Debtors understand, however, that the Plan may not be confirmable with respect to such Classes if any such Class does not vote in favor of the Plan.

## XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims the potential for the greatest recovery and, therefore, is in the best interests of such holders. If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include: (i) formulation of an alternative plan of liquidation or (ii) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

10-61078-rk    Doc 592    FILED 06/27/11    ENTERED 06/27/11 19:27:12    Page 35 of 37

# XIII. THE SOLICITATION; VOTING PROCEDURE

## A. Parties in Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim as it existed before the default.

In general, a holder of a claim may vote to accept or to reject a plan if (i) the claim is "allowed," which means generally that no party in interest has objected to such claim, and (ii) the claim is impaired by the plan. If, however, the holder of an impaired claim will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims do not actually vote on the plan. If a claim is not impaired by the plan, the Bankruptcy Code deems the holder of such claim to have accepted the plan and, accordingly, holders of such claims are not entitled to vote on the plan. Claims in Classes 1, 2, and 3 are Unimpaired under the Plan, and holders of such Claims are therefore not entitled to vote. Claims and Interests classified in Classes 7 and 8 will not receive or retain any distribution under the Plan, and are therefore deemed to have voted to reject the Plan. Accordingly, only Holders of Claims in Classes 4, 5 and 6 are entitled to vote on the Plan.

## B. Voting Procedures

Detailed Voting Procedures are set forth in Appendix C of this Disclosure Statement and in the motion to approve this Disclosure Statement.

## C. Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtors in their sole discretion, which determination will be final and binding. The Debtors reserve the absolute right to contest the validity of any withdrawal. The Debtors also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## D. Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Debtors at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by the Debtors in a timely manner at the address set forth below. The Debtors will determine whether any withdrawals of Ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots which is not received in a timely manner by the Debtors will not be effective to withdraw a previously cast Ballot.

Any party who has previously submitted to the Debtors prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change his or its vote by submitting to the Debtors prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan.  In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date of receipt by the Debtors will be counted for purposes of determining whether the Requisite Acceptances have been received.

### E.        Further Information; Additional Copies

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact McDonald Hopkins LLC:

Bucyrus Community Hospital
MCDONALD HOPKINS LLC
Attention: DeBorah Barrow
600 Superior Avenue East, Suite 2100
Cleveland, OH  44114
Telephone:  (216) 348-5400

## XIV.    CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will result in the greatest recoveries to holders of Claims.  Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.

Consequently, the Debtors urge all holders of Claims to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received by McDonald Hopkins LLC or before 4:00 p.m., Eastern Time, on _____, 2011.

June 27, 2011                                              Respectfully submitted,

                                                         BUCYRUS COMMUNITY HOSPITAL, INC.
                                                         (for itself and on behalf of the Affiliated Debtor)


                                                         By:       /s/ Jerome L. Meyer_____
                                                                   Name:  Jerome L. Meyer
                                                                   Title:  Financial Transition Officer

                                                         Counsel:

                                                         McDONALD HOPKINS LLC

                                                         SHAWN M. RILEY  (0037235)
                                                         PAUL W. LINEHAN  (0070116)
                                                         MELISSA S. GIBERSON  (0082413)
                                                         600 Superior Avenue, East, Suite 2100
                                                         Cleveland, OH  44114-2653
                                                         Telephone:  (216) 348-5400
                                                         Facsimile:  (216) 348-5474
                                                         Email:    sriley@mcdonaldhopkins.com
                                                                   plinehan@mcdonaldhopkins.com
                                                                   mgiberson@mcdonaldhopkins.com

                                                         Counsel to the Debtors and Debtors in Possession